IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IRENE RODRIGUEZ, et al. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 3:20-CV-0045-D |
| VS. | § | |
| | § | |
| SOUTHERN HEALTH PARTNERS, | § | |
| INC., et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

Plaintiff Irene Rodriguez ("Rodriguez") brings this lawsuit on behalf of herself and as parent and legal guardian of her prematurely-born twins, A.R. and B.R.,[1] alleging that defendants Navarro County, Southern Health Partners, Inc. ("SHP"), Grady Shaw, M.D. ("Dr. Shaw"), and Linda Hullett, R.N. ("Hullett") failed to provide proper prenatal care to Rodriguez while she was incarcerated as a pretrial detainee at the Navarro County Jail (the "Jail"). Rodriguez brings federal-law claims under 42 U.S.C. § 1983 and a state-law negligence claim. In two motions, Navarro County, and SHP, Dr. Shaw, and Hullett (collectively, the "SHP Defendants") move to dismiss under Fed. R. Civ. P. 12(b)(6). For the reasons that follow, the court grants the motions to dismiss Rodriguez's claims under § 1983, declines to reach her state-law negligence claim, and grants Rodriguez leave to

---

[1]Fed. R. Civ. P. 5.2(a)(3) provides that, "[u]nless the court orders otherwise, in an electronic or paper filing with the court that contains . . . the name of an individual known to be a minor . . . a party or nonparty making the filing may include only . . . the minor's initials."

repleas.

I

Rodriguez sues defendants Navarro County, SHP (a private company that contracted with Navarro County to provide medical care at the Jail), and Dr. Shaw and Hullett (two SHP employees), alleging that while Rodriguez was a pretrial detainee at the Jail, SHP and its staff ignored her requests for prenatal care and the obvious signs that she was having problems with her pregnancy. In support of her claims, Rodriguez alleges the following facts.[2]

On December 22, 2017, when she was approximately 25 to 26 weeks pregnant with twins, Rodriguez was arrested and detained at the Jail. At the time of her arrest, Rodriguez informed Jail personnel that she was pregnant with twins. Rodriguez also informed Jail personnel that she had a previously-scheduled doctor appointment on December 28, 2017, but her request to keep this appointment was denied.

Six days after her arrest, on December 28, 2017, Rodriguez notified Jail personnel that she was beginning to show signs of premature labor,[3] and she asked to be taken to a local hospital. Her request was denied. The following day, Rodriguez was seen at the Jail by Dr. Shaw. Dr. Shaw measured Rodriguez's stomach, but he did not otherwise examine her even

---

[2]In deciding defendants' Rule 12(b)(6) motions, the court construes Rodriguez's amended complaint in the light most favorable to her, accepts all well-pleaded factual allegations, and draws all reasonable inferences in her favor. *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).

[3]Rodriguez notified Jail staff in writing that she had lost her mucus plug, which she maintains usually signals that childbirth is imminent.

though he allegedly knew that Rodriguez had reported signs of premature labor.

Over the next two weeks, Rodriguez continued to discharge fluid and became increasingly concerned about her pregnancy and the likelihood of premature labor. She repeatedly notified Jail staff in writing that she was concerned about her pregnancy and that she expected the babies to be born at any time, but neither the Jail nor its medical personnel took any action to address Rodriguez's concerns.

On January 5 or 6, 2018 Rodriguez reported to Hullett that she was having contractions. Hullett examined Rodriguez and confirmed that Rodriguez was, in fact, having contractions at regular intervals, approximately three minutes apart. Although contractions of this nature are a strong indicator of impending childbirth, Hullett did not permit Rodriguez to see a doctor or go to the hospital. She instead sent Rodriguez back to her jail cell.

On January 9, 2018, at approximately 3:00 a.m., Rodriguez notified the guards on duty that her contractions had become strong and that she needed urgent medical attention. Because no medical staff or Jail personnel with medical training were present at the Jail, the guards on duty called Hullett. Hullett determined that even though Rodriguez's contractions were timed at approximately one minute apart, Rodriguez did not need to be transported to a hospital immediately and could instead be kept under observation at the Jail.

Just after 5:00 a.m., Rodriguez began to give birth to A.R., the first of her twins. Having determined that Rodriguez now required hospitalization, the Jail staff on duty called Emergency Medical Services ("EMS"). Before EMS arrived, however, A.R. was born and stopped breathing. A correctional officer attempted to find a nasal aspirator to clear the

- 3 -

mucus out of A.R.'s airway, but he was unable to find one.  EMS eventually arrived and cleared A.R.'s airway, but this was after critical minutes had been lost.  Because A.R. required emergency treatment, a second ambulance had to be dispatched to the Jail so that Rodriguez and A.R. could both be transported to the hospital.  Rodriguez's second twin, B.R., was delivered in her jail cell at 5:50 a.m.  Rodriguez and her newborn twins were then transported to Navarro Regional Hospital.  Later that same day, Rodriguez and the twins were transported to Baylor Scott & White Medical Center in Dallas where it was noted in Rodriguez's medical records that her pregnancy was complicated by "late limited prenatal care."  Am. Compl. ¶ 36.  A.R. and B.R. were later diagnosed with cerebral palsy, renal failure, respiratory failure, and numerous other serious short-and long-term health issues. Rodriguez alleges that defendants' failure to provide proper prenatal care, including access to a hospital and/or physician when they knew it was very likely that Rodriguez was at a heightened risk of going into premature labor, caused the serious harms to A.R. and B.R.

Rodriguez later filed the instant lawsuit against Navarro County, SHP, Dr. Shaw, and Hullett.  In her amended complaint she alleges claims under § 1983 for unlawful conditions of confinement against Navarro County and SHP and for deliberate indifference against Dr. Shaw and Hullett.  Rodriguez also alleges a Texas-law claim for negligence against all defendants.  Navarro County and the SHP Defendants move to dismiss the amended complaint under Rule 12(b)(6).  Rodriguez opposes both motions.

II

Under Rule 12(b)(6), the court evaluates the pleadings by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).  To survive a motion to dismiss, Rodriguez must allege enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U. S. 544, 570 ( 2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level [.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)).  Furthermore, under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" it demands more than "'labels and conclusions.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  And "a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U. S. at 555).

- 5 -

III

The court considers together Navarro County's and the SHP Defendants' motions to dismiss Rodriguez's § 1983-based municipal liability claims against Navarro County and SHP.[4]

A

A municipality is a "person" subject to suit under § 1983 under certain circumstances. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978). Although a municipality cannot be held liable simply on a theory of *respondeat superior*, *id.* at 691, it can be held liable if a deprivation of a constitutional right is inflicted pursuant to an official policy or custom, *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). Municipal liability requires proof of three elements: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle v. City of Houston*, 613 F.3d 536, 541-42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

The first element requires that Rodriguez adequately plead an official policy or custom. "[A] policy can be shown through evidence of an actual policy, regulation, or

---

[4]Although SHP is a private corporation, "[t]he standards applicable to determining liability under § 1983 against a municipal corporation are applicable to determining the liability of a private corporation performing a government function." *Olivas v. Corr. Corp. of Am.*, 408 F.Supp.2d 251, 254-55 (N.D. Tex. 2006) (Bleil, J.), *aff'd*, 215 Fed. Appx. 332 (5th Cir. 2007).

decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Id*. at 542 (citing *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003)). Although a "single decision by a [policymaker] may, under certain circumstances, constitute a policy for which a municipality may be liable[,] . . . this 'single incident exception' is extremely narrow and gives rise to municipal liability only if the municipal actor is the final policymaker." *Id*. (citations, brackets, and some internal quotation marks omitted). A custom is "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam)).

To satisfy the second element, Rodriguez must adequately plead the identity of a policymaker with "final policymaking authority." *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). "A 'policymaker' must be one who takes the place of a governing body in a designated area of city administration." *Webster*, 735 F.2d at 841 (citing *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984) (en banc)). "City policymakers not only govern conduct; they decide the goals for a particular city function and devise the means of achieving those goals. . . . [T]hey are not supervised except as to the totality of their performance." *Bennett*, 728 F.2d at 769. "[The court's] analysis must also take into account the difference between final decisionmaking authority and final policymaking authority, a distinction that this circuit

- 7 -

recognized as fundamental[.] . . . [D]iscretion to exercise a particular function does not necessarily entail final policymaking authority over that function." *Bolton v. City of Dallas*, 541 F.3d 545, 548-49 (5th Cir. 2008) (per curiam) (citations omitted); *see also Jett v. Dall. Indep. Sch. Dist.*, 7 F.3d 1241, 1247 (5th Cir. 1993) (explaining distinction between final policymaking authority and mere decisionmaking).

The third element requires that Rodriguez adequately plead that the municipal policy or custom was the "moving force" of the constitutional deprivation, which requires a "high threshold of proof." *Piotrowski*, 237 F.3d at 580 (citing *Monell*, 436 U.S. at 694). The "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Valle*, 613 F.3d at 542 (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). Rodriguez therefore "must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* (quoting *Brown*, 520 U.S. at 411); *see also Piotrowski*, 237 F.3d at 579 ("[E]ven a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." (quoting *Brown*, 520 U.S. at 407)). Simple or even heightened negligence, however, is insufficient to meet the deliberate indifference requirement. *Piotrowski*, 237 F.3d at 579 (quoting *Brown*, 520 U.S. at 407).

B

Navarro County moves to dismiss Rodriguez's § 1983-based municipal liability claims on the grounds that Rodriguez has failed to demonstrate the existence of an official policy that was actually adopted by the Sheriff or the Commissioners Court; has failed to plausibly allege an unwritten policy specifically adopted by a policymaker with facts showing deliberate indifference; and has failed to allege and prove an underlying constitutional violation and that the constitutional deprivation was caused by an official Navarro County policy, custom, or practice.   The SHP Defendants move to dismiss Rodriguez's § 1983-based municipal liability claims against SHP on the grounds, *inter alia*, that Rodriguez has failed to plead a governmental policy or custom and "has failed to set forth SHP . . . as [an] official policy maker[] for the jail."[5]  SHP Ds. Br. at 8.

Rodriguez responds that she has sufficiently pleaded all three requirements for municipal liability based on three alleged policies "that worked in unison to cause the twins' premature birth and resulting maladies."  Ps. Br. at 8.  First, she contends that Navarro County and SHP had a policy of not having any medical staff on site for approximately nine hours of every day.  Second, she posits that Navarro County and SHP had a policy of not providing any training to Jail staff regarding the recognition of medical emergencies or how

_____

[5]The SHP Defendants also contend that Hullett and Dr. Shaw are not official policymakers for the Jail.  But Rodriguez does not attempt to base § 1983 municipal liability against SHP on the ground that Hullett or Dr. Shaw is a policymaker of SHP.  Accordingly, the court will not address the SHP Defendants' policymaker arguments with respect to Hullett or Dr. Shaw.

to properly respond to them.  Third, Rodriguez maintains that Navarro County had a policy of not allowing inmates to seek treatment from a hospital or specialist, even when medical staff knew it was necessary and that the inmate was likely to suffer an emergency when there was no staff on site trained to recognize or treat it.  Rodriguez further contends that, to the extent the decision not to train non-medical staff to recognize or respond to emergencies is only attributable to Navarro County, "SHP was still certainly aware of this reality, which should have informed its policymaking decisions as to maintaining sufficient coverage at the Jail with medical personnel, as well as allowing inmates to seek outside treatment to minimize the risk of emergencies occurring at the Jail." *Id.*

IV

A

The court begins with Rodriguez's contention that SHP and Navarro County had a policy of not allowing inmates to seek treatment from a hospital or specialist, even when medical staff knew it was necessary and that the inmate was likely to suffer an emergency when there was no staff on site trained to recognize or treat it.

"Municipal liability for section 1983 violations results if a deprivation of constitutional rights was inflicted pursuant to official custom or policy." *Pogue v. City of Dallas*, 2014 WL 3844675, at *3 (N.D. Tex. Aug. 4, 2014) (Boyle, J.) (quoting *Piotrowski*, 237 F.3d at 579).  A plaintiff's allegations regarding the policy or custom cannot be conclusory, and they must contain specific facts showing the existence of such a custom. *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (citing *Fraire v.*

- 10 -

*City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992)).  "A single incident unaccompanied by supporting history will likely be an inadequate basis for inferring such a custom or usage unless the actor or actors involved had been given official policy-making authority." *Renfro v. City of Kaufman*, 27 F.Supp.2d 715, 717 (N.D. Tex. 1998) (Fish, J.) (citing *Worsham v. City of Pasadena*, 881 F.2d 1336, 1339-40 (5th Cir. 1989)).  And "[b]oiler plate allegations of municipal policy, entirely lacking in any factual support that a municipal policy does exist, are insufficient." *Crow v. Cash Special Util. Dist.*, 2005 WL 1126826, at *2 (N.D. Tex. May 11, 2005) (Sanders, J.) (quoting *Baxter v. Vigo Cty. Sch. Corp.*, 26 F.3d 728, 736 (7th Cir. 1994)).

Rodriguez alleges in her amended complaint that "it was Navarro County and SHP policy at the Jail to refuse to send anyone to the hospital unless there was a manifest emergency—in other words, when the damage was already done," Am. Compl. ¶ 57, and that "inmates with serious medical conditions that require more than limited nursing care are not allowed to seek more advanced care at a hospital to prevent dangerous medical events before they happen," *id.* ¶ 58.  But these conclusory allegations are insufficient to support a reasonable inference that either SHP or Navarro County actually had an official policy or custom of not allowing inmates to seek hospital treatment unless there was a medical emergency.

Rodriguez does not allege that SHP or Navarro County had any official policy that dictated when Jail inmates were permitted to go to the hospital.  *Valle*, 613 F.3d at 542.  Nor does she allege a custom in this regard.  Even assuming that all of the facts in the amended

- 11 -

complaint are true, Rodriguez has only alleged that *she* was not permitted to go to the hospital despite her repeated requests.  *See* Am. Compl. ¶¶ 16-17, 19-20, 25, 27, 28, 29.  She does not allege that there was any other instance in which an inmate was denied hospital treatment when it was medically necessary or that her requests to be taken to the hospital were refused by someone with official policymaking authority.  *Renfro*, 27 F.Supp.2d at 717. The court is therefore unable to draw the reasonable inference that there was a widespread practice that was so common and well-settled as to constitute a custom that fairly represented municipal policy.  "A mere allegation that a custom or policy exists, without any factual assertions to support such a claim, is no more than a formulaic recitation of the elements of a § 1983 claim and is insufficient to state a claim for relief."  *Pinedo v. City of Dallas, Tex.*, 2015 WL 221085, at *6 (N.D. Tex. Jan. 15, 2015) (Fitzwater, J.).

B

Rodriguez also maintains that Navarro County had a policy of not providing training to any other jail staff regarding the recognition of medical emergencies or how to respond properly.  She alleges in her amended complaint that

> there was no one else present on staff who was trained to recognize serious medical needs that required emergency care. In fact, non-medical correctional staff had no medical or emergency training whatsoever.  In a system in which an inmate will not receive any care unless the need for it is recognized, it[]is a complete failure of that system to have substantial periods of time during which no staff member present has the training or ability to recognize that need.

Am. Compl. ¶ 52; *see also id.* ¶ 54 ("In particular, there is an approximately 9-hour gap every

night during which there is not a single person at the jail who is professional[ly] trained to provide any kind of medical care or even be able to recognize an urgent need for medical attention.").

To the extent Rodriguez bases her § 1983 claim on Navarro County's failure to staff the Jail at all times with correctional staff who had medical or emergency training, Rodriguez has failed to plausibly allege a policy or custom.[6]  Rodriguez has not alleged that Navarro County had an actual policy, regulation, or officially-adopted decision regarding the medical or emergency training of non-medical correctional staff.  *See Valle*, 613 F.3d at 542.  Nor has she alleged, other than in conclusory terms, that the Jail's failure to have on duty non-medical staff with medical or emergency training was more than an isolated occurrence.  *See Renfro*, 27 F.Supp.2d at 717.  Rodriguez asserts that the guards on duty the night she went into labor were not adequately trained in how to respond to a medical emergency.  *See, e.g.,* Am. Compl. ¶ 27 (alleging that at the time she went into labor, "[n]o jail staff who was physically

---

[6]It is unclear whether Rodriguez intends to plead a failure to train claim, which is a separate theory of municipal liability.  *See Arevalo v. City of Farmers Branch, Tex.*, 2017 WL 1153230, at *11 (N.D. Tex. Mar. 28, 2017) (Fitzwater, J.) (citing *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010)).  To plead a plausible failure to train claim, Rodriguez must allege facts that enable the court to draw the reasonable inference that "(1) the training procedures were inadequate; (2) the city's policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused [Rodriguez's] injury."  *Id.* (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011).  Because the amended complaint contains no allegations regarding the training procedures for non-medical Jail personnel or any Navarro County policymaker who was deliberately indifferent in adopting the Jail's training policy, and relies only on the conclusory assertion that "non-medical correctional staff had no medical emergency training whatsoever," Am. Compl. ¶ 52, the court will assume that Rodriguez does not intend to plead a separate failure to train claim.

present had any medical training at all.").  But she does not plausibly allege any other instance in which the Jail operated without any staff on duty who were trained in responding to a medical emergency.  The court is therefore unable to draw the reasonable inference that there was a widespread practice that was so common and well-settled as to constitute a custom that fairly represented municipal policy.

C

Finally, Rodriguez alleges that Navarro County and SHP had an official policy of not having any medical staff on site at all for approximately nine hours out of every day.

1

Rodriguez alleges in her amended complaint that Navarro County contracted with SHP to provide all of the medical care at the Jail; that the contract specified exactly how many and what kind of medical staff were to be employed at the Jail, and at what times; that the Sheriff and/or the Commissioners Court[7] approved the contract; and that between approximately 10:00 p.m. and 7:00 a.m., no medical staff was present at the Jail.  Am. Compl. ¶¶ 47-49, 51.  These allegations are sufficient to plausibly allege an official policy

---

[7]Rodriguez alleges in the alternative that the Commissioners Court may be the policymaker with respect to Jail policy.  *See* Am. Compl. ¶ 73 ("Navarro County's policymaker with authority over the Jail is its Sheriff, or alternatively, the Commissioners Court.").  "However, in Texas, '[t]he sheriff is without question the county's final policymaker in the area of law enforcement.'"  *Jackson v. Ford*, 544 Fed. Appx. 268, 272 (5th Cir. 2013) (per curiam) (quoting *Colle v. Brazos County, Tex.*, 981 F.2d 237, 244 (5th Cir. 1993); Tex. Loc. Gov't Code Ann. § 351.041 (West 2011)); *see also Feliz v. El Paso County*, ___ F.Supp.3d ___, 2020 WL 1081612, at *9 (W.D. Tex. Feb. 27, 2020) ("Texas law is clear that a sheriff is a county's 'final policymaker in the area of law enforcement,' including county jails." (citations omitted)).

of which a policymaker can be charged with actual or constructive knowledge. *Valle*, 613 F.3d at 541-42. The allegations of the amended complaint permit the court to draw the reasonable inference that Navarro County had an official policy, as reflected in its contract with SHP, that medical staff would not be present at the Jail between the hours of 10:00 p.m. and 7:00 a.m. And by alleging that the Sheriff and/or the Commissioners Court approved the contract with SHP, Rodriguez has adequately pleaded a policymaker[8]—i.e., the Navarro County Sheriff—who had actual or constructive knowledge of the policy. Accordingly, to the extent Rodriguez bases her § 1983 claim against Navarro County on the alleged policy that no medical staff would be present at the Jail between the hours of 10:00 p.m. and 7:00 a.m., she has satisfied the first two elements of municipal liability under *Monell*.

2

Before turning to the third *Monell* element, the court addresses the SHP Defendants' contention that Rodriguez "has failed to set forth SHP . . . as [an] official policy maker[] for the jail." SHP Ds. Br. at 8.

Whether a city official or, in this case, a private entity, is a final policymaker is a question of state and local law. *Praprotnik*, 485 U.S. at 124. As the court has noted, "a

---

[8]In its motion to dismiss, Navarro County does not dispute that the Sheriff and/or Commissioners Court has final policymaking authority with respect to the provision of medical care at the Jail. It argues only that Rodriguez has failed to allege that the official policies were *actually adopted* by the Sheriff or Commissioners Court. But as explained above, Rodriguez has adequately alleged that the policy of not having medical staff at the Jail between the hours of 10:00 p.m. and 7:00 a.m. was adopted by the Navarro County Sheriff approving the contract with SHP.

- 15 -

policymaker is one who takes the place of the governing body in a designated area of city administration," *Pinedo*, 2015 WL 221085, at *4 (citing *Webster*, 735 F.2d at 841); governs not only conduct, but decides the goals for a particular city function, and devises the means of achieving those goals, *Webster*, 735 F.2d at 841; *Bennett*, 728 F.2d at 769; and is not supervised except as to the totality of his performance, *Webster*, 735 F.2d at 841; *Bennett*, 728 F.2d at 769.  In the context of § 1983 claims, courts must be sensitive to the distinction between decisionmakers and final policymakers.

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986) (internal citations omitted); *see also Jett*, 7 F.3d at 1246 ("In *Pembaur* and *Praprotnik* the Court carefully distinguished between those having mere *decisionmaking* authority and those having *policymaking* authority.").

Policymaking authority requires more than a showing of mere discretion or decisionmaking authority on the part of the official.  *Webster*, 735 F.2d at 841.  If the governing body chooses to delegate policymaking authority to a city official, it does so in either of two ways.  *Bennett*, 728 F.2d at 769.  It can delegate policymaking power by an express statement, job description, or other formal action.  *Id*.; *Swann v. City of Dallas*, 922

F. Supp. 1184, 1204 (N.D. Tex. 1996) (Boyle, J.), *aff'd*, 131 F.3d 140 (5th Cir. 1997) (unpublished table decision).  Or, by its conduct or practice, it may encourage or acknowledge the agent in a policymaking role.  *Bennett*, 728 F.2d at 769.  In essence, the governing body must expressly or impliedly acknowledge that the agent acts in lieu of the governing body to set goals and to structure and design the area of the delegated responsibility, subject only to the power of the governing body to control finances and to discharge or curtail the authority of the agent.  *Webster*, 735 F.2d at 841.  Whether an official has been delegated final policymaking authority is a question of law for the judge, not a question of fact for the jury.  *See Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

3

Rodriguez has plausibly alleged that the Jail had an official policy that no medical staff would be present between the hours of 10:00 p.m. and 7:00 a.m.  But she does not plausibly allege that this was *SHP*'s policy (as opposed to *Navarro County's* policy), or that SHP had final policymaking authority with respect to the hours medical staff would be present at the Jail.

In her amended complaint, Rodriguez alleges that "[m]anagement at SHP has policymaking authority over the policies described in this lawsuit and utilized at the Navarro County Jail."  Am. Compl. ¶ 74.  But this conclusory allegation is insufficient to enable the court to reasonably infer that SHP is the final policymaker with respect to the hours during which the Jail will be staffed with medical personnel.  As the court notes above, policymakers possess not only the discretion to direct specific actions, but also the "final

authority to establish municipal policy" with respect to those actions. *Pembaur*, 475 U.S. at 481. And that authority is delegated by the county through either express delegations—such as state or local law—or implied customs and behavior. Rodriguez has failed to allege any state or local law or evidence of custom that would enable the court to reasonably infer that SHP possesses final policymaking authority with respect to the working hours of medical staff at the Jail. In fact, Rodriguez expressly alleges that "Navarro County has a *non-delegable* duty under Texas law and the U.S. Constitution to provide medical care to inmates at its Jail. The County cannot absolve itself of this duty by simply paying someone else to carry it out." Am. Compl. ¶ 71 (emphasis added). If anything, the amended complaint plausibly alleges that the Navarro County Sheriff is the policymaker and that Navarro County contracted with a vendor (SHP) to perform a function that the county would otherwise have itself performed.

To the extent Rodriguez suggests that SHP's role in the negotiation of its contract with Navarro County to provide medical services at the Jail somehow vested SHP with final policymaking authority, the court rejects this argument. Rodriguez alleges in her amended complaint that "[t]he policies described in this Complaint are the product of both Navarro County and SHP, which collaborated and agreed on exactly how the provision of medical care at the Jail was to be carried out." *Id.* ¶ 75. But the mere fact that SHP "collaborated and agreed" to provide medical care at the Jail during certain hours does not, without more, transform SHP into a policymaker with final policymaking authority for the Jail such that SHP can be held liable under *Monell* for any alleged constitutional deprivations resulting

from this policy.

In sum, the amended complaint does not permit the court to draw the reasonable inference that SHP—as opposed to the Navarro County Sheriff—was the policymaker with respect to the policy that no medical staff would be present between the hours of 10:00 p.m. and 7:00 a.m.  Accordingly, the court cannot conclude, based on the allegations in the amended complaint, that there is any basis for § 1983 liability against SHP based on this policy.  And because Rodriguez has failed to point to any other policy or custom that can be fairly attributed to SHP and that caused her alleged constitutional injuries, the court grants the SHP defendants' motion to dismiss Rodriguez's § 1983-based municipal liability claims[9] asserted against SHP.

D

The court now turns to the third *Monell* element.  Navarro County contends that Rodriguez has failed to allege that her constitutional deprivation was caused by Navarro County's policy, custom, or practice.

Rodriguez asserts that defendants deprived her of her constitutional rights under the Fourteenth Amendment by failing to provide her with constitutionally adequate medical

---

[9]In her response to the SHP Defendants' motion to dismiss, Rodriguez maintains that the Fifth Circuit has not definitively ruled on the question whether a private company can be vicariously liable for the actions of its employees in a § 1983 cause of action, and that the question whether SHP can be held vicariously liable for the constitutional violations of its employees committed within the scope of their employment is an open question.  The court expresses no view on this question because Rodriguez has not pleaded a § 1983 claim against SHP based on alleged constitutional violations of its employees.

- 19 -

treatment, arguing that "the avoidable premature birth of her twins and their concomitant physical maladies were the result of . . . Navarro County's . . . gross inattention to the needs of detainees." Am. Compl. ¶ 79. But Rodriguez has failed to plausibly allege that Navarro County's policy of not having medical staff on site between 10:00 p.m. and 7:00 a.m. was the moving force behind her alleged constitutional deprivation.

Rodriguez alleges that her constitutional rights were violated because her twins were born in the Jail as opposed to the hospital. But she has not plausibly alleged that it was the absence of medical staff at the Jail that caused her alleged constitutional injury. Rodriguez asserts that, when she notified the guards on duty that she needed urgent attention, they called Hullett, and that it was Hullett who "decided . . . that it was sufficient to simply keep Plaintiff under observation, even though no one qualified to deliver babies was present at the jail." *Id.* ¶ 29. In other words, Rodriguez alleges that the reason she was not taken to the hospital was because Hullett decided that Rodriguez should remain at the Jail. Rodriguez does not allege that the outcome would have been any different—i.e., that she would have been transported to the hospital sooner—had medical staff (including Hullett herself) been present at the Jail.

Rodriguez further alleges that, immediately after A.R. was born at the Jail, A.R. stopped breathing more than once; that a correctional officer with no medical training looked for a nasal aspirator to clear mucus out of A.R.'s airway; that the officer could not find one, either because the Jail did not have one or the correctional officers had not been trained on where medical supplies were kept; that critical minutes were lost before EMS medics arrived

and were able to clear A.R.'s airway; and that the inability to breathe is especially dangerous for a pre-term baby whose lungs are typically underdeveloped. But Rodriguez has not plausibly pleaded a direct causal link between Navarro County's policy of not having medical staff on site between 10:00 p.m. and 7:00 a.m. and the deprivation of federal rights. This is because she has not plausibly pleaded that the presence of medical staff would have prevented A.R. from being born prematurely or from stopping breathing after birth, or that a person with medical training would have located a nasal aspirator (assuming the jail had one) or would have found it sooner, and well before EMS medics arrived and were able to clear A.R.'s airway.

Accordingly, because Rodriguez has failed to plausibly allege that the Jail's policy of not having medical staff present between the hours of 10:00 p.m. and 7:00 a.m. was the "moving force" of the constitutional deprivation, *Piotrowski*, 237 F.3d at 580, or that there was a direct causal link between the municipal action and the deprivation of federal rights, *Valle*, 613 F.3d at 542, the court grants Navarro County's motion to dismiss Rodriguez's § 1983 claim based on this policy.

E

Accordingly, because Rodriguez has failed to plausibly plead the *Monell* elements with respect to the three alleged policies that she asserts in support of her § 1983-based municipal liability claims against Navarro County and SHP, the court grants defendants' motions to dismiss these claims against Navarro County and SHP.

- 21 -

V

The court next considers plaintiffs' deliberate indifference claims brought under §

1983 against Dr. Shaw and Hullett, beginning with the SHP Defendants' argument that these

claims are subject to dismissal because Dr. Shaw and Hullett are private actors.[10]

A

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured

by the Constitution and laws of the United States, and must show that the alleged deprivation

was *committed by a person acting under color of state law*."  *Cornish v. Corr. Servs. Corp.*,

402 F.3d 545, 549 (5th Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

"[P]rivate conduct, no matter how discriminatory or wrongful, is excluded from § 1983's

reach."  *Id.* (internal quotation marks omitted) (quoting *Richard v. Hoechst Celanese Chem.

Grp.*, 355 F.3d 345, 352 (5th Cir. 2003)).  Although "[p]rivate individuals generally are not

considered to act under color of law," private action may nevertheless "be deemed state

action when the defendant's conduct is fairly attributable to the State."  *Moody v. Farrell*,

868 F.3d 348, 352 (5th Cir. 2017) (citations and internal quotation marks omitted); *see also

Filarsky v. Delia*, 566 U.S. 377, 383 (2012) ("Anyone whose conduct is 'fairly attributable

to the state' can be sued as a state actor under § 1983." (quoting *Lugar v. Edmondson Oil

Co.*, 457 U.S. 922, 937 (1982))).  To establish fair attribution,

---

[10]Because the court is dismissing Rodriguez's § 1983 claims against SHP on other
grounds, *see supra* § IV(C)(3), it does not specifically address the SHP Defendants' motion
to dismiss Rodriguez's claims against SHP on the ground that SHP is a private actor.

> the plaintiff must show: (1) that the deprivation was caused by
> the exercise of some right or privilege created by the state or by
> a rule of conduct imposed by the state, or by a person for whom
> the state is responsible, and (2) that the party charged with the
> deprivation may fairly be said to be a state actor.

*Moody*, 868 F.3d at 352 (quoting *Priester v. Lowndes County*, 354 F.3d 414, 423 (5th Cir.

2004)); *see also Noatex Corp. v. King Constr. Co. of Hous., L.L.C.*, 609 Fed. Appx. 164, 168

(5th Cir. 2015) (per curiam).

"The Supreme Court has utilized a number of tests for deciding whether a private

actor's conduct can be fairly attributable to the State." *Cornish*, 402 F.3d at 549 (citing

*Richard*, 355 F.3d at 352; *Bass v. Parkwood*, 180 F.3d 234, 241-43 (5th Cir. 1999)).

> The "public function test" examines whether the private entity
> performs a function which is "exclusively reserved to the
> State[.]"  Under the "state compulsion test[,]" a private actor's
> conduct is attributable to the State when it exerts coercive power
> over the private entity or provides significant encouragement.
> The "nexus" or "state action test" considers whether the State
> has inserted "itself into a position of interdependence with the
> [private actor, such] that it was a joint participant in the
> enterprise[.]"  And, under the "joint action test[,]" private actors
> will be considered state actors where they are "willful
> participant[s] in joint action with the State or its agents[.]"  The
> Supreme Court has not resolved "[w]hether these different tests
> are actually different in operation or simply different ways of
> characterizing [this] necessarily fact-bound inquiry[.]"

*Cornish*, 402 F.3d at 549-50 (citations omitted) (some alterations in original).

B

To determine whether a private actor's deprivation of a protected right is fairly

attributable to the state, the court must first "identif[y] the specific conduct of which the

plaintiff complains." *Cornish*, 402 F.3d at 550 (citation omitted).  In this case, the conduct involves the medical treatment of Rodriguez while she was incarcerated at the Jail.  At issue is whether Dr. Shaw's or Hullett's conduct surrounding Rodriguez's medical treatment at the Jail is fairly attributable to the state.

The SHP Defendants contend that Rodriguez's amended complaint fails to assert or establish each of the essential elements to sustain claims against Dr. Shaw and Hullett as private actors and that each of these defendants must be dismissed for Rodriguez's failure to state a claim upon which relief under § 1983 can be granted.  Rodriguez responds, *inter alia*, that the conduct of Dr. Shaw and Hullett is fairly attributable to the state under the "public function" test because Rodriguez was not able to seek any medical care other than that provided by Navarro County and SHP, Navarro County contracted with the SHP Defendants to provide care at the Jail, and the SHP Defendants acted under color of law when they took on the duty of providing medical care to inmates at the Jail.  The court agrees.

"Courts have held that private entities providing medical services to inmates in a correctional facility perform a traditional state function and therefore can be considered state actors subject to liability under § 1983 with respect to those services."  *Doe v. Steward Health Care Sys. LLC*, 2018 WL 4233816, at *7 (S.D. Tex. July 31, 2018) (collecting cases); *see also West*, 487 U.S. at 54-57 (holding that private doctor under contract with state prison to provide medical care to prisoners acted under color of state law when he treated an inmate); *Davis v. Kirk*, 2007 WL 4353798, at *9 (S.D. Tex. Dec. 11, 2007) (denying private

physician's summary judgment motion on § 1983 claim because her provision of medical care for inmates at county jail rendered her a state actor); *Lemoine v. New Horizons Ranch & Ctr., Inc*., 990 F.Supp. 498, 502-03 (N.D. Tex. 1998) (Cummings, J.) (holding that private physician under contract to provide medical care for residents of private juvenile facility was a state actor).   Accordingly, the court denies the SHP Defendants' motion to dismiss Rodriguez's deliberate indifference claims asserted against Dr. Shaw and Hullett under § 1983 on the ground that these defendants are private actors.

VI

The court now turns to the merits of Rodriguez's deliberate indifference claims against Dr. Shaw and Hullett brought under the Fourteenth Amendment.

A

"Section 1983 creates a private right of action for redressing the violation of federal law by those acting under color of state law."  *Colson v. Grohman*, 174 F.3d 498, 504 n.2 (5th Cir. 1999) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ*., 465 U.S. 75, 82 (1984)). "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates.  Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983."  *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citations and internal quotation marks omitted) (quoting *Johnston v. Harris Cty. Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir. 1989)).  Rodriguez bases her § 1983 claims on allegations that the unconstitutional conduct of Dr. Shaw and Hullett violated her rights under the Fourteenth Amendment.

- 25 -

Although the state has an important interest in the incarceration of pretrial detainees and convicted state prisoners,

> [t]he State's exercise of its power to hold detainees and prisoners . . . brings with it a responsibility under the U.S. Constitution to tend to the essentials of their well-being: "[W]hen the State by affirmative exercise of its powers so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . . it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."

*Hare v. City of Corinth, Miss.*, 74 F.3d 633, 638-39 (5th Cir. 1996) (en banc) (quoting

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)).

Convicted prisoners derive their right to have these basic needs met from the Eighth Amendment's prohibition on cruel and unusual punishment. *Id.* at 639. Pretrial detainees, on the other hand, having not been adjudged guilty of any crime and therefore not punishable at all, derive their protections from the due process guarantees of the Fourteenth Amendment. *Id.*; *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979). These protections are said to be "at least as great as . . . [those] available to a convicted prisoner." *Hare*, 74 F.3d at 639 (citation omitted). Therefore, because Rodriguez was a pretrial detainee, the operative question is whether she has plausibly pleaded that she suffered a violation of her Fourteenth Amendment rights.

The applicable standard for making this determination depends on whether the constitutional challenge is based on a "condition of confinement" or an "episodic act or omission." *Flores v. County of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir. 1997) (citing

- 26 -

*Hare*, 74 F.3d at 644).  Where the claim is based on a condition of confinement, "the constitutional challenge is to the 'general conditions, practices, rules, or restrictions of pretrial confinement.'"  *Palo ex rel. Estate of Palo v. Dallas County*, 2007 WL 2140590, at *2 (N.D. Tex. July 26, 2007) (Fitzwater, J.) (quoting *Hare*, 74 F.3d at 644).  By contrast, where the claim is based on an episodic act or omission, "the complained-of harm is a particular act or omission of one or more officials, and the case focuses on 'whether [the] official breached his constitutional duty to tend to the basic human needs of persons in his charge.'"  *Id.* (quoting *Hare*, 74 F.3d at 645).

Although in the context of her municipal liability claims Rodriguez maintains that she is "plead[ing] her case under the alternative theories of conditions of confinement and episodic acts or omissions," Am. Compl. ¶ 76, she does not similarly allege these alternative theories in the context of her deliberate indifference claims against Dr. Shaw and Hullett. She alleges only an episodic act or omission, i.e., the failure of Dr. Shaw and Hullett "to provide proper medical care to [Rodriguez]," which she maintains "constitutes deliberate indifference to her serious medical needs." *id.* ¶ 87.

## B

As noted above, an episodic act or omission claim is distinct from a condition of confinement claim because it involves a particular act or omission of one or more officials, whose intent to cause harm is not presumed.  *See Hare*, 74 F.3d at 645.  To state an episodic act or omission claim against Dr. Shaw or Hullett, Rodriguez must allege that they violated her right to medical treatment with "subjective deliberate indifference." *Johnson v. Johnson*

*County*, 2006 WL 1722570, at *3 (N.D. Tex. June 21, 2006) (Fitzwater, J.) (citing *Flores*, 124 F.3d at 738). "A prison official acts with deliberate indifference 'only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it.'" *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (alteration in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)); *see also Hyatt v. Thomas*, 843 F.3d 172, 179 (5th Cir. 2016) (same). Subjective deliberate indifference "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001) (citing *Hare*, 74 F.3d at 645, 649). Rather, "[d]eliberate indifference is an extremely high standard to meet" and requires a showing that "the officials 'refused to treat [the pretrial detainee], ignored h[er] complaints, intentionally treated h[er] incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

C

The court begins with Rodriguez's claim against Dr. Shaw.[11]  Rodriguez alleges that during her single visit with Dr. Shaw on December 29, 2017, Dr. Shaw measured her stomach, but did not examine her "or do anything else to address her concerns that she was

---

[11]Because the court concludes that Rodriguez has failed to plausibly allege a deliberate indifference claim against Dr. Shaw, it need not address the SHP Defendants' argument that Rodriguez's claim against Dr. Shaw is time-barred.

- 28 -

about to give birth prematurely," even though he "kn[ew] that she had lost her mucus plug." Am. Compl. ¶ 23.  She maintains that Dr. Shaw was deliberately indifferent to Rodriguez's repeated requests to see a specialist or go to the hospital and that he was "aware that a substantial risk of serious harm to Plaintiff and her babies existed but disregarded that risk." *Id.* ¶ 88.

These allegations are insufficient to plausibly allege that Dr. Shaw acted with deliberate indifference.  Although Rodriguez avers that on December 28, 2017 she informed "jail staff" that she believed she had lost her mucus plug, she does not allege that she ever informed Dr. Shaw of this fact.  Her allegation that Dr. Shaw "kn[ew] that she had lost her mucus plug" is therefore conclusory and unsupported.

Even assuming *arguendo* that Dr. Shaw *did* know on December 29, 2017 that Rodriguez believed that she had lost her mucus plug the day before, Rodriguez herself acknowledges that the discharge of a mucus plug only signals that childbirth is "imminent." *Id.* ¶ 19.  Rodriguez alleges in her amended complaint that "[t]he risk of serious harm came to fruition when Plaintiff gave birth prematurely in the jail to twins who both suffered from a variety of serious and debilitating conditions." *id.* ¶ 89. But she has not plausibly alleged that Dr. Shaw was aware, on December 29, 2017, or at any time thereafter, that there was a substantial risk that Rodriguez would give birth prematurely in her jail cell.

Rodriguez does not allege that she was in labor when Dr. Shaw saw her.  She contends that, during the December 29, 2017 visit, Dr. Shaw measured her stomach but did not

otherwise examine her.[12]  Without a physical examination, Dr. Shaw would have had no

reason to suspect that Rodriguez, who at the time was only 26 to 27 weeks pregnant, was in

labor or was soon to be in labor.  And Rodriguez has not plausibly alleged that Dr. Shaw

would have had any reason to believe that there was a substantial risk that, when Rodriguez

*did* go into labor, there would be insufficient time to transport her to the hospital before she

gave birth.

Accordingly, because Rodriguez has failed to plausibly allege that Dr. Shaw knew that

a substantial risk of serious bodily harm—in Rodriguez's case, premature childbirth at the

Jail—was imminent, Rodriguez's Fourteenth Amendment-based deliberate indifference claim

against Dr. Shaw fails.

## D

The court now turns to Rodriguez's deliberate indifference claim against Hullett.

## 1

In support of this claim, Rodriguez alleges that on January 5 or 6, 2018, Hullett

examined her and confirmed that she was having contractions at regular intervals,

approximately three minutes apart, but did not permit Rodriguez to see a doctor or go to the

---

[12]Rodriguez maintains in her response that, after the December 29, 2017 visit, Dr. Shaw took no further action, did not schedule a follow-up of any kind, and "did nothing more at all, up to and including the birth of the twins," and that "[t]his falls well short of the standard of care."  Ps. Br. at 12.  Even if Dr. Shaw's treatment of Rodriguez amounted to negligence or even medical malpractice, however, it is clearly established that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference[.]"  *Gobert*, 463 F.3d at 346.

hospital, and that when the Jail's overnight guards called Hullett at approximately 3:00 a.m. on January 9, 2018 and informed her that Rodriguez was having contractions timed at approximately one minute apart,

> Hullett decided . . . that it was sufficient to simply keep Plaintiff under observation, even though no one qualified to deliver babies was present at the jail.  Moreover, even though there were no available medical observation cells, Hullett insisted that she be kept at the Jail rather than taken to the hospital immediately.

*Id.* ¶ 29.  Rodriguez also alleges that, as a trained professional, Hullett knew that premature birth involves serious medical risks that can be significantly mitigated by timely treatment; that any medical emergency has a substantially better chance of an improved outcome if it can be immediately treated in a hospital setting, as opposed to a jail cell; and that there was a high likelihood that Rodriguez would go into labor at any moment.

2

As with Rodriguez's claims against Dr. Shaw, the court concludes that Rodriguez's allegations against Hullett are insufficient to meet the "extremely high" deliberate indifference standard.  *See Domino*, 239 F.3d at 756.  Rodriguez alleges that Hullett knew on January 5 or 6 that Rodriguez was having contractions at regular intervals, approximately three minutes apart, and that Hullett knew, when the overnight guards called her at 3:00 a.m. on January 9, that Rodriguez was having contractions at regular intervals, approximately one minute apart.  But Rodriguez's allegation that "Hullett . . . knew that there was a high likelihood that Plaintiff would go into labor at any moment" is conclusory.  Am. Compl. ¶

42.  And Rodriguez does not assert that Hullett decided that nothing be done; she alleges that Hullett thought it was sufficient to keep Rodriguez under observation.  This decision—that it would be sufficient to keep Rodriguez under observation at the Jail instead of transporting her to the hospital—could have been based on Hullett's medical judgment that Rodriguez was unlikely to give birth prematurely before medical staff arrived in the morning.  *See Domino*, 239 F.3d at 756 ("[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment[,]' [a]nd, the 'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference." (second alteration in original) (citations omitted)).  The court therefore concludes that Rodriguez has failed in this respect to plausibly allege facts that are sufficient to meet the "extremely high" deliberate indifference standard.

Nor has Rodriguez plausibly alleged that Hullett failed to take reasonable measures to abate the risk that Rodriguez's twins would be born prematurely at the Jail.  Rodriguez alleges that Hullett ordered that Rodriguez be kept under observation.  It is reasonable to infer that Hullett gave this instruction to jail personnel so that EMS could be notified if it became necessary to transport Rodriguez to the hospital.  In other words, under Rodriguez's version of the facts, Hullett *did* take action to avert Rodriguez's risk of premature childbirth at the Jail.  This is not a case where a nurse was made aware that a pretrial detainee was showing signs of labor and simply did nothing.  On reflection, Hullett's directive to keep Rodriguez under observation may have been erroneous—even negligent.  But "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not

- 32 -

constitute deliberate indifference, nor does a prisoner's disagreement with h[er] medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346.  Neither Rodriguez's disagreement with Hullett's decision to keep her under observation at the Jail rather than to immediately transport her to a hospital, nor the fact that this decision ultimately proved insufficient to avoid premature childbirth at the Jail, is sufficient to support a constitutional claim of deliberate indifference.  *Id.*

Accordingly, the court grants the SHP Defendants' motion to dismiss Rodriguez's Fourteenth Amendment claim of deliberate indifference against Hullett.

VII

Rodriguez also asserts a claim for negligence under Texas law.  Although this court can exercise supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a), "when all federal claims are dismissed or otherwise eliminated from a case prior to trial, [the Fifth Circuit has] stated that [its] 'general rule' is to decline to exercise jurisdiction over the pendent state law claims." *McClelland v. Gronwaldt*, 155 F.3d 507, 519 (5th Cir. 1998) (citing *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989)), *overruled on other grounds by Arana v. Ochsner Health Plan*, 338 F.3d 433, 440 (5th Cir. 2003) (en banc).  Having dismissed Rodriguez's federal-law claims, the court in its discretion declines at this time to exercise supplemental jurisdiction over her state-law negligence claim.[12]  Indeed, this is a case in which the state-law claims can be seen as dwarfing Rodriguez's § 1983 claim.  And

---

[12]Because the court is dismissing Rodriguez' state-law claim against Dr. Shaw, the court does not address whether this claim is time-barred.

- 33 -

unless on repleading Rodriguez can state a plausible § 1983 claim, she is likely headed to state court to pursue the balance of this litigation.

VIII

Rodriguez requests that, if the court grants defendants' motions, she be permitted to replead. Courts often grant plaintiffs one opportunity to replead, unless it appears that the plaintiff cannot cure the initial deficiencies in the pleading. *See, e.g., In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." (citation omitted)). Because there is no indication that Rodriguez cannot, or is unwilling to, cure the defects that the court has identified, the court grants Rodriguez leave to file a second amended complaint within 28 days of the date this memorandum opinion and order is filed.

\*   \*   \*

For the reasons explained, the court grants Navarro County's and the SHP Defendants' motions to dismiss Rodriguez's federal-law claims, declines to exercise supplemental jurisdiction over Rodriguez's state-law claim for negligence, and grants Rodriguez leave to file a second amended complaint within 28 days of the date this

- 34 -

memorandum opinion and order is filed.

**SO ORDERED**.

June 3, 2020.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE