IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IRENE RODRIGUEZ, individually | § | |
| and as parent and legal guardian of | § | |
| A.R. and B.R., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:20-cv-00045-D |
| | § | |
| SOUTHERN HEALTH PARTNERS, INC.; | § | |
| NAVARRO COUNTY; LINDA | § | |
| HULLETT; DR. GRADY SHAW; and | § | |
| NAVARRO REGIONAL HOSPITAL; | § | |
| | § | |
| *Defendants*. | § | |

---

## PLAINTIFF'S SECOND AMENDED COMPLAINT

---

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Pursuant to the Court's Order of June 3, 2020, Plaintiff Irene Rodriguez ("Plaintiff"), individually and as parent and legal guardian of A.R. and B.R., files this Second Amended Complaint against Southern Health Partners, Inc.; Navarro County; Linda Hullett; Dr. Grady Shaw; and Navarro Reginal Hospital ("NRH") (collectively, "Defendants"), and would respectfully show the Court the following:

## I.
## INTRODUCTION

1.      This lawsuit alleges that Southern Health Partners, Inc. ("SHP"), which had been contracted to provide medical care in the Navarro County Jail ("the Jail"), Linda Hullett, a nurse employed by SHP at the jail, and Dr. Grady Shaw utterly failed to provide critical pre-natal care to Irene Rodriguez while she was incarcerated at the jail.  SHP and its staff ignored requests for care by

Rodriguez as well as obvious signs that she was having problems with her pregnancy, resulting in the premature birth of twins A.R. and B.R. and catastrophic injuries to them.  The lawsuit further asserts a civil rights claim brought under 42 U.S.C. § 1983 arising from the deliberate indifference of Linda Hullett towards Plaintiff's serious medical needs, as well as the unlawful policies of Navarro County and SHP at the Navarro County Jail.  Namely, the County and SHP sacrificed the needs of the inmates they had assumed charge of in favor of their bottom line.  It was jail policy to refuse sending anyone to the hospital—in an effort to avoid picking up the bill—until there was a manifest emergency, which is too late. This miserly approach to inmate health was compounded by the fact that SHP did not have any medical staff at all at the jail overnight, no physician was on call for emergencies, and no other jail staff was trained to recognize the need to call an ambulance.  Such policies are wholly inconsistent with the medical standard of care and in this case, directly caused the harm alleged herein.  Navarro County expressly delegated policymaking authority at the Jail to SHP, and furthermore, has a duty under Texas law to provide a "safe and suitable" jail, rather than a constitutionally deficient one.

      2.      Irene Rodriguez became incarcerated at the Navarro County Jail as a pretrial detainee in late December 2017.  Despite knowing of her pregnancy with twins, which requires closer medical attention than a single pregnancy—as well as specific, specialized care when there are indicators of potential premature birth—Nurse Hullett refused to allow Rodriguez to attend a pre-scheduled doctor's appointment on December 28.  Then, despite mounting signs over approximately the next twelve days that there were problems with Rodriguez's pregnancy and that premature birth of the twins was possible—including the passing of her mucous plug, fluid discharge, and cervical contractions—Hullett refused to allow Rodriguez to go to a hospital or see an obstetrician.  Indeed, she ignored a direct physician's order to get Rodriguez in to see her obstetrician as soon as possible, as well as a second doctor's instructions on December 29 to get Rodriguez to the hospital if she had

further contractions or concerns about her pregnancy. Instead, Hullett simply consigned Rodriguez to her fate at the Jail. It was a complete failure to take any action at all. No reasonable medical professional could possibly consider this a legitimate medical decision, any more than it would be a legitimate medical decision to arbitrarily withhold blood pressure medication from an inmate who has been prescribed that medication for hypertension. In other words, Hullett ignored an obvious, serious danger and did nothing.

3.      Dr. Shaw saw Rodriguez on December 27th, but only measured her stomach and didn't examine her in any other way or address the concerns associated with a pregnancy involving twins in a jail setting. Although he left an order that Rodriguez was to see her obstetrician as soon as possible, he failed to follow up to ensure that she did indeed see her. Shaw did nothing at all to monitor the health of a patient whom he knew had a medical condition that required close attention. Ultimately, the twins were born very prematurely, in a jail cell with no supportive personnel or equipment present, on January 9th—this resulted in both of them suffering catastrophic physical maladies, including permanent brain damage.

4.      But for SHP's, Linda Hullett's, and Dr, Grady Shaw's negligence, as well as the deliberate indifference of Hullett and the combined policies at the Jail of (a) no medical staff overnight at the jail, (b) no medical training whatsoever for non-medical staff, and (c) not letting inmates go to the hospital before a manifest emergency occurred, the premature birth at the jail and concomitant catastrophic injuries to the twins would more likely than not have been avoided.

## II.
## PARTIES

5.      Plaintiff Irene Rodriguez is a resident of Corsicana, Texas.

6.      Defendant SHP is a Delaware company with its headquarters in Chattanooga, Tennessee and may be served through its registered agent CT Corporation System, 1999 Bryan St. Suite 900, Dallas, TX 75201.

7.     Defendant Navarro County is a municipality formed under the laws of the State of Texas and may be served though its County Judge, H.M. Davenport, Jr., at 300 West 3rd Ave. Suite 102, Corsicana, TX 75110.

8.     Linda Hullett is a resident of Texas and an employee of SHP and can be served at her place of employment, the Navarro County Jail, 300 West 2nd Ave., Corsicana, TX 75110.

9.     Dr. Grady Shaw is a resident of Texas and can be served at his home address, 1613 Glenbrook St., Corsicana, TX 75110.

### III.
### JURISDICTION AND VENUE

10.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 since Plaintiffs are suing for relief under 42 U.S.C. § 1983 and this action arises under the Constitution, laws, or treaties of the United States.

11.     The Court has supplemental jurisdiction over the state law negligence claims under 28 U.S.C. § 1367 because they are so related to the claims under § 1983 that they form part of the same case or controversy.  Moreover, these claims do not raise any novel or complex issues of state law.

12.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 as this is the judicial district in which at least one Defendant resides and in which a substantial part of the events or omissions giving rise to the claim occurred.

### IV.
### FACTS

***Plaintiff's Pregnancy and the Lack of Medical Care Resulting In
the Premature Birth of A.R & B.R***

13.     On or about December 22, 2017, while she was 25-26 weeks pregnant, Plaintiff was arrested and confined to the Navarro County Jail.

14.     Plaintiff notified the jail, and specifically Linda Hullett, that she was pregnant with

4

twins.

15.     Hullett was the supervising nurse at the Jail, and the only nurse present for a large portion of the week.

16.     Notwithstanding the knowledge that Plaintiff was pregnant, Hullett refused to follow up with Plaintiff's previous health care providers to obtain her medical history.

17.     The jail also told Plaintiff that a nurse would be present at the jail 24-hours-per-day in case any problems arose with her pregnancy.  However, this was not true: in fact, there was no nurse present between the hours of approximately 10 p.m. and 7 a.m, every day.

18.     Plaintiff notified Hullett that she had a pending doctor's appointment in Navarro County on December 28th, 2017 to follow up on her pregnancy and asked to be allowed to keep this appointment.

19.     On or just before December 27th, 2017, Plaintiff notified Hullett in writing that she had lost her mucus plug and needed to go to the hospital to see a specialist, because the discharge of her mucus plug signaled that childbirth was imminent.

20.     On December 27th, Plaintiff saw Dr. Grady Shaw.  Shaw is not an obstetrician, but is a generalist physician who is contracted by SHP to occasionally see inmates at the Navarro County Jail.  Shaw does not have regularly scheduled hours at the Jail, but rather is called in on an ad-hoc basis.

21.     Plaintiff told Shaw that she had recently passed her mucus plug and had experienced some contractions, both of which are indicators of impending labor.  Shaw's notes indicate that he knew her expected delivery date for a full term delivery was in March 2018.

22.     Shaw measured her stomach but did nothing else to address her concerns that she was about to give birth prematurely.  This was the only time that Plaintiff was seen by Dr. Shaw.  He took no further action, nor did he schedule a follow-up of any kind.

23.     However, Shaw, did note that Plaintiff had an appointment with her obstetrician the next day (December 28), and left an accompanying order that Plaintiff be seen by an obstetrician as soon as possible.

24.     Nonetheless, Hullett ignored both Dr. Shaw's order and Plaintiff's stated concerns, and did not allow Plaintiff to go to her scheduled appointment on December 28.  In fact, Plaintiff was never allowed to see any obstetrician (or any other doctor) until the twins were born on January 9.

25.     Plaintiff's appointment had been scheduled prior to her detainment, and under the serious circumstances of her pregnancy, there was no reasonable basis not to allow Plaintiff to see her, especially since it had been expressly ordered by Shaw.

26.     Shaw never followed up to ensure that his order that Plaintiff be seen by an obstetrician was carried out.

27.     Over approximately the following two weeks, Plaintiff continued to discharge fluid and became increasingly concerned about her pregnancy and the likelihood of premature birth. Plaintiff repeatedly gave written notice to Hullett begging to be taken to a hospital or seen by a specialist because she was concerned about her pregnancy and expected the babies to be born at any time.

28.     However, Hullett refused to allow Plaintiff access to an obstetrician.

29.     On December 29, Hullett examined Plaintiff and confirmed that she was having contractions approximately three minutes apart.  Plaintiff again told Hullett she needed to go to the hospital or see an obstetrician, and again Hullett refused her.

30.     Instead, the same day, Hullett called a local obstetrician (Dr. Charles Cook) on the phone.  Note that this was not Plaintiff's obstetrician, but another doctor who had never seen Plaintiff, knew nothing about her medical history, and had no familiarity with her at all.

Nonetheless, Dr. Cook told Hullett that Plaintiff should be taken to a hospital immediately if she continued to have contractions or other concerns about her pregnancy.

31.     As previously stated, Plaintiff did continue to have contractions and concerns about her pregnancy on a continuous basis until her twins were born on January 9th; Hullett, however, completely ignored Cook's instructions, and never allowed Plaintiff to go to the hospital or be examined by an obstetrician.

32.     On January 2,  Plaintiff was seen by the night shift nurse, because she was still having contractions.  The nurse examined Plaintiff and confirmed that she was in fact having contractions; these were at regular intervals approximately three minutes apart.  Nonetheless, the nurse would not allow Plaintiff to see a doctor or go to the hospital.  Instead, Plaintiff was once again sent back to her cell.  At the time of this examination, Hullett's notes from December 29 regarding PLaintiff's prior contractions and the instructions from Dr. Cook that she must be taken to the hospital if she continued to have them were not in Plaintiff's medical record, because Hullett had failed to record them (see ¶¶ 63–66 below).

33.     Throughout the period between January 2 and January 9, Hullett brought Plaintiff prenatal vitamins every morning, and every morning, Plaintiff would tell Hullett that she needed to go to the hospital and see her obstetrician because she was still having contractions and discharge. Hullett ignored her, and even went so far as to accuse Plaintiff of lying about her condition.  These interactions were witnessed by Plaintiff's cellmate.

34.     Additionally, Plaintiff submitted countless written requests for help to Hullett and the Jail.  She submitted so many that at one point, Correctional Officer Betty Rivera told Plaintiff she was submitting too many requests, and would only be allowed to submit one per day.

35.     Nonetheless, Hullett took no action at all during this time period, refusing to even examine Plaintiff again.

36.     After getting no response from Hullett, Plaintiff became so frustrated that she began submitting written requests to speak with the Jail Lieutenant, the Jail Captain, a judge, her probation officer, and anyone else who she thought might be able to intervene and get her clearance to go to the hospital.

37.     On January 8, she did get to speak with Charlie York, who was the Captain of the Jail.  She told him that she was having contractions and discharge, and was afraid she would go into labor.  York simply said that he would speak to Hullett and do whatever Hullett said to do.  Later that evening, the night shift nurse communicated to Plaintiff that York had spoken to Hullett, but Hullett still refused to authorize any treatment or even an evaluation by an obstetrician.

38.     Hullett completely ignored Plaintiff's increasingly serious indicators of impending labor with twins.  This is not only contrary to basic, reasonable medical judgment, but it also flatly ignored orders from **two separate doctors** that Plaintiff needed to be taken to a hospital, or at the very least, examined by an obstetrician.

### *The Premature Birth of A.R. and B.R. at the Navarro County Jail*

39.     By January 9th, at approximately 3 a.m., the contractions had become so strong that Plaintiff notified the guards that she needed urgent attention.  Despite the fact that she had been told that a nurse would be on site around the clock, no medical staff was at the jail at that time, because the Jail *never* had a nurse on site between the hours of 10 p.m. and 7 a.m.

40.     The guards did not call an ambulance or take Plaintiff to the hospital; instead, they called Nurse Hullett on the phone.  No jail staff who was physically present had any medical training at all, because it was the County's policy not to train them (discussed further below).

41.     Sgt. Robin Woodall, a correctional officer, later wrote in a report that she called Hullett because Hullett had "knowledge of Inmate Rodriguez's current medical situation regarding her pregnancy" and that "Rodriguez had stated several times prior to this that she had been having

contractions."

42.     At about 4:50 a.m., Plaintiff's contractions were less than three minutes apart. Contractions of increasing strength and frequency are yet another strong indicator of impending childbirth.  However, Plaintiff was still not allowed to go to the hospital or see a doctor.

43.     Hullett instead took no action at all, even though she knew that no one qualified to deliver babies—let alone extremely vulnerable pre-term twins—was present at the jail.  Hullett also knew that the jail did not have any of the specialized equipment that is immediately necessary to care for extremely premature infants, including a nasal aspirator (not to mention one small enough for a 28-week premature infant), radiant warmers, and face-masks and oxygen delivery equipment suitable for effective positive pressure ventilation in extremely premature infants.

44.     Moreover, even though there were no available medical observation cells, Hullett insisted that Plaintiff be kept at the Jail rather than taken to the hospital immediately.  This meant that correctional officers wasted more than twenty minutes moving other inmates around to make room for Plaintiff in a medical observation cell.

45.     By 5:15 a.m., Plaintiff's contractions were just one minute apart.  Hullett was informed and still, inexplicably, refused to authorize transport to the hospital.

46.     At about 5:30 a.m., Plaintiff began giving birth as she walked down the hall of the jail.  It was at this point the jail finally realized it needed to get Plaintiff to a hospital and called EMS.  Now, though, it was too late.  Pre-term babies simply *cannot* be born safely in a jail cell with no medical personnel present; every reasonable medical professional would know that is putting the babies and the mother directly in harm's way.  Yet, by completely ignoring clear warning signs and Plaintiff's pleas for help for nearly two weeks, as well as ignoring the orders of two doctors that Plaintiff must be seen by an obstetrician, Hullett and the Jail had guaranteed that this disaster would occur.

47.     To be clear, it was not only the failure to get Plaintiff to the hospital more quickly on January 9th that was deliberately indifferent to Plaintiff's rights; Hullett repeatedly and continuously decided to take no action over nearly two weeks, despite numerous indicators of a medical emergency.  This includes ignoring Shaw's order to get Plaintiff in to see her obstetrician and ignoring Dr. Cook's instructions to get Plaintiff to the hospital if she had further contractions or concerns about her pregnancy.

48.     Immediately after being born, A.R. stopped breathing more than once.  A correctional officer (who, again, had no medical training) left Plaintiff and the baby to look for a nasal aspirator to clear mucus out of A.R.'s airway.  The officer could not find one, either because the Jail simply did not have one, or the correctional officers had not been trained on where medical supplies were kept (even if the jail had had an adult-sized aspirator, it would likely not have been small enough for a 28-week premature infant).  Critical minutes were lost before EMS medics arrived and were able to clear A.R.'s airway.

49.     This necessitated the dispatch of a *second* ambulance to the Jail, so that A.R. could be transported to the hospital while Plaintiff was still giving birth to B.R.  Obviously, in a situation where newborn, premature babies are not breathing, every second counts.  Both A.R. and B.R. required emergency treatment to get them breathing sufficiently, which is very common in preterm births.  This is one of the primary reasons it is especially critical for preterm babies to be delivered in a hospital setting with trained specialists present.

50.     B.R. was delivered at 5:50 a.m.  Both of the twins' births occurred in Plaintiff's cell; the EMS report states that "a sterile environment was not able to be established."  Plaintiff and the baby twins were then transported to the Navarro Regional Hospital.

51.     Later the same day, Plaintiff and the baby twins were transported again to Baylor Scott & White Medical Center in Dallas.  There, it was noted in her records that the pregnancy was

complicated by "late limited prenatal care."

### *Injuries Suffered by A.R. and B.R.*

52.     The twins were later diagnosed with brain injuries, renal failure, respiratory failure, and other extremely serious health issues, both short- and long-term.

53.     It is widely known that premature birth can cause numerous short- and long-term complications for the baby, including those that A.R. and B.R. in fact suffered.

54.     One of these issues is hypoxia, which is a deprivation of oxygen in the body, caused by the preterm baby's lungs being underdeveloped and the resulting inability to breathe properly. After a premature baby is born, its breathing can be supported by various means. These techniques require both specialized equipment and specialized training, neither of which were ever going to be available at the Jail. Furthermore, as previously stated, every second counts when it comes to a baby with an oxygen deficit. Every precaution must be taken to ensure that preterm babies are delivered with equipment and specialists on hand to immediately assist the baby's breathing. Hullett and the Jail knew that preterm babies born at the Jail would not have access to these things until they were transported to the hospital, which would take an eternity in the context of a baby not breathing. This is exactly what happened. Hypoxia, which both twins suffered from severely, is a direct cause of the exact brain injuries that A.R. and B.R. in fact incurred.

55.     Another common issue with premature babies is hypothermia, which is the baby's inability to stay sufficiently warm. This is normally treated by placing the baby under a special radiant warmer, which of course is not available in a jail. A less effective alternative technique is to wrap the baby in plastic; even if plastic wrap was available, this was not done because no one at the jail had the training to be aware of this treatment. Hypothermia is a very dangerous condition, especially in preterm babies with hypoxia, where it contributes to brain injuries such as those suffered by A.R. and B.R. Both A.R. and B.R. were hypothermic for prolonged periods before they

could be treated at the hospital by trained specialists.

56.     It is also widely known that premature birth can be avoided or at least delayed with timely medical intervention.  Even a relatively short delay of one or two days significantly decreases the risk of birth complications and mitigates their severity.  For example, magnesium sulfate can delay labor by at least several days, and is commonly given to a woman who is in danger of going into labor prematurely.

57.     Furthermore, additional treatment can be provided to mitigate the risk and severity of complications associated with premature birth.  For example, in addition to delaying the onset of labor, magnesium sulfate can decrease an infant's risk of cerebral palsy, which both twins were later diagnosed with.  Steroids (specifically, Celestone Soluspan) are also typically given to women in danger of premature birth; these stimulate the physical development of the baby significantly, greatly decreasing the risk and severity of complications such as breathing difficulties, bleeding on the brain, and a serious bowel condition called necrotizing enterocolitis.  Both A.R. and B.R. suffered all of these complications at birth.  It should further be stressed that steroid treatment is so common that it is given to **any** woman believed to be at increased risk for early preterm delivery.  Plaintiff would most certainly have received this treatment had she been timely seen by an obstetrician.

58.     None of these preventive measures (nor any others) were taken because Nurse Hullett and the Jail's policies prevented Plaintiff from going to the hospital or seeing an obstetrician, despite continuous and obvious indications that she was in serious danger of preterm labor.  The failure was further caused by Dr. Shaw not or monitoring his patient at all or following up to ensure Plaintiff did in fact get examined by an obstetrician.

### Summary of the Misconduct of Hullett and Shaw

59.     As medically trained professionals, both Hullett and Shaw knew that premature birth involves serious medical risks, and that timely treatment is necessary to significantly mitigate those

risks.  They also knew that premature babies are subject to specific, serious risks such as hypoxia and hypothermia, which can only be treated properly in a hospital setting.  No reasonable medical professional would even consider risking babies being born prematurely in a jail cell.

60.     Furthermore, Hullett knew that there was a high likelihood that Plaintiff would go into labor at any moment.  She knew that the system in place at the jail had a giant gap in medical care coverage at night.  She knew none of the non-medical staff had any training on how to respond to emergencies, and certainly had no idea how to deliver and care for premature babies, when the first moments of those babies' lives are critical for their long-term health.  She knew the Jail had none of the equipment necessary to keep a preterm infant warm and breathing.

61.     Of critical importance, Hullett had been ordered by two doctors to have Plaintiff taken to a hospital and evaluated by an obstetrician.  She completely ignored these orders, just as she ignored Plaintiff's daily pleas for help because she was having contractions and discharge and feared going into labor at any moment.  There is no doubt that, faced with a woman who is about 27 weeks pregnant and having consistent, regular contractions, along with passing her mucus plug and having unusual discharge, any obstetrician would have had that woman admitted to a hospital and started on treatment.

62.     Nonetheless, instead of simply following doctors' orders, Hullett ignored all of these facts and decided to play Russian Roulette with the lives of Plaintiff and her babies.  This is the very definition of "deliberate indifference."

63.     Further evidence of Hullett's complete disregard for Plaintiff's serious issues with her pregnancy is the fact that Hullett's notes from December 29 (regarding both her examination of Plaintiff and subsequent call to Dr. Cook) were not recorded until long after the fact—sometime after Plaintiff's examination by the night shift nurse on January 2.

64.     This is evident from the manner of their recording: all of the Jail's medical notes for

Plaintiff are handwritten on two sheets.  The first notes are Shaw's from December 27 (see paragraphs 20–24 above), and directly beneath those are notes from Plaintiff's January 2 examination at 7:28 p.m. (see paragraph 32 above).  Hullett's notes from December 29 begin directly beneath the note from January 2, on the same page, and continue onto the second page. Furthermore, she made a note in the margin that it was a "late entry," although she did not mark the time or date that it was actually entered.  Late-entered notes, by standard medical practice, must include the time and date that they were actually entered.  These conspicuously omit that information.

65.     Crucially, when Hullett did eventually enter these notes, she would have seen the record of Plaintiff's examination on January 2—which, again, was right there on the same page Hullett was writing on—and the observation that she was having regular contractions three minutes apart.  That would have triggered Dr. Cook's instructions from December 29 to get Plaintiff in to the hospital if she had any further contractions.  But Hullett ignored Dr. Cook's instructions and did nothing.

66.     Moreover, the late-entered note describing Hullett's examination of Plaintiff on December 29 contains the false statement that Plaintiff described her contractions as "false contractions."  Plaintiff never said that; it is a complete fabrication in an attempt by Hullett to deflect blame.

67.     The fact that these notes had not been recorded when Plaintiff was seen by the night nurse on January 2 had the further effect of depriving that nurse of critical information about Plaintiff's health.  Had the night shift nurse known that Plaintiff had previously been observed to be experiencing contractions, and that Dr. Cook had instructed that she be taken to a hospital if they continue, the night nurse would reasonably have sent Plaintiff to the hospital on January 2.  The fact that Hullett did not even bother to enter this critical information into Plaintiff's record shows how

little she cared about the health of Plaintiff and her twin babies.

68.     Defendants' failure to provide proper prenatal care, including access to a hospital and/or an obstetrician when they knew it was very likely Plaintiff was at serious risk of giving premature birth, caused the harms described above to her and the twins.

69.     Specifically, had they heeded the warning signs and gotten proper care for Plaintiff, it is more likely than not that the birth complications A.R. and B.R. suffered would have been averted.

70.     As for Defendant Shaw, his failure to do anything more than measure Plaintiff's stomach when she was exhibiting strong indicators of imminent premature birth fell well short of the standard of care.  Had he taken proper action, including but not limited to performing a full examination, ensuring that Plaintiff was seen by a prenatal specialist, and/or admitting her to a hospital, it is more likely than not that the birth complications A.R. and B.R. suffered would have been averted.  Even a simple follow-up visit would have allowed him to learn that Plaintiff was still experiencing contractions and discharge, and that she had not been allowed to see her obstetrician.

### Navarro County and SHP Were Both Policymakers Regarding the Medical Services at the Jail

71.     It is the duty of Navarro County and its law enforcement policymaker, its Sheriff and/or the Commissioners Court, to provide a safe and suitable jail for its inmates.  This duty includes a duty to provide basic, essential medical care.  Inmates have no other means of gaining access to necessary medical care.

72.     Navarro County has, for a number of years and including the time at issue in this lawsuit, contracted with SHP to provide all of the medical care at the Jail.

73.     The Sheriff and/or the Commissioners Court were well aware of the entire contents of the contract with SHP, because they were involved in its negotiation, and reviewed and approved that contract.

74.     Prior to awarding the contract to SHP, Navarro County circulated a Request for

Proposals to potential contractors.

75.     That Request states that a "Mandatory Requirement for All Proposals" is "[a]

statement that the policies and procedures for the medical program will be developed by the

Proposer."  It further states under "General Conditions" that the "Policies and Procedures of the

Provider relating to medical care are to be established and implemented solely by the Provider."

This is an express delegation of policymaking authority to SHP regarding the medical care at the

Jail.

76.     Nonetheless, Navarro County has a non-delegable **duty** under Texas law to provide

medical care to its inmates.  Therefore, even though it has delegated **policymaking authority** to

SHP, the County cannot absolve itself of its own duty to provide medical care at its Jail.  So, both

SHP and Navarro County are liable for SHP's unconstitutional execution of its policymaking

authority regarding the medical care at the Jail.

77.     In the alternative, it is alleged that the delegation of policymaking authority described

above made SHP the sole policymaker regarding medical services at the Jail.

78.     As a second alternative, if such express language is insufficient to delegate

policymaking authority to SHP, the Navarro County Sheriff and/or its Commissioners' Court

retained policymaking authority over the medical services at the Jail.

### *Unlawful Policies at the Jail*

79.     Throughout Plaintiff's confinement, the medical staff at Navarro County Jail

consisted of, at most, one nurse at any given time.

80.     Between approximately 10 p.m. and 7 a.m. every day, there was never any medical

staff at the jail.  This had been specifically approved by Navarro County when it accepted SHP's

proposal, which specified its precise staffing plan and how much it would cost.

81.     Worse, there was no one else present on staff who was trained to recognize serious

medical needs that required emergency care.  In fact, non-medical correctional staff had no medical or emergency training whatsoever.

82.     This lack of training for non-medical personnel was official Jail policy.  In its Agreement with Navarro County, SHP expressly undertakes to provide ALL of the medical care at the Jail.  No related responsibility, such as to correctional officers working for the County, was reserved by the County.  Therefore, the County and SHP agreed that correctional officers would not be participating in the provision of medical care, including any training to recognize or respond to emergencies.

83.     In other words, having formulated a policy that had no medical staff on site between 10 p.m. and 7 a.m., SHP failed to provide any personnel during that time period who could recognize and respond to emergencies.

84.     In a system in which an inmate will not receive any care unless the need for it is recognized, it is a complete failure of that system to have substantial periods of time during which no staff member present has the training or ability to recognize that need.

85.     This level of staffing and total lack of medical or emergency training for non-medical personnel is insufficient and incapable of providing even the minimum standard of care at a facility that houses over 200 full time inmates.

86.     In particular, there is an approximately 9-hour gap every night during which there is not a single person at the jail who is professional trained to provide any kind of medical care or even be able to recognize an urgent need for medical attention.

87.     In other words, if an event occurs in which an inmate needs immediate medical attention, there is a 37.5% chance that no one who is capable of recognizing or responding to that situation will be present at the time.

88.     The Navarro County Sheriff was fully aware of this situation, since the Sheriff

himself and many of his direct employees were at the Jail at all times and interacted directly with both medical providers and inmates in need of medical care.  Nonetheless, the Sheriff allowed it to continue, and did not either (a) require SHP to provide such personnel or (b) train his own officers to be able to recognize and respond to emergencies.

89.     In fact, the County and SHP were well aware of this potential problem and decided not to address it.  In the County's Requests for Proposals, it identifies a number of "Specifications" under which the Provider must operate, "unless other terms are agreed to by the parties."  One of these terms was that "Provider shall identify a 'responsible physician,'" and "[t]he 'responsible physician or another covering physician shall be on call to the nurse seven days per week, twenty-four hours per day for emergency situations."  Although numerous other terms from the Request for Proposal were ultimately incorporated into the contract between SHP and the County, this one was intentionally omitted from the final contract.  And in fact, the Jail did *not* have a physician on call twenty-four hours per day for emergencies.  SHP and the County were deliberately indifferent in omitting this policy that the County originally deemed necessary, when they knew there would be no medical staff on site overnight.

90.     Furthermore, it was Navarro County and SHP policy at the Jail to refuse to send anyone to the hospital unless there was a manifest emergency—in other words, when the damage was already done.  Indeed, this makes emergencies more likely to occur, because inmates in need of critical preventive care do not receive it.

### *These Policies Caused the Complained-of Injuries to A.R. and B.R.*

91.     These policies make for a deadly combination.  On the one hand, inmates with serious medical conditions that require more than limited nursing care are not allowed to seek more advanced care at a hospital to prevent dangerous medical events before they happen.  Then, when the emergencies do inevitably happen, there is a nearly 40% chance that not a single person at the jail

will know how to recognize or respond to that emergency, greatly exacerbating the damage it will cause when every second that treatment is delayed matters.

92.     SHP and Navarro County essentially set a trap that was certain to cause some inmates to suffer far greater harm from medical conditions than they should.

93.     This is exactly what happened to Plaintiff, who begged Defendant Hullett and others at the Jail repeatedly to be taken to the hospital.  Tragically, she was refused.

94.     When Plaintiff began to give birth, no medical staff was on site, and no one at the Jail knew what to do.  A.R. was born with her airway clogged with mucus, and she was unable to breathe.  Jail staff did not know how to treat that situation, and A.R.'s airway was not fully cleared until EMS arrived sometime later.  Those few minutes make a big difference to a baby who cannot breathe.

95.     Although correctional officers did call Nurse Hullett on the phone, that is not nearly the same as having medically trained personnel present to make an in-person assessment of Plaintiff's condition.  Had a reasonable nurse or doctor been physically present, she would have personally observed Plaintiff's physical condition, and more likely than not would have called an ambulance immediately.  Instead, Hullett relied on the communicated observations of a correctional officer who was completely untrained in anything remotely approaching obstetrical care.

96.     Alternatively, if the Jail had instituted the previously-contemplated policy of having a physician on-call at all hours, that physician would have been called, and would have gotten Plaintiff transported to a hospital when she first complained of having more intense contractions at around 3:00 a.m., hours before the Jail finally did call an ambulance.  The twins' birth inside the Jail would have been completely averted.

97.     It goes without saying that Navarro County and SHP *could* allow inmates with serious health conditions to go to the hospital; they *could* make sure medical staff is on site at all

times in case of emergency; they *could* have a physician on call 24-hours-per-day for emergencies; they *could* provide some training to other correctional officers regarding the recognition of health emergencies and how to respond. They simply choose not to.

98. Navarro County and SHP choose not to do any of those things for purely financial reasons.

99. Navarro County wants to keep the costs of maintaining the Jail as low as possible; that is why it contracted with SHP in the first place. Naturally, if SHP had to pay more for extra medical staff or training, that cost would be passed on to the County. The cost for services outside the contract, such as hospital care or ambulance calls, comes out of Navarro County's pocket. Therefore, the County has a strong financial incentive to minimize trips to the hospital.

100. On the other hand, SHP is a private company and exists only to make money. Not only is it looking after its own bottom line when it cuts its costs maintaining the prison, but it also has a very strong interest in keeping the County's costs low. If it did not keep the County's costs as low as possible, SHP could easily lose the contract to a competitor.

101. Indeed, this is standard operating procedure for SHP and the municipalities it works with. For example, in October 2017, Madison County, Kentucky decided to renew its contract with SHP only through the end of January 2018 (only a 3-month renewal), after SHP announced a cost increase of $88,000 per year. SHP responded by cutting on-site medical services to a paltry 12 hours per day, which would save Madison County $36,000 per year.

102. That means that every inmate who went through the Madison County Jail and happened to suffer a medical emergency while they were there had a 50-50 chance that it would occur when no medical staff were on site. Madison County and SHP were willing to place those inmates at significantly increased risk—and in fact, more risk than what they had previously determined to be the maximum allowable—for a mere $36,000.

103.    In short, Navarro County and SHP consistently choose their own bank accounts over the needs of the inmates.  The policies described here are a reflection of that preference, and were a direct cause of A.R.'s and B.R.'s premature birth in an unsafe environment and the resulting complications, which would otherwise have been avoidable.

**V.**
**CAUSE OF ACTION UNDER 42 U.S.C. § 1983**

***Navarro County's and SHP's Liability Under* Monell**

104.    All preceding paragraphs are incorporated here by reference.

105.    At all times material to this Complaint, Navarro County and SHP acted under color of the statutes, customs, ordinances, and usage of the State of Texas and Navarro County.

106.    As described above, Navarro County expressly delegated policymaking authority to SHP regarding the medical care at the Jail through contractual language required in SHP's proposal to provide medical services at the Jail.

107.    Nonetheless, Navarro County has a non-delegable **duty** under Texas law to provide medical care to its inmates.  Therefore, even though it has delegated policymaking **authority** to SHP, the County cannot absolve itself of its own duty to provide medical care at its Jail.  So, both SHP and Navarro County are liable for SHP's unconstitutional execution of its policymaking authority regarding the medical care at the Jail.

108.    In the alternative, it is alleged that the delegation of policymaking authority described above made SHP the sole policymaker regarding medical services at the Jail.

109.    As a second alternative, if such express language is insufficient to delegate policymaking authority to SHP, the Navarro County Sheriff and/or its Commissioners' Court retained policymaking authority over the medical services at the Jail.

110.    Navarro County's policymaker with authority over the Jail is its Sheriff, or alternatively, the Commissioners Court.

111.    Management at SHP has policymaking authority over the policies described in this lawsuit and utilized at the Navarro County Jail.  The Chief Executive Officer, or in the alternative, the Chief Operating Officer has policymaking authority for policies of the type alleged in this lawsuit.  Alternatively, SHP, as a single private entity, is itself a "policymaker" for purposes of § 1983 liability.  Indeed, the language in Navarro County's express delegation of policymaking authority is to the Provider itself, in this case, SHP.

112.    The policies described in this Complaint are the sole product of SHP, although Navarro County was fully aware of them, and approved of them, due to the constant presence of the Sheriff himself and Sheriff's Office staff at the Jail.  The policy under which there was no nurse on staff overnight was expressly approved by Navarro County.  The previously-contemplated policy of maintaining an on-call physician 24-hours-per-day was deliberated upon and ultimately omitted from the contract; this was the decision of both the County and SHP.

113.    Acting under color of law, Defendants Navarro County and SHP deprived Plaintiff of the rights and privileges secured to her by the Eighth and/or Fourteenth Amendments to the United States Constitution and by other laws of the United States by failing to provide constitutionally adequate medical treatment.  Plaintiff pleads her case under the alternative theories of conditions of confinement and episodic acts or omissions.[1]

114.    The constitutionally inadequate system of medical care – the conditions at the Navarro County Jail – caused Plaintiff to suffer a deprivation of her constitutional rights. These conditions of Plaintiff's confinement as set forth in this Complaint were not reasonably related to a legitimate governmental purpose.  These conditions amounted to punishment before Plaintiff was judged guilty and thus violated due process of law.  Navarro County's and SHP's intent to punish

---

[1] Plaintiffs may plead the alternative theories of conditions of confinement and episodic acts or omissions in a jail medical care case under 42 U.S.C. § 1983.  *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009).

Plaintiff may be inferred from their decision to expose pretrial detainees such as Plaintiff to an unconstitutional condition.  In other words, an official intent to punish may be inferred from general conditions, practices, rules, or restrictions of pretrial confinement.

115.    Navarro County and SHP are liable to Plaintiff under 42 U.S.C. § 1983 for creating, maintaining, and perpetuating the conditions of confinement that resulted in the constitutionally inadequate medical care at its Jail.

116.    The challenged conditions set forth in this Complaint violated Plaintiff's constitutional rights and were the foreseeable product of the Navarro County's and SHP's decision to staff the Jail with only a single nurse, and no medical staff at all for 9 hours per day.  This is woefully insufficient for a jail that houses over 200 people, and this lack of medical staff prevented confined persons such as Plaintiff from receiving constitutionally adequate medical care.  As Plaintiff shows, the avoidable premature birth of her twins and their concomitant physical maladies were the result of the Navarro County's and SHP's gross inattention to the needs of detainees.  In the absence of any legitimate penological or administrative goal, this amounts to punishment.

117.    Furthermore, Navarro County and SHP did not sufficiently train and/or supervise their staff at the Jail to ensure that they were able to recognize and respond to emergencies properly. As described above, it was official policy for SHP to be responsible for all medical care at the jail, and because of that, Navarro County's official policy was to *not* train its correctional officers to be able to recognize or respond to medical emergencies.

118.    Additionally, Navarro County originally deemed it necessary to have a physician on call at all times for emergencies, because it knew there would be no medical staff on site overnight and that the correctional officers who would be present overnight had no medical training whatsoever.  However, this policy was deliberately omitted from the final agreement with SHP, and in fact SHP did *not* maintain a physician on-call at all times for emergencies.

119.     Finally, it was the policy of the Navarro County Jail to refuse sending anyone to the hospital unless there was a manifest emergency; i.e., when it was too late to prevent the emergency.

120.     The above policies, either individually or in combination, prevent a pretrial detainee at the Navarro County Jail from having access to medical care.  None of these policies have a legitimate penological goal.  Preventing a pretrial detainee's access to medical care cannot be seen as anything other than an unconstitutional punishment, and is therefore an unlawful condition of confinement.

121.     In the alternative, Navarro County and SHP are liable because the policies, customs or practices described above, including a failure to train and/or supervise their employees, were the moving force behind episodic acts or omissions which resulted in violations of Plaintiff's constitutional rights and caused the harm described in this lawsuit .

122.     By its actions and/or inactions as described above, Defendants Navarro County and SHP have violated 42 U.S.C. § 1983 and the constitutional provisions cited in this Complaint.

### *Deliberate Indifference by Linda Hullett*

123.     All preceding paragraphs are incorporated here by reference.

124.     At all times material to this Complaint, Defendant Hullett acted under color of the statutes, customs, ordinances, and usage of the State of Texas and Navarro County.

125.     Hullett's failure to provide proper medical care to Plaintiff constitutes deliberate indifference to her serious medical needs.  Specifically, Hullett had been alerted to Plaintiff's likelihood of giving birth prematurely.  She knew Plaintiff had passed her mucus plug and experienced regular contractions, indicative of imminent childbirth, which continued for a period of nearly two weeks.  Nonetheless, Hullett was deliberately indifferent to Plaintiff's repeated requests to see a specialist or go to the hospital.

126.     To summarize, Hullett:

- Was aware that the general conditions at the Jail were woefully inadequate for delivering extremely premature babies;

- Was aware that there was no medical staff present overnight and that correctional officers had no medical training whatsoever;

- Was told by Plaintiff on or about December 27 that she was having contractions and had passed her mucus plug;

- Was aware of Dr. Shaw's observation of Plaintiff's contractions on December 27 and his order from the same day to get Plaintiff in to see her obstetrician as soon as possible;

- Completely ignored that order by Dr. Shaw, and never allowed Plaintiff to see any obstetrician;

- Personally observed Plaintiff with further contractions on December 29, but still did nothing;

- Was instructed on December 29 by Dr. Cook to get Plaintiff to the hospital if she continued to have contractions or concerns with her pregnancy;

- Failed to timely enter the critical information from the December 29 examination and Dr. Cook's instructions into Plaintiff's medical records;

- When she did enter the notes from December 29, completely ignored the night shift nurse's notes *written directly above where Hullett was entering her notes*, which stated that Plaintiff had been observed with regular contractions on January 2.  This should have triggered Dr. Cook's instructions to get Plaintiff to the hospital, but Hullett did nothing;

- Was told daily, between January 2 and January 9, both in person when delivering prenatal vitamins and through numerous written requests, that Plaintiff continued to

have contractions, discharge, and concerns about going into labor, but still did nothing, refusing to even examine Plaintiff again;

- Was informed by phone in the early morning of January 9 that Plaintiff was having very strong contractions approximately three minutes apart, and did nothing;

- Shortly thereafter was informed by phone that the contractions were only one minute apart, and still did nothing, and did not authorize even calling an ambulance until Plaintiff was in active labor.

127.    In other words, Hullett was thoroughly aware over the course of approximately two weeks that a substantial—and steadily increasing—risk of serious harm to Plaintiff and her babies existed but utterly, and repeatedly, disregarded that risk.

128.    The risk of serious harm came to fruition when Plaintiff gave birth prematurely in the jail to twins who both suffered from a variety of serious and debilitating conditions.

129.    By her actions and/or inactions as described above, Hullett has violated 42 U.S.C. § 1983 and the constitutional provisions cited in this Complaint.

## VI.
## CAUSE OF ACTION: NEGLIGENCE

130.    All preceding paragraphs are incorporated here by reference.

131.    Plaintiff has fully complied with the requirements of §§ 74.051–052 of the Texas Civil Practice and Remedies Code by sending the required notice and authorization forms.

132.    The medical neglect made the basis of this action and the resulting damages, injuries, and death was proximately caused by the negligent conduct of Dr. Grady Shaw, Linda Hullett, Southern Health Partners, Inc., and their agents, representatives, and/or employees.

133.    SHP is responsible for the negligent acts and/or omissions attributable to their employees, agents, officers, directors, supervisors and representatives under the theory of *respondeat*

*superior*, or vicarious liability, because the acts and/or omissions of such persons occurred in the course and scope of their employment, agency or representative capacity.

134. Defendants committed one or more of the following acts or omissions, either directly or through their employees, agents, officers, supervisors and representatives, each of which amounted to an act and/or omission which a reasonable person or entity would not have done in the same or similar circumstances, proximately causing the occurrences, injuries, and damages complained of herein:

      a.     Failed to monitor a serious medical condition;

      b.     Failed to diagnose a serious medical condition;

      c.     Failed to recognize Plaintiff's imminent premature delivery even as strong indicators of such continued to appear;

      d.     Failed to seek emergency medical treatment in a timely manner for a patient in danger of imminent premature childbirth;

      e.     Failed to adequately train employees and health care workers to detect and diagnose serious medical conditions or illnesses, such as premature childbirth;

      f.     Failed to staff a jail facility that housed over 200 inmates with an adequate number of qualified medical providers able to meet the medical needs of the inmate population, and more specifically, the medical needs of Plaintiff;

      g.     Failed to provide adequate treatment or medications to a patient with a known serious medical condition; and

      h.     Failed to supervise the staff providing medical care and services to inmates, including Plaintiff.

135. Plaintiff's twin pregnancy was riskier than a regular pregnancy, but her premature delivery could have been averted with timely intervention. Furthermore, or alternatively, the serious complications suffered by the twins would have been mitigated had they been born in a proper setting (such as a hospital), with trained medical staff, as opposed to Plaintiff's jail cell and only detention officers on hand. The above described acts of negligence by Defendants proximately

caused the injuries to Plaintiff and her twins.

136.    Defendants, including their employees, agents, officers, supervisors, and/or representatives, knew of the obvious signs of Plaintiff's imminent premature childbirth, but did nothing to treat her.

137.    Each of these acts and omissions, singularly or in combination with others, constituted negligence, or gross negligence, which proximately caused the occurrence made the basis of this action and proximately caused the injuries and damages alleged herein.

### *Vicarious Liability*

138.    At the time of the incident described in the foregoing paragraphs, Linda Hullett was an agent, servant, and/or employee of SHP at the Navarro County Jail, and was acting within the course and scope of her authority as such agent, servant, and/or employee.

139.    As a result of Defendants Hullett's negligent acts and/or omissions, Defendant SHP is vicariously liable for her actions.

140.    At the time of the incident described in the foregoing paragraphs, Dr. Grady Shaw was an agent, servant, and/or employee of SHP at the Navarro County Jail, and was acting within the course and scope of his authority as such agent, servant, and/or employee.

141.    As a result of Defendants Shaw's negligent acts and/or omissions, Defendant SHP is vicariously liable for his actions.

### VII.
### DAMAGES

142.    As a direct and proximate result of the above described acts and omissions of Defendants, Plaintiffs, and those interests that Plaintiffs legally represent, have suffered serious damages.  Accordingly, Plaintiffs seek to recover all actual, compensatory, and exemplary damages which have resulted from Defendants' above described conduct.  These damages include, but are not necessarily limited to, the following:

a) Irene Rodriguez's physical suffering, both past and future;

b) Irene Rodriguez's mental pain and anguish, both past and future;

c) All reasonable and necessary medical expenses of Irene Rodriguez A.R., and B.R. that were caused in the past, or will in the future be incurred, due to the above described negligence of Defendants;

d) A.R.'s physical suffering, both past and future;

e) A.R.'s mental pain and anguish arising from the debilitating physical conditions she suffers as a result of Defendants' negligent conduct, described herein;

f) All reasonable and necessary medical expenses, both past and future, associated with the medical treatment of A.R. for conditions that resulted from Defendants' negligent conduct, described herein;

g) B.R.'s physical suffering, both past and future;

h) B.R.'s mental pain and anguish arising from the debilitating physical conditions he suffers as a result of Defendants' negligent conduct, described herein;

i) All reasonable and necessary medical expenses, both past and future, associated with the medical treatment of B.R. for conditions that resulted from Defendants' negligent conduct, described herein;

j) All economic costs incurred by Irene Rodriguez, both past and future, in caring for A.R. and B.R. related to conditions caused by Defendants' negligent conduct, described herein;

k) All economic costs incurred by A.R. and B.R., both past and future, in caring for themselves related to conditions caused by Defendants' negligent conduct, described herein;

l) Punitive damages against all Defendants except Navarro County;

m) Attorney's fees under 42 U.S.C. § 1983; and

n) Pre- and post-judgment interest in accordance with Texas law.

## VIII.
## JURY DEMAND

103.   Plaintiff demands a trial by jury.

## IX.

## PRAYER

Plaintiff Irene Rodriguez requests that Defendants Navarro County; Southern Health Partners, Inc.; Linda Hullett; and Dr. Grady Shaw be summoned to appear and answer and that upon final trial or hearing, a judgment be entered in favor of Plaintiffs and against the Defendants for:

a)   Compensatory and actual damages in an amount deemed sufficient by the trier of fact;

b)   Exemplary damages;

c)   Reasonable and necessary attorneys' fees under 42 U.S.C. § 1988;

d)   Costs of court;

e)   Pre-judgment and post-judgment interest at the highest rate permitted by law; and

f)   All such other and further relief, at law or in equity, to which she may show herself to be justly entitled.

Respectfully submitted,

By:  /s/ *Don Tittle*
　　　Don Tittle
　　　State Bar # 20080200
　　　don@dontittlelaw.com
　　　Roger Topham
　　　State Bar # 24100557
　　　roger@dontittlelaw.com
LAW OFFICES OF DON TITTLE
6301 Gaston Avenue, Suite 440
Dallas, Texas  75214
214/522-8400
214/389-1002- FAX

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of July, 2020, I electronically submitted the foregoing document using the electronic case filing system of the court, and that a true and correct copy has been served

upon the following counsel of record, by electronic service via the Court's CM/ECF system:

**Frank Alvarez**
State Bar No. 00796122
frank.alvarez@qpwblaw.com
**Jo Beth Drake**
State Bar No. 24045942
jobeth.drake@qpwblaw.com
QUINTAIROS, PRIETO, WOOD & BOYER, PA.
1700 Pacific Avenue, Suite 4545
Dallas, Texas 75201
(214) 754-8755
*Attorneys for Defendant*
*Southern Health Partners, Inc.*

**Robert S. Davis**
State Bar No. 05544200
rsd@flowersdavis.com
FLOWERS DAVIS, P.L.L.C.
1021 ESE Loop 323, Suite 200
Tyler, Texas 75701
(903) 534-8063
*Attorney for Defendant Navarro County*

  */s/ Don Tittle*
Don Tittle