IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IRENE RODRIGUEZ, individually and as parent and legal guardian of A.R., and MARIA ANTONIA SANTOS as representative of the estate of B.R., | § § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | CIVIL ACTION NO. 3:20-cv-00045-D |
| SOUTHERN HEALTH PARTNERS, INC. LINDA HULLETT, and DR. GRADY SHAW, | § § § § | |
| *Defendants.* | § § | |

---

**BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO STRIKE**

---

**Don Tittle**
Texas Bar #20080200
don@dontittlelaw.com
**Law Offices of Don Tittle, PLLC**
8350 N Central Expy., Suite M1085
Dallas, Texas 75206
(214) 522-8400 – Telephone
(214) 389-1002 – Facsimile

**Roger Topham**
Texas Bar #24100557
13809 Research Blvd. Suite 500
Austin, Texas 78750
(512) 987-7818
rt@tophamlaw.com


*COUNSEL FOR PLAINTIFFS*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

I.       INTRODUCTION AND SUMMARY OF ARGUMENT ...............................................1

II.      STATEMENT OF FACTS ..............................................................................................2

    A.   Plaintiffs' Experts Are Qualified to Offer Their Opinions. ............................................2

    B.   Dr. Shaw's Treatment of Irene Rodriguez. ...................................................................5

III.     SUMMARY JUDGMENT STANDARD OF REVIEW ..................................................6

IV.      DR. CARPENTER AND DR. MEYN ARE QUALIFIED TO OFFER THEIR OPINIONS ON
DEFENDANTS' BREACHES OF THE STANDARD OF CARE ............................................6

    A.   Expert Medical Testimony Under Texas Law. ...............................................................8

    B.   Rule 702. ........................................................................................................................9

    C.   The Ordinary Medical Standard of Care Applies Equally in a Correctional Setting. ....................11

    D.   Due to Their Training and Experience, Physicians May Testify on the Standard of Care
Applicable to Nurses. .........................................................................................................14

    E.   Issues of Medical Causation are Entirely Independent of the Correctional Setting. ......................17

V.       CLAIMS AGINST DR. SHAW ARE NOT TIME-BARRED ......................................18

    A.   Shaw's Treatment of Irene Rodriguez Was Not "Completed" Until January 9, 2018. ....................19

    B.   The Claims Are Subject to Chapter 74's 75-Day Tolling Period Because Sufficient Statutory
Notice Was Provided to Defendants. ...................................................................................23

VI.      CONCLUSION .............................................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Bala v. Maxwell* ........................................................................................................22
    909 S.W.2d 889 (Tex. 1995)

*Canavati De Checa v. Diagnostic Ctr. Hosp., Inc.* .............................................23–24
   852 S.W.2d 935 (Tex. 1993)

*Carreras v. Marroquin* ............................................................................................27
  339 S.W.3d 68 (Tex. 2011)

*Chambers v. Conaway* .............................................................................................22
  883 S.W.2d 156 (Tex. 1993)

*Children's Med. Ctr. of Dallas v. Durham* .........................................................7, 16
   402 S.W. 3d 391 (Tex. App.—Dallas 2013, no pet.)

*Cleveland v. Bell* .....................................................................................................11
  938 F.3d 672 (5th Cir. 2019)

*College Station Med. Ctr., LLC v. Kilaspa* ............................................................23
   494 S.W.3d 307 (Tex. App.—Waco 2015, pet. denied)

*Cooper v. Kliebert* ...................................................................................................12
  2016 U.S. Dist. LEXIS 92098 (M.D. La. July 15, 2016)

*Davenport v. Adu-Lartey* .........................................................................................26
  526 S.W.3d 544 (Tex. App.—Houston [1st Dist.] 2017, pet. denied)

*Gonzalez v. Padilla* .................................................................................................12
  485 S.W.3d 236 (Tex. App.—El Paso 2016, no pet.)

*Harvey v. Kindred Healthcare Operating, Inc.* .......................................................16
  578 S.W.3d 638 (Tex. App.—Hous. [14th Dist.] 2019, no pet.)

*Hayes v. Carroll* ..................................................................................................7, 16
  314 S.W.3d 494 (Tex. App.—Austin 2010, no pet.)

*Hyatt v. Thomas* .........................................................................................................6
  843 F.3d 172 (5th Cir. 2016)

*IHS Acquisition No. 131, Inc. v. Crowson* .....................................................7, 12, 16
  351 S.W.3d 368 (Tex. App.—El Paso 2010, no pet.)

*Janvey v. Democratic Senatorial Campaign Comm., Inc.* .......................................................... 25
    712 F.3d 185 (5th Cir. 2013)

*Johnson v. PHCC–Westwood Rehab. & Health Care Ctr., LLC* ................................................ 26
    501 S.W.3d 245 (Tex. App.—Houston [1st Dist.] 2016, no pet.)

*Magnolia Place Health Care, LLC v. Jackson* ......................................................................... 12
    2021 Tex. App. LEXIS 10204 (Tex. App.—Beaumont Dec. 30, 2021, no pet.)

*Martinez-Partido v. Methodist Specialty & Transplant Hosp.* .................................................... 16
    327 S.W.3d 274, 279–280 (Tex. App.—San Antonio 2010)

*Maypole v. Acadian Ambulance Serv.* .................................................................................. 26–27
    647 S.W.3d 533 (Tex. App.—Dallas 2022, pet. granted)

*McDowell v. Brown* ............................................................................................................. 7, 12, 17
    392 F.3d 1283 (11th Cir. 2004)

*Mendoza v. Murphy* ................................................................................................................. 19
    532 F.3d 342 (5th Cir. 2008)

*Mounce v. Doe* ........................................................................................................................ 12
    2014 U.S. Dist. LEXIS 78920 (E.D. La. June 10, 2014)

*Nexion Health at Beechnut, Inc. v. Moreno* ............................................................................. 12
    2016 Tex. App. LEXIS 3177 (Tex. App.—Hous. [1st Dist.] Mar. 29, 2016, no pet.)

*Oakley v. Hudson* ................................................................................................................. 7, 17
    2014 U.S. Dist. LEXIS 172660 (S.D. Tex. Dec. 15, 2014)

*Rabatin v. Kidd* ....................................................................................................................... 27
    281 S.W.3d 558 (Tex. App.—El Paso 2008, no pet.)

*Rowntree v. Hunsucker* ............................................................................................................ 21
    833 S.W.2d 103 (Tex. 1992)

*U.S. v. Hicks* ............................................................................................................................. 9
    389 F.3d 514 (5th Cir. 2004)

*U.S. v. Wen Chyu Liu* ......................................................................................................... 10–11,m 14
    716 F.3d 159 (5th Cir. 2013)

*Woodward v. Lopinto* ............................................................................................................... 12
    2021 U.S. Dist. LEXIS 93158 (E.D. La. May 17, 2021)

## Federal Rules

FED. R. CIV. P. 56.................................................................................................................6, 25

Fed. R. Evid. 702 ...............................................................................................................10

## Texas Statutes

TEX. CIV. PRAC. & REM. CODE § 74.051–052.......................................................................23, 25

TEX. CIV. PRAC. & REM. CODE § 74.251 ....................................................................................18

TEX. CIV. PRAC. & REM. CODE § 74.401–402.......................................................................8–9, 11

## Other Authorities

Texas Board of Nursing Position Statement 15.27 .......................................................................19

Plaintiffs Irene Rodriguez, individually and as representative of A.R., and Maria Antonia Santos, as representative of the estate of B.R., submit this Brief in Support of the Response in Opposition to the Motion for Partial Summary Judgment and Motion to Strike filed by Defendants, and would respectfully show the Court the following:

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

This lawsuit involves claims under § 1983 for civil rights violations, as well as state law claims for negligence, stemming from Defendants' failure to adequately care for Irene Rodriguez's high-risk twin pregnancy while she was incarcerated at the Navarro County Jail.  Despite various warnings of likely preterm labor, Defendants kept Rodriguez inside the jail and did not allow her to be seen by an obstetrician or seek appropriate treatment.  As a result, the babies were born prematurely inside the jail, where the total lack of appropriate personnel and equipment caused the twins to suffer severe, life-changing injuries.  The second twin, B.R., died while this lawsuit was pending on February 15, 2021.

Defendants move to strike two of Plaintiffs' experts, Dr. Robert Carpenter and Dr. Donald Meyn, because while they have appropriate medical expertise, they have never worked in a correctional facility.  This argument is meritless.  The standard of care for medical treatment is the same regardless of where the medical care is provided.  Defendants also argue that Carpenter and Meyn are essentially overqualified to testify whether nurse Hullett breached the standard of care. On the contrary, it is well established that physicians can testify to the standard of care applicable to nurses.  Dr. Carpenter and Dr. Meyn are fully qualified to offer their stated opinions under the traditional analysis of *Daubert* challenges.

1

Additionally, Dr. Shaw has filed a Motion for Partial Summary Judgment[1] on a single, narrow issue: he asserts that all claims against him are time-barred due to provisions in the Texas Medical Liability Act (Chapter 74 of the Texas Civil Practices & Remedies Code).  This is not true.  First, the claims of the twins are not time-barred, because the statute of limitations as to them runs for ten years, due to their status as minors.  Moreover, Shaw's course of treatment for Irene persisted until January 9, 2018, and there is no precise, ascertainable date of his alleged failure to follow up on Irene, meaning the claims filed against him on January 8, 2020 were timely.  Finally, in the alternative, Plaintiff complied with the notice requirement of Chapter 74, which tolls the statute of limitations for 75 days.

## II.    STATEMENT OF FACTS

As noted above, Defendants' Motion for Summary Judgment is limited to (a) a motion for summary judgment on all claims based on the assertion that Plaintiffs have no medical experts who are qualified to testify, and (b) a motion for summary judgment on claims against Dr. Shaw, based on the assertion that they are time-barred.  Defendants do not move for summary judgment on any other claims on any other basis.  Therefore, this statement of facts will be limited to those relevant to the matters at issue.  Additional facts may be noted within the arguments themselves.

### A.  *Plaintiffs' Experts Are Qualified to Offer Their Opinions.*

Dr. Robert Carpenter graduated from Baylor College of Medicine in May 1973 and completed his internship and residency there (1973-1977) and served as Chief Resident in OB/GYN from July 1976 to June 1977.[2]  He completed his Fellowship in Maternal Fetal Medicine

---

[1] Although Defendants style their Motion without the "Partial" designation, it is clear that it is in fact only seeking partial summary judgment.  Beyond the issue of Plaintiffs' experts, Defendants did not move separately (or present any arguments) for summary judgment on any claims against Linda Hullett or Southern Health Partners.
[2] Pls.' Appx. at 27, 44–45.

at Baylor in June 1979 and performed additional study in OB Ultrasound and Fetoscopy at Yale University School of Medicine and Hospital from September to October 1977.[3] Carpenter is Board Certified in obstetrics and gynecology and in the subspecialty of Maternal Fetal Medicine by the American Board of Obstetrics and Gynecology.[4] His Curriculum Vitae is attached as an exhibit to the brief of Plaintiffs' Response to Defendants' Motion for Summary Judgment, with additional details concerning my educational and professional activities.[5] Carpenter has been in the active practice of OB/GYN since graduation and is currently in private practice.[6] His license to practice medicine is currently active in the state of Texas and on record with the Texas Medical Board.[7]

Dr. Donald Meyn is licensed to practice medicine in the State of Louisiana, he is a Diplomate of the American Board of Pediatrics in both General Pediatrics and Neonatal-Perinatal Medicine, and he is a Fellow of the American College of Pediatrics.[8] Meyn completed residency at the University of Alabama at Birmingham in 2006 and a fellowship in Neonatology, also at the University of Alabama at Birmingham, in 2009.[9] He is Board Certified in Pediatrics and Sub-Board Certified in Neonatal–Perinatal Medicine.[10] He has been in full time practice as a Neonatologist since 2009 with Infamedics.[11] His current practice includes inpatient care of infants at a Level 3 Surgical Neonatal Intensive Care Unit, which admits approximately 1500 patients and 140 very low birth weight infants yearly.[12] Meyn is a member of the active medical staff of three

---

[3] Pls.' Appx. at 27, 44–45.
[4] Pls.' Appx. at 27, 44–45.
[5] Pls.' Appx. at 27, 44–66.
[6] Pls.' Appx. at 27, 44–45.
[7] Pls.' Appx. at 27, 44–45.
[8] Pls.' Appx. at 76, 92–93.
[9] Pls.' Appx. at 76, 92–93.
[10] Pls.' Appx. at 76, 92–93.
[11] Pls.' Appx. at 76, 92–93.
[12] Pls.' Appx. at 76, 92–93.

Baton Rouge area hospitals: Woman's Hospital, Baton Rouge General Medical Center, and Ochsner Medical Center Baton Rouge.[13]   His Curriculum Vitae is attached as an exhibit to the brief of Plaintiffs' Response to Defendants' Motion for Summary Judgment with further details on his experience and qualifications.[14]

Both Meyn and Carpenter have stated that the medical standard of care is the same as applied in a correctional setting as it is in a hospital.[15]   Dr. Michelle Spears, Irene Rodriguez's former obstetrician, has stated the same thing.[16]   Claire Teske, Defendants' nursing expert, has similarly stated that beyond the national standards described by the National Commission on Correctional Healthcare ("NCCHC"), the standard of care for nurses set out by the Board of Nursing does not differentiate between a correctional setting and any other.[17]   Dr. Meyn has reviewed the NCCHC standards and stated that they augment, rather than displace, the ordinary standard of care, and are generally intended to promote reasonable policies at the administrative level, rather than specific standards for medical providers in the context of their individual practice and decision-making.[18]   Moreover, the specific breaches of the standard of care at issue in this case (such as proper documentation of patient information, communication with physicians, and following physician's orders) are universally important and apply regardless of setting.[19]

Additionally, both Dr. Carpenter and Dr. Meyn have extensive experience working with nurses and providing them direction, and are familiar with the standard of care applied to nurses.[20]

---

[13] Pls.' Appx. at 76, 92–93.
[14] Pls.' Appx. at 77, 92–94.
[15] Pls.' Appx. at 28–29, 77–78, 97–98.
[16] Pls.' Appx. at 109.
[17] Pls.' Appx. at 113–15.
[18] Pls.' Appx. at 77.
[19] Pls.' Appx. at 28, 77–78.
[20] Pls.' Appx. at 28–29, 68–69, 78, 96.

**B.  *Dr. Shaw's Treatment of Irene Rodriguez.***

Defendant Dr. Grady Shaw examined Irene Rodriguez on December 27, 2017 regarding her twin pregnancy, while she was incarcerated at the Navarro County Jail.[21]  He noted that Irene had an appointment to see her obstetrician the next day.[22]  He issued an order to Linda Hullett and the jail nursing staff to ensure Irene was seen by an obstetrician "as soon as possible" (using the common shorthand "asap").[23]  He additionally noted the need to further monitor Iren's pregnancy.[24]  It is undisputed that Shaw never examined Rodriguez again, or took any other action to ensure his orders had been followed.[25]  The twins were born prematurely at the jail on January 9, 2018, and were severely injured as a result.[26]

In his deposition, Shaw testified that the standard of care would have required Irene to be seen immediately by an obstetrician when she reported the passing of her mucous plug.[27]  He also admitted that Nurse Hullett failed in her duties in multiple ways: (1) Irene Rodriguez's complaints about her pregnancy should have been brought to his attention, which would have caused him to get Irene to an obstetrician immediately;[28] (2) Hullett should have reviewed the notes from Irene's examination on January 2 when she entered her late notes from December 29 (which she did sometime after the January 2 exam);[29] and (3) the progress notes from December 29 and notes about Dr. Cook's instructions should not have been entered days after the fact.[30]

---

[21] Pls.' Appx. at 3.
[22] Pls.' Appx. at 3.
[23] Pls.' Appx. at 1.
[24] Pls.' Appx. at 3.
[25] Pls.' Appx. at 15–18.
[26] Pls.' Appx. at 4–8, 37–42, 86–90.
[27] Pls.' Appx. at 14.
[28] Pls.' Appx. at 11–13.
[29] Pls.' Appx. at 22.
[30] Pls.' Appx. at 19–22.

## III.   SUMMARY JUDGMENT STANDARD OF REVIEW

A court shall grant summary judgment only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[31]   A disputed fact is material if it "might affect the outcome of the suit under the governing law."[32]   As long as the evidence regarding a given dispute is such that a jury could reasonably find in favor of the non-movant, that dispute is "genuine."[33]   The reviewing court may not "weigh the evidence or evaluate the credibility of witnesses;" rather, it must construe all facts and draw all inferences in favor of the non-movant.[34]   In sum, a non-movant will defeat summary judgment by identifying any genuinely disputed fact material to each challenged element.

## IV.   DR. CARPENTER AND DR. MEYN ARE QUALIFIED TO OFFER THEIR OPINIONS ON DEFENDANTS' BREACHES OF THE STANDARD OF CARE

Defendants do not challenge the general medical qualifications of Carpenter, an obstetrician/gynecologist with a specialty in maternal–fetal medicine and over 45 years of experience,[35] or Meyn, a neonatologist with 14 years of experience.[36]   Rather, Defendants argue (a) that Dr. Carpenter and Dr. Meyn should be excluded entirely from testifying in this case due to their lack of experience in a correctional setting, and (b) that as physicians, they cannot testify regarding the standard of care applicable to a nurse.   Neither of these objections are supported by the plain text of either Rule 702 or the Texas Medical Liability Act, as outlined below.

Defendants' assertions are meritless for several additional reasons.   First, the breaches of the standard of care at issue in this case concern practices that are universally important in the field

---

[31] FED. R. CIV. P. 56(a).
[32] *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016).
[33] *Id.*
[34] *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 358 (5th Cir. 2017).
[35] Pls.' Appx. at 27, 44–45.
[36] Pls.' Appx. at 76, 92–93.

6

of medicine, such as following physician's orders, effective communication, timely documentation, appropriate responses to emergencies, and recognizing the limits of one's own medical training, expertise, and licensure.[37]   None of these issues are unique to correctional medicine, and they are all part of Dr. Carpenter's and Dr. Meyn's professional training and experience as physicians.[38]   Moreover, the general medical standard of care is not somehow "diminished" if one happens to practice in a correctional facility, as opposed to any other setting.[39] *Defendants do not cite a single case* supporting their assertion that only correctional doctors may testify about medical failures that happen to occur in a correctional facility.

Second, one does not have to *be* a nurse to testify to the standard of care applicable to a nurse.   Physicians may testify to that standard of care because their professional experience necessitates ongoing, close work with nurses—including their supervision.[40]   Indeed, physicians are largely responsible for defining a nurse's standard of care, because it is ultimately the physicians themselves who depend on nurses' work being consistent and reliable, so that the physicians may provide the level of care they are required to provide.[41]   Moreover, a physician certainly must know the limits—set by training, experience, or the scope of a nurse's license—of what they can and cannot reasonably expect a nurse to do.[42]   In fact, multiple courts have held that physicians may testify to the standard of care for nurses.[43]   Both Carpenter and Meyn have worked

---

[37] Pls.' Appx. at 28, 77–78.

[38] Pls.' Appx. at 28, 77–78.

[39] Pls.' Appx. at 28–29, 77–78.

[40] Pls.' Appx. at 28–29, 78.

[41] Pls.' Appx. at 28–29, 78.

[42] Pls.' Appx. at 28–29, 78.

[43] *Oakley v. Hudson*, 2014 U.S. Dist. LEXIS 172660 at *3–4 (S.D. Tex. Dec. 15, 2014) ("A physician's area of expertise ordinarily encompasses the standard of care applicable to nurses.") (citing *McDowell v. Brown*, 392 F.3d 1283, 1296 (11th Cir. 2004), *Children's Med. Ctr. of Dallas v. Durham*, 402 S.W. 3d 391, 399 (Tex. App.—Dallas 2013, no pet.), and *Hayes v. Carroll*, 314 S.W.3d 494, 504–05 (Tex. App.—Austin 2010, no pet.)); *see also IHS Acquisition*

extensively with nurses in their field and can testify to the standard of care applicable to them.[44]
Their qualifications are clearly sufficient to satisfy the requirements of § 74.402, listed above.
Again, Defendants fail to cite a single case supporting their assertion.

Finally, a substantial portion of Carpenter's and Meyn's testimony is regarding medical causation, which is wholly independent of the setting in which it occurs.[45]  For example, a doctor does not need correctional experience to explain to a jury that babies born very prematurely will suffer if they are not provided immediate breathing and environmental support by specialized medical personnel and equipment.[46]

## A.  *Expert Medical Testimony Under Texas Law.*

The Texas statute governing expert witness testimony on whether a physician departed from the standard of care in a medical liability claim requires only that the witness is a physician who:

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
>
> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim;  and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.[47]

---

*No. 131, Inc. v. Crowson*, 351 S.W.3d 368, 372 (Tex. App.—El Paso 2010, no pet.) (Physician qualified to testify to nursing standard of care based on "his physician's experience with respiratory distress and treatment combined with his knowledge of nursing practices.").

[44] Pls.' Appx. at 28–29, 68–69, 78, 96.

[45] Pls.' Appx. at 28, 31–42, 78, 80–90.

[46] Pls.' Appx. at 88.

[47] TEX. CIV. PRAC. & REM. CODE § 74.401(a).  Further, "practicing medicine" "includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians."  *Id.* at § 74.401(b).

The statute further instructs courts to "consider whether, at the time the claim arose or at the time the testimony is given, the witness: (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and (2) is actively practicing medicine in rendering medical care services relevant to the claim."[48]

Notably, the statute allows courts to depart from these criteria if there is good reason to *admit* the testimony of someone who does not meet them, but does not allow the *exclusion* of a witness who *does* meet the criteria.[49]

Regarding testimony about whether a non-physician health care provider breached the standard of care, the statute is even less stringent, allowing such testimony if the witness:

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim;  and

> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.[50]

Drs. Carpenter and Meyn meet all of these criteria.[51]

## B.    *Rule 702.*

A witness qualifies as an expert if his knowledge of the subject matter on which he is to testify is such that his opinion will likely assist the trier of fact at arriving at the truth.[52]  As per Federal Rule of Evidence 702,

---

[48] *Id.* at § 74.401(c).
[49] *Id.* at § 74.401(d).
[50] *Id.* at § 74.402(b).
[51] Pls.' Appx. at 27–31, 44–66, 76–80, 92–94.
[52] *U.S. v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004).

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.[53]

The Fifth Circuit's opinion in *United States v. Wen Chyu Liu* is instructive here regarding the liberal standards applied to expert testimony.  In that case, the Court noted that "[a] lack of personal experience . . . should not ordinarily disqualify an expert, so long as the expert is qualified based on some other factor provided by Rule 702: 'knowledge, skill, experience, training,  or education.'"[54]   The Court referenced another Fifth Circuit case in which "an expert did not lack qualifications to testify about the design of a crawler tractor, based on his review of blueprints and photographs, despite a lack of prior experience approving crawler tractor designs."[55]   It ultimately concluded, "Because of Ostermiller's training and experience as a chemical engineer and his broad experience in chemical plants including polymer plants, we conclude that the district court abused its discretion in excluding his opinion testimony related to the manufacturing of CPE [chlorinated polyethylene]. The court's concerns about his lack of experience in CPE manufacturing are relevant to the weight of his testimony, not its admissibility."   The Fifth Circuit further observed, "A lack of specialization should generally go to the weight of the evidence rather than its admissibility . . . an expert witness is not strictly confined to his area of practice, but may testify concerning related

---

[53] FED. R. EVID 702.
[54] *U.S. v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013).
[55] *Id.* (citing *Dixon v. International Harvester Co.*, 754 F.2d 573, 579–580 (5th Cir. 1985)).

applications . . . ."[56]  Note that the term "specialization" here does not refer to Carpenter's or Meyn's *medical* specializations, which Defendants do not argue are insufficient.  Rather, it refers to a broader understanding of "specialization" to encompass experience in a different setting, as discussed in *Wun Chyu Liu*.

In short, the testimony of Carpenter and Meyn is admissible under either the Texas Medical Liability Act and/or Rule 702.

**C.  *The Ordinary Medical Standard of Care Applies Equally in a Correctional Setting.***

Defendants assert—without any support from legal precedent, testimony, or other evidence—that the standard of care for medical providers is somehow different (and impliedly lower) inside a correctional facility than it is anywhere else.  This is simply not correct.[57]  The fact that a testifying expert does not need to have been practicing in an identical setting to the defendant is immediately obvious from the fact that the Texas Medical Liability Act allows experts to testify against clinicians when the expert was not engaging with patients at all, but was only acting as a consultant or professor regarding the field of medicine in question.[58]  The difference between an active clinician and a professor is unquestionably greater than any alleged difference between a clinician in a hospital and a clinician in a correctional facility.

Moreover, several courts have found that medical standards of care are universal, regardless of setting.  This includes the Eleventh Circuit Court of Appeals, which has held that **"The standard of care applicable to nurses is universal, and does not diminish when the**

---

[56] *Id.* at 168–69.

[57] It is worth noting that the medical standard of care for negligence claims should not be confused with the minimum level of culpability for constitutional violations.  This is because, by definition, a constitutional violation generally must involve something more than negligence. *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019).

[58] TEX. CIV. PRAC. & REM. CODE § 74.401(b), 74.402(a).

**setting is a jail rather than hospital."**[59]  Courts within the Fifth Circuit coming to similar conclusions include the Western District of Texas (nutritionist qualified to testify about potential vegan diets in prison despite a lack of experience in corrections);[60] the Middle District of Louisiana (psychiatrist qualified to testify whether appropriate medication was provided to pretrial detainees awaiting transfer to mental health institution despite lack of experience in corrections);[61]  and the Eastern District of Louisiana ("With respect to defendant's argument that Reams' labor and delivery triage experience is not relevant because her experience lies in a hospital, not a prison setting, this lack of specialization goes to weight, not admissibility.").[62] Several Texas appellate courts have similarly found that medical experts may testify as to the standard of care applicable in nursing homes or rehabilitation facilities without having any experience in such facilities themselves.[63]

Further, while Defendants have produced no testimony to support their position, several medical practitioners involved in this case have stated that the standard of care in a correctional facility is the ordinary medical standard of care.  This includes Dr. Michelle Spears (the

---

[59] *McDowell*, 392 F.3d at 1296.

[60] *McKennie v. Tex. Dep't of Crim. Justice*, 2011 U.S. Dist. LEXIS 153538 at *2–7 (W.D. Tex. May 10, 2011).

[61] *Cooper v. Kliebert*, 2016 U.S. Dist. LEXIS 92098 at *3–7 (M.D. La. July 15, 2016).

[62] *Woodward v. Lopinto*, 2021 U.S. Dist. LEXIS 93158 at *8 (E.D. La. May 17, 2021); *see also Mounce v. Doe*, 2014 U.S. Dist. LEXIS 78920 at *13–15 (E.D. La June 10, 2014) (Dentist with no correctional experience was qualified to testify regarding general dentistry standards of care, and the treatments and practices performed in a jail).

[63] *IHS Acquisition*, 351 S.W.3d at 371–72; *Gonzalez v. Padilla*, 485 S.W.3d 236, 243–44 (Tex. App.—El Paso 2016, no pet.); *Magnolia Place Health Care, LLC v. Jackson*, 2021 Tex. App. LEXIS 10204 at *27–29 (Tex. App.—Beaumont Dec. 30, 2021, no pet.); *Nexion Health at Beechnut, Inc. v. Moreno*, 2016 Tex. App. LEXIS 3177 at *12–14 (Tex. App.—Hous. [1st Dist.] Mar. 29, 2016, no pet.).

obstetrician who treated Irene Rodriguez before she was arrested),[64] Carpenter,[65] and Meyn.[66] Claire Teske, Defendants' nursing expert, similarly testified that other than the standards expressed in the NCCHC's published standards on correctional health care, the standard of care for nurses set out by the Board of Nursing does not differentiate between a correctional setting and any other.[67]

Additionally, while Defendant Dr. Grady Shaw was not specifically asked whether a different standard of care applied in a jail, he testified that the standard of care would have required Irene to be seen immediately by an obstetrician when she reported the passing of her mucous plug.[68]  He also admitted that Nurse Hullett failed in her duties in multiple ways: (1) Irene Rodriguez's complaints about her pregnancy should have been brought to his attention, which would have caused him to get Irene to an obstetrician immediately;[69] (2) Hullett should have reviewed the notes from Irene's examination on January 2 when she entered her late notes from December 29 (which she did sometime after the January 2 exam);[70] and (3) the progress notes from December 29 and notes about Dr. Cook's instructions should not have been entered days after the fact.[71]  As noted by Drs. Carpenter and Meyn, these breaches are of fundamental

---

[64] Pls.' Appx. at 109.

[65] Pls.' Appx. at 28–29.

[66] Pls.' Appx. at 77–78, 97–98.

[67] Pls.' Appx. at 113–115.  The NCCHC Standards, it should be noted, are general in nature, and their purpose is to provide recommended policies for correctional facilities to implement to encourage the delivery of sufficient medical care to inmates.  Indeed, they could be described as adding an extra layer to the standard of care; they certainly do not *diminish* the ordinary standard in any way.  Pls.' Appx. at 77.  The NCCHC Standards regarding pregnant inmates are included in Plaintiffs' appendix at 24–26.

[68] Pls.' Appx. at 14.

[69] Pls.' Appx. at 11–13.

[70] Pls.' Appx. at 22.

[71] Pls.' Appx. at 19–22.

requirements of the ordinary provision of medical care, regardless of setting.[72]   It is also noteworthy that Defendants' expert Dr. Mark Landon, who has been designated to testify on the care given at the jail, has no personal experience working in a correctional facility, himself.[73]

Finally, to whatever extent correctional experience is a form of "specialization," the Fifth Circuit has held that "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight."[74]   For all of these reasons, Dr. Carpenter and Dr. Meyn are qualified to offer the opinions on the standard of care applicable to Defendants in this case.

## D. *Due to Their Training and Experience, Physicians May Testify on the Standard of Care Applicable to Nurses.*

Defendants claim that Drs. Carpenter and Meyn cannot testify regarding the standard of care applicable to nurse Linda Hullett, because they are doctors, rather than nurses.  This is not true.  As with their challenge regarding the correctional setting, Defendants fail to cite any support from legal precedent, testimony, or other evidence for this assertion.

Many of the same reasons Carpenter and Meyn can testify to the standard of care in a correctional facility apply equally to their qualifications to testify to the standard or care applicable to nurses.  Neither Rule 702 nor Chapter 74 require an expert witness to have held the exact same position as a defendant they are testifying about.  Also as noted above, any difference in "specialization" goes to the weight of the testimony, not its admissibility.[75]

---

[72] Pls.' Appx. at 28, 77–78.
[73] Pls.' Appx. at 118.
[74] *U.S. v. Wen Chyu Liu*, 716 F.3d 159, 168–69 (5th Cir. 2013) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) and *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991).
[75] *Wen Chyu Liu*, 716 F.3d at 168–69.

14

Furthermore, physicians are necessarily familiar with the standard of care applicable to nurses due to their close working relationship and the fact that physicians supervise nurses. Because their work is inextricably intertwined, and because a physician must know what he can and cannot reasonably expect from nurses working under him, it follows that physicians must know the standard of care nurses must comply with. Both Carpenter and Meyn have stated that, and both have stated that they have extensive experience working with nurses and/or supervising them throughout their careers.[76]

This becomes even more obvious when the specific alleged breaches of the standard of care in this case are examined. These include (a) a nurse's responsibility to communicate critical medical information to the responsible physician;[77] (b) a nurse's responsibility to accurately and timely document patient encounters (thus allowing physicians and other medical practitioners to be fully informed about the patient);[78] (c) a nurse's responsibility to follow a physician's orders;[79] and (d) a nurse's responsibility to know the limits of her own training and expertise, so that she obtains the involvement of a physician when it is appropriate.[80] Each of these directly implicate— and in fact are defined by—a nurse's professional relationship with a physician; naturally, a sufficiently experienced physician will be aware of what they expect from nurses in this regard. Responsibilities such as these are also universally applicable to medical care and not in any way unique to a correctional facility.

---

[76] Pls.' Appx. at 28–29, 68–69, 78, 96.
[77] Pls.' Appx. at 28, 77–78.
[78] Pls.' Appx. at 28, 77–78.
[79] Pls.' Appx. at 28, 77–78.
[80] Pls.' Appx. at 28, 77–78.

Texas appellate courts have repeatedly held that physicians may testify to a nurse's standard of care.[81]   The Houston Court of Appeals (14th District) observed that "A physician is qualified to testify as an expert regarding whether a nonphysician healthcare provider departed from the accepted standards of care when the physician states she is familiar with the standard of care (1) for both nurses and physicians and (2) for the prevention and treatment of the illness, injury, or condition involved in the claim."[82]   Carpenter and Meyn have stated so here.[83]

Explaining the requirements of Chapter 74, the Austin Court of Appeals observed that the defendants' argument that an expert witness (who was a physician) could not testify to the standard of care applied to nurses or physicians with different specialties

> ignores the plain language of the statute, which focuses not on the defendant doctor's area of specialty, but on the medical condition involved in the claim. . . . Patman's medical training and experience gained through years of practice as a vascular surgeon qualified him to provide expert testimony regarding the standard of care required of a physician or nurse whose patient is unconscious or in an impaired or altered mental state with an allegedly blood-flow-constricting bandage applied to a leg.[84]

Applying these rules here, Dr. Carpenter (an obstetrician/gynecologist with a specialty in maternal–fetal medicine and over 45 years of experience) and Dr. Meyn (a pediatrician/neonatologist with extensive experience in labor and delivery and over 16 years in

---

[81] *E.g.*, *Harvey v. Kindred Healthcare Operating, Inc.*, 578 S.W.3d 638, 647 (Tex. App.—Hous. [14th Dist.] 2019, no pet.); *Children's Med. Ctr. of Dallas v. Durham*, 402 S.W. 3d 391, 399 (Tex. App.—Dallas 2013, no pet.); *Hayes v. Carroll*, 314 S.W.3d 494, 504–05 (Tex. App.—Austin 2010, no pet.); *IHS Acquisition No. 131, Inc. v. Crowson*, 351 S.W.3d 368, 372 (Tex. App.—El Paso 2010, no pet.); *Martinez-Partido v. Methodist Specialty & Transplant Hosp.*, 327 S.W.3d 274, 279–280 (Tex. App.—San Antonio 2010) (noting, "The need to properly communicate a patient's medical history crosses all disciplines and medical settings.").
[82] *Harvey*, 578 S.W.3d at 647 (citing additional cases).
[83] Pls.' Appx. at 28–29, 30–66, 68–69, 77–94, 96.
[84] *Hayes*, 314 S.W.3d at 504–05.

practice) are abundantly qualified to speak about the medical conditions at issue in this case, in addition to having worked their entire careers both alongside and directing the activities of nurses.

The Eleventh Circuit also stated in *McDowell* that "A physician's area of expertise necessarily encompasses the standard of care applicable to nurses."[85]  The Southern District of Texas followed *McDowell* in an almost identical holding, only substituting the word "ordinarily" for "necessarily."[86]  In sum, Carpenter and Meyn are qualified to opine that Linda Hullett's various failures in providing obstetrical care to Irene Rodriguez and failing to ensure that the twins were born in an appropriate environment were breaches of the standard of care.

## E.  *Issues of Medical Causation are Entirely Independent of the Correctional Setting.*

Defendants have not asked the Court to strike only certain opinions by Carpenter and Meyn; instead, they ask these experts to be excluded entirely.  As discussed above, they are incorrect.  However, it must also be noted that the opinions of Carpenter and Meyn discuss not only the standard of care but also medical causation.  Medical causation, by its very nature, is a purely scientific question that is completely independent of the setting in which the medical care was provided.[87]  For example, whether the harmful results of premature labor can be mitigated by appropriate intervention,[88] or whether very low birth weight babies born prematurely without breathing support can suffer brain injuries related to hypoxia[89] are questions entirely unrelated to setting (of course, the latter is much more likely to occur outside a hospital setting, but would apply equally inside a hospital that failed to provide appropriate support).  Therefore, granting

---

[85] *McDowell*, 392 F.3d at 1296.
[86] *Oakley*, 2014 U.S. Dist. LEXIS 172660 at *3–4.
[87] Pls.' Appx. at 28, 78.
[88] Pls.' Appx. at 39–41.
[89] Pls.' Appx. at 88–90.

Defendants' Motion would unjustly exclude testimony that they have provided no basis for excluding.

## V.    CLAIMS AGINST DR. SHAW ARE NOT TIME-BARRED

As an initial, critical matter, Shaw has overlooked the fact that claims brought on behalf of the twins, A.R and B.R., could not possibly be time-barred.  This is because as minor children, they had until at least December 27, 2027 to assert their claims.[90]  The Texas Medical Liability Act (Chapter 74 of the Texas Civil Practice & Remedies Code) states that "minors under the age of 12 years shall have until their 14th birthday in which to file, or have filed on their behalf, the claim."[91]  Even when applying the Chapter's statute of repose, the twins would have 10 years after the date of the act or omission to bring the claim.[92]  Plaintiffs dispute Shaw's identification of December 27, 2017 (discussed below), but even accepting that date as the earliest possible date of accrual, the deadline for the twins to file their claims would be no earlier than December 27, 2027.[93]

Thus, Shaw's argument only pertains to claims brought by Irene Rodriguez on her own behalf.  Those claims are not time-barred, either, because Shaw's course of treatment of Irene persisted until she was released from custody on January 9, 2018, and (contrary to Shaw's assertion) a precise date of the tort is not ascertainable.  Alternatively, Plaintiffs provided sufficient notice under Chapter 74 to invoke the statutory 75-day tolling period.

---

[90] It is undisputed, and a central fact of the case, that A.R. and B.R. were born on January 9, 2018.  *See also, e.g.,* Pls.' Appx at 4–8.

[91] TEX. CIV. PRAC. & REM. CODE § 74.251(a).

[92] *Id.* at § 74.251(b).

[93] Claims were originally filed by Irene Rodriguez on behalf of B.R as his parent and guardian. After B.R.'s tragic death while this case was pending, those claims transferred to Maria Antonia Santos, when she was named the representative of his estate.

**A. *Shaw's Treatment of Irene Rodriguez Was Not "Completed" Until January 9, 2018.***

Chapter 74 states, "Notwithstanding any other law and subject to Subsection (b), no health care liability claim may be commenced unless the action is filed within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is completed."[94]   As Shaw points out, Texas courts have interpreted this as presenting three distinct, potential accrual dates for a medical liability claim: (1) the occurrence of the breach or tort, (2) the last date of the relevant course of treatment, or (3) the last date of the relevant hospitalization.[95]   Additionally, "if the date of the alleged tort is ascertainable, the limitations period begins at that time."[96]

Here, Shaw mistakenly claims that the date of the alleged tort was December 27, 2017. That is not true.  Rather, Plaintiffs claim that the injuries were caused by Shaw's failure to follow up in any way *after* the exam of December 27, despite knowing about Irene's high-risk twin pregnancy and ordering Hullett to ensure Irene was seen by an obstetrician as soon as possible.[97] Shaw was the only medical provider there capable of providing a treatment decision.[98] Furthermore, Hullett, as an LVN, is not licensed to provide care without supervision by a higher level practitioner.[99]   Therefore, Shaw was ultimately responsible for Irene's care while she was in

---

[94] TEX. CIV. PRAC. & REM. CODE § 74.251(a).

[95] *Mendoza v. Murphy*, 532 F.3d 342, 347 (5th Cir. 2008) (citing *Shah v. Moss*, 67 S.W.3d 836, 841 (Tex. 2001) (*Shah* concerned Chapter 74's predecessor statute, but the analysis of the limitations provision is the same).

[96] *Id.*

[97] Pls.' Appx. at 37, 72–73, 87, 99.

[98] *See* Texas Board of Nursing Position Statement 15.27, *The Licensed Vocational Nurse Scope of Practice* ("The LVN cannot perform independent assessments as the LVN has a directed scope of practice under supervision."), *available at* https://www.bon.texas.gov/practice_bon_position_statements_content.asp.html#15.27.

[99] *Id.* ("The practice of vocational nursing must be performed under the supervision of a RN, advanced practice registered nurse (APRN), physician, physician assistant, podiatrist or dentist. Supervision is defined as the process of directing, guiding, and influencing the outcome of an individual's performance of an activity.").

the jail, and had a responsibility to monitor both Irene's health and the nurses' performance of their duties. Thus, the date of this failure *could not have been* December 27, but rather occurred at an unascertainable, later time.

The records show that Shaw's December 27 exam established a "course of treatment" for her twin pregnancy that consisted of, at least, an order to ensure Irene was seen by an obstetrician and monitoring at the jail.[100] Shaw also knew that jail medical staff was providing Irene daily prenatal vitamins.[101] Due to the nature of pregnancy, as opposed to a medical condition of unknown duration—such as an illness—this course of treatment was necessarily intended to continue indefinitely until Irene either gave birth or was released from jail. Nonetheless, Shaw did not follow up in any way to ensure his orders had been followed.[102] As a result, Irene's various signs of potential imminent labor were ignored, and she gave birth prematurely at the jail on January 9, 2018.[103] Irene was then released on bond.[104] Thus, Shaw's course of treatment as the physician responsible for Irene's care while she was incarcerated continued until she delivered the babies and was subsequently released on January 9. This makes the accrual date of the alleged negligence the last day of the relevant course of treatment: January 9, 2018. Therefore, Irene's claims against Shaw were timely when they were filed on January 8, 2020. At the very least, the issue of the date of Shaw's alleged negligence, and whether it is ascertainable, is a disputed material fact for a jury to determine.

---

[100] Pls.' Appx. at 1–3.
[101] Pls.' Appx. at 1.
[102] Pls.' Appx. at 15–18.
[103] Pls.' Appx. at 4–8, 31–42, 80–90.
[104] Pls.' Appx. at 9.

Shaw seems to implicitly recognize the nature of Plaintiffs' claims by citing cases in opposition to a "course of treatment" analysis.[105] Shaw, though, does not develop this argument at all, and the cited cases are distinguishable.  In *Rowntree v. Hunsucker*, the plaintiff claimed that a specialist she had seen failed to diagnose or treat an occluded artery.[106] The last time the plaintiff saw the doctor was September 15, 1986.[107] Notice of a claim was provided on July 31, 1989, and suit was not filed until October 1989.[108] The claim would clearly have been barred by the two-year statute of limitations if the accrual date was September 15, 1986, so the plaintiff argued that a prescription she had been given by the doctor established a course of treatment that continued for the duration she was taking it.[109] The Texas Supreme Court ultimately found that "limitations . . . extended by a patient's taking of medication is an unworkable rule."[110] It also noted that "[t]he Hunsuckers do not allege any injury from taking the medication Dr. Rowntree prescribed,"[111] and concluded, "In sum, the Hunsuckers do not allege that a course of treatment was the direct cause of Mrs. Hunsucker's injury. . . . Rather, the Hunsuckers claim that Dr. Rowntree breached a duty to perform the proper examinations from which he should have detected the occluded arteries. Dr. Rowntree could have breached this duty only on those occasions when he had opportunity to perform such examinations."[112] In short, the Court refused to extend the statute of limitations based on a prescription that had no causal relationship to the alleged tort.

---

[105] Defs.' Mot. for Summ. J. at 7 n.20, 8 n.21.
[106] *Rowntree v. Hunsucker*, 833 S.W.2d 103, 103–04 (Tex. 1992).
[107] *Id.* at 104.
[108] *Id.*
[109] *Id.*
[110] *Id.* at 107.
[111] *Id.* at 104.
[112] *Id.* at 108.

*Rowntree* is distinguishable from this case because here (a) the alleged tort *could not have occurred* on the last examination date, and (b) Shaw's alleged failure was an essential part of the continuing course of treatment—namely, a failure to follow up personally with a high-risk patient and also ensure that the course of treatment he ordered was executed by jail nursing staff.

*Bala v. Maxwell*, meanwhile, stands for the simple proposition that when a failure-to-diagnose is alleged, the date of that type of failure is ascertainable: it is the date of the last examination prior to the discovery of the undiagnosed illness.[113] *Bala* is inapplicable, because this case does not involve a failure to diagnose.

This case is more comparable to *Chambers v. Conaway*, in which it was alleged that a physician ordered a mammogram and sonogram but failed to perform other follow-up tests after a patient reported a lump in her breast, which was later determined to be cancer.[114] A physician filed an affidavit in support of the plaintiff's claim, stating that the standard of care called for a biopsy because mammograms and sonograms were not conclusive.[115] He further stated that the defendant doctor "was responsible for monitoring the health and medical needs of his patient, including not only addressing those specific complaints made by a patient but also caring for, monitoring and treating those conditions of which he had notice, i.e.[,] Christine Conaway's complaints of a lump in her left breast."[116] Based on this description of the standard of care, the Court decided the defendant doctor might have been negligent through the time period ending with the termination of his relationship with her, which was January 19, 1988—approximately 20 months after the last sonogram.[117]

---

[113] *Bala v. Maxwell*, 909 S.W.2d 889, 891–92 (Tex. 1995).
[114] *Chambers v. Conaway*, 883 S.W.2d 156, 157–58 (Tex. 1993).
[115] *Id.* at 158.
[116] *Id.*
[117] *Id.*

Similarly, here, Plaintiffs' experts have stated that Shaw breached the standard of care when he failed to follow up on Irene's high-risk pregnancy of which he had actual notice.[118]  Like the doctor in *Chambers*, his responsibility to Irene was ongoing until she was no longer his patient, i.e., when she was released from custody on January 9.

For the above reasons, the precise date of the alleged negligence is unascertainable, which means the accrual date is the last date of the course of treatment, which was January 9, 2018. Plaintiffs' claims against Shaw are timely.

## B. *The Claims Are Subject to Chapter 74's 75-Day Tolling Period Because Sufficient Statutory Notice Was Provided to Defendants.*

Chapter 74 requires notice of a medical liability claim, along with authorizations for the release of relevant medical records, to be provided to defendants prior to suit.[119]  When this notice and authorization is provided, the statute of limitations for the medical liability claims in question is tolled by 75 days.[120]  Notice to one defendant is considered constructive "notice to all," and is sufficient to toll the limitations period.[121]  The tolling period is invoked when notice is provided anytime within the two-year period after the date of accrual.[122]  This is true even if the notice is sent fewer than 60 days before filing suit, as the statute instructs.[123]  If a defendant did not have the full 60 days to evaluate the claims prior to suit being filed, the remedy is a temporary abatement, not dismissal or a loss of the tolling period.[124]

---

[118] Pls.' Appx. at 37, 72–73, 87, 99.
[119] TEX. CIV. PRAC. & REM. CODE § 74.051–52.
[120] *Id.* at § 74.051(c); *College Station Med. Ctr., LLC v. Kilaspa*, 494 S.W.3d 307, 309 (Tex. App.—Waco 2015, pet. denied).
[121] *Canavati De Checa v. Diagnostic Ctr. Hosp., Inc.*, 852 S.W.2d 935, 938 (Tex. 1993).
[122] *Id.*
[123] *Id.* ("When notice is sent to any health care provider within two years of the claim's accrual, the limitations period for all defendants is tolled for seventy-five days.").
[124] *Id.* at 939.

Shaw concedes that Plaintiffs sent a notice letter and authorizations to Southern Health Partners on December 23, 2019, and he has submitted those documents with his Motion.[125] Nonetheless, Shaw asserts that the notice that was sent did not sufficiently comply with the statute, and therefore cannot toll the limitations period.  First, Shaw seems to suggest that the fact that it was sent fewer than 60 days before the filing of suit negates the tolling period.[126]  He cites no precedent for such a result, and that suggestion is clearly contradicted by the Texas Supreme Court's comprehensive discussion and holdings in *Canavati De Checa v. Diagnostic Center Hospital*, noted above ("When notice is sent to any health care provider within two years of the claim's accrual, the limitations period for all defendants is tolled for seventy-five days. . . . abatement is the sole remedy for failure to serve timely notice of a health care liability claim under the Act.").[127]  Here, the notice was sent to SHP on December 23, 2019—within two years of the claim's accrual, even assuming *arguendo* that it is the earliest date suggested by Shaw (December 27, 2017).[128]  Thus, the timing of Plaintiff's notice has no effect on the tolling period.

Shaw also complains, in a footnote, that the notice letter "fails to give specific details about the allegations."[129]  This assertion is meritless.  A plain reading of the notice letter shows that it describes in detail that Rodriguez was not allowed to attend her appointment with her obstetrician on December 28, 2017; that she made various specific complaints about troubling complications with her pregnancy, but nothing was done; and that as a result the twins were born prematurely inside the jail in unsafe conditions, causing them to suffer serious injuries.[130]  Particularly

---

[125] Defs.' Appx. Ex. G.
[126] Defs.' Mot. For Summ. J. at ¶ 27.
[127] *De Checa*, 852 S.W.2d at 938–39.
[128] Defs.' Appx. Ex. G at 1.
[129] Defs.' Mot. for Summ. J. at ¶ 27 n.33.
[130] Defs.' Appx. Ex. G at 1–2.

24

considering that the letter was drafted without the benefit of any discovery and without having seen any of Irene's medical records from the jail, these details are more than sufficient to provide notice of the claims.

Primarily, Shaw argues that the authorizations were deficient because they failed to list every individual medical provider that provided treatment related to the claims or treated Irene in the previous five years.[131]   However, while Shaw lists a number of these alleged providers who were not identified, **he has provided no evidence or citations to the record supporting his assertion that they were, in fact, providers who should have been identified under the statute**. He further provides no information or argument as to each individual's status as "physicians or health care providers who have examined, evaluated, or treated [A.R. or B.R.] in connection with the injuries alleged to have been sustained in connection with the claim asserted," or whether they treated A.R. and B.R. before or after the authorizations were sent.[132]   A motion for summary judgment based on limitations is an affirmative defense and must be supported by evidence, so Shaw's argument should fail for this reason alone.[133]   As a practical matter, without being pointed to specifics as to who all of these unidentified providers are, Plaintiffs are unable to examine the question of whether the failure to include them was "material" or substantially affected Shaw's ability to investigate the claim.  The authorizations Plaintiff did provide represented a good-faith effort to identify the known medical providers who treated A.R. and B.R. for the injuries alleged,

---

[131] Defs.' Mot. for Summ. J. at ¶¶ 27–29.

[132] TEX. CIV. PRAC. & REM. CODE § 74.052(c).  Shaw only complains about the authorizations provided for A.R. and B.R., not Irene Rodriguez herself.  It goes without saying that A.R. and B.R. were not treated by any physicians in the five years prior to the incident at issue here, since they were not yet born.

[133] FRCP 56(c)(1); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 193 (5th Cir. 2013) ("[A] defendant moving for summary judgment on the affirmative defense of limitations must prove that defense conclusively.").

which included the doctors and/or facilities at which A.R. and B.R were treated following their

birth (Navarro Regional Hospital, Baylor Scott & White Hospital, and Children's Medical

Center).[134]

Although Shaw points to cases in which authorizations that failed to include all of the

required medical providers were found to be insufficient, the only two cited opinions that are

published are from the same court.[135]  A third case cited by Shaw, *Maypole v. Acadian Ambulance

Service*, was in fact later overturned by an *en banc* decision, which discussed this precise issue in

depth and held,

> Section 74.052 does not require the authorization to list "all" of the claimant's
> health care providers, whether current or for the preceding five years.  This Court
> must take the statute as we find it and presume the legislature included the words it
> intended to include and omitted words—in this case "all" or "every"—it intended
> to omit.  Indeed, it would be absurd and unreasonable to expect a plaintiff to know
> or remember . . . the identity of every person and entity that provided health care of
> any kind for the preceding five years . . . .  [W]e reject the notion that a "virtually
> perfect" authorization must be served with the pre-suit notice to trigger tolling
> limitations under that section.   The TMLA's pre-suit notice and medical
> authorization requirements were designed to encourage the parties to negotiate and
> settle disputes prior to suit, not to be a game of legal "gotcha" that courts can use
> to deny an entire class of claimants access to the judicial system—in this case, for
> failing to provide information not required by the language of the TMLA . . .[136]

The Court additionally observed that "we construe the TMLA—as courts construe all

statutes—to encourage and safeguard constitutional rights and to protect the rights of claimants to

file meritorious lawsuits."[137]  It must be noted that the *en banc* ruling in *Maypole* was challenged

by the defendants in that case and is currently pending before the Texas Supreme Court.

---

[134] Defs.' Appx. Ex. G at 6, 10, 14; Pls.' Appx. at 104–105.

[135] *Davenport v. Adu-Lartey*, 526 S.W.3d 544, 554 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *Johnson v. PHCC–Westwood Rehab. & Health Care Ctr., LLC*, 501 S.W.3d 245, 251–52 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

[136] *Maypole v. Acadian Ambulance Serv.*, 647 S.W.3d 533, 544, 548–49 (Tex. App.—Dallas 2022, pet. granted).

[137] *Id.* at 541 (citing *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011) (Medina, J.) (plurality op.); *id.* at 416 (Guzman, J., concurring)).

26

Nonetheless, the *Maypole* holding is currently the law for any cases within the jurisdiction of the Dallas Court of Appeals.  Furthermore, the El Paso Court of Appeals came to a similar conclusion in *Rabatin v. Kidd*, holding that an authorization that omitted physicians who had treated the plaintiff in the previous five years was sufficient to toll the statute of limitations.[138]  At any rate, the Court need not reach this issue, as it can find either (a) the accrual date was January 9, 2018, as discussed above, or (b) Shaw failed to support his "insufficient notice" argument with any evidence or details about the individuals he claims were material but unidentified.

Finally, even if Plaintiffs' authorizations did not perfectly comply with the statute, this is an issue that Shaw has been aware of for quite some time.  A motion for summary judgment on this issue could have been filed at any point, once Shaw became aware of these additional providers.  Instead, he waited until the last possible moment, more than three years after the case was filed.  This has nothing to do with the statutory purpose of the notice and authorizations, which is to allow early investigation and settlement negotiations prior to undertaking a costly litigation.[139] The authorizations Plaintiffs provided gave Shaw (and the other Defendants) access to more than 18,000 pages of the most critical medical records, from which they could decide whether they wanted to consider settlement.  However, they never expressed any serious interest in settlement, nor did they ask the court for the abatement they were entitled to because suit was filed fewer than 60 days after notice was provided.[140]  Instead, Shaw is invoking this technicality as the ultimate

---

[138] *Rabatin v. Kidd*, 281 S.W.3d 558, 562 (Tex. App.—El Paso 2008, no pet.).

[139] *Carreras v. Marroquin*, 339 S.W.3d 68, 73 (Tex. 2011).

[140] *See Maypole*, 647 S.W.3d at 550 ("Acadian offered no evidence that it did not have or was unable to obtain information it needed to conduct an investigation or negotiate a settlement of appellants' claims. . . . All indications in the record are that Acadian . . . already had substantial information in its possession, yet intentionally chose not to evaluate appellants' claims or seek their resolution. Rather, Acadian sat idly until the statute of limitations expired and then asked the trial court to dismiss appellants' case, claiming, without proof, appellants had seriously harmed Acadian.").

last-minute "gotcha," which decidedly *undermines* the notice provision's purpose of avoiding unnecessary litigation. Granting his motion based on this alone would be remarkably unjust, considering the above.

## VI.    CONCLUSION

Defendants have moved for summary judgment on two narrow issues, asserting (a) that Plaintiffs' experts are not qualified because they are physicians, rather than nurses, and because they have no experience in a correctional setting. On the contrary, the breaches of the standard of care described by Dr. Carpenter and Dr. Meyn are universal and apply just as forcefully in a correctional facility as they would anywhere else. Furthermore, once their qualifications are recognized (and Defendants do not dispute their qualifications to opine generally on the medical issues involved in this case), any perceived lack of a particular "specialization" goes to the weight of their testimony, not its admissibility. Additionally, it is well settled that physicians may speak to the standard of care of nurses, especially when they have extensive experience working alongside them. Meanwhile, Defendants cited **no case law** directly supporting their positions. Plaintiffs believe this is not a close call, but in the unlikely event the Court decides Carpenter and Meyn are unqualified to testify, Plaintiffs respectfully ask for a continuance of the trial in order to designate replacement experts. Plaintiffs have not been dilatory in their prosecution of this case, and should have an opportunity to cure a defect that closes the Court's door to them when such a cure is available.

Second, Dr. Grady Shaw asks the Court to dismiss all claims against him, arguing that they are time-barred. They are not. First, claims brough on behalf of the children are not time barred—the statute of limitations for those would not run until 2027. Second, Shaw's continuing course of treatment, and the fact that a specific date of the alleged tort is unascertainable, mean that the accrual date for the claims against him was January 9, 2018. Thus, Plaintiffs' claims—filed

January 8, 2020—were timely.  Alternatively, the claims are subject to a 75-day statutory tolling period, since Plaintiffs provided sufficient notice of their claim less than two years after the accrual date.  The claims against Shaw are timely.  Defendants' Motion for Summary Judgment and Motion to Strike should be denied in full.

Respectfully submitted,

*/s/   Don Tittle*
**Don Tittle**
Texas Bar No.:  20080200
don@dontittlelaw.com
**Law Offices of Don Tittle, PLLC**
8350 N Central Expy., Suite M1085
Dallas, Texas 75206
(214) 522-8400 – Telephone
(214) 389-1002 – Facsimile

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of June, 2023, a true and correct copy of foregoing document was forwarded to all counsel of record pursuant to the Federal Rules of Civil Procedure.

*/s/   Don Tittle*
Don Tittle