IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IRENE RODRIGUEZ, individually and as parent and legal guardian of A.R., and MARIA ANTONIA SANTOS as representative of the estate of B.R., | § § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | CIVIL ACTION NO. 3:20-cv-00045-D |
| SOUTHERN HEALTH PARTNERS, INC. LINDA HULLETT, and DR. GRADY SHAW, | § § § § | |
| *Defendants.* | § § | |

---

**APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO STRIKE**

---

Plaintiffs submit this Appendix in support of their Response to Defendants' Motion for Partial Summary Judgment and Motion to Strike:

**<u>INDEX OF EXHIBITS</u>**

Jail medical records of Irene Rodriguez (excerpts): 1-3

Jail incident report: 4-8

Jail records of Irene Rodriguez (excerpts): 9

Deposition of Grady Shaw (excerpts): 10-23

NCCHC Standards (excerpts): 24-26

Declaration of Robert Carpenter: 27-29

Report of Robert Carpenter: 30-43

Curriculum Vitae of Robert Carpenter: 44-66

Deposition of Robert Carpenter (excerpts): 67-75

Declaration of Donald Meyn: 76-78

Report of Donald Meyn: 79-91

Curriculum Vitae of Donald Meyn: 92-94

Deposition of Donald Meyn (excerpts): 95-102

Deposition of Irene Rodriguez (excerpts): 103-107

Deposition of Michelle Spears (excerpts): 108-111

Deposition of Claire Teske (excerpts): 112-116

Deposition of Mark Landon (excerpts): 117-119

Respectfully submitted,

/s/   Don Tittle
**Don Tittle**
Texas Bar No.:  20080200
don@dontittlelaw.com
**Law Offices of Don Tittle, PLLC**
8350 N Central Expy., Suite M1085
Dallas, Texas 75206
(214) 522-8400 – Telephone
(214) 389-1002 – Facsimile

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of June, 2023, a true and correct copy of foregoing document was forwarded to all counsel of record pursuant to the Federal Rules of Civil Procedure.

/s/   Don Tittle
Don Tittle

**Southern Health Partners**
Your Partner in Affordable Inmate Healthcare

Inmate Name: Irene Rodriguez

DOB or ID#: 89          SO# 054398

Allergies: NKDA

Start at top and write
Subsequent orders below

| | Date of Physician's Order: | |
|---|---|---|
| **1** | 11-23-17 | Pre natal Vitamin ÷ po QD  RBTO Dr. Shaw/BAverylvn  noted BAverylvn |
| **2** | 12/27/17  1538 | 1) Get in to see Dr. Spears or  one of her partners ASAP  12/27/17 noted |
| **3** | Date of Physician's Order: | |
| **4** | Date of Physician's Order: | |
| **5** | Date of Physician's Order: | |
| **6** | Date of Physician's Order: | |

**PROGRESS NOTES**

SO# 054398

| List Date/Time | Inmate's Name: (Last, First) | | D.O.B.: | Allergies: |
|---|---|---|---|---|
| | Rodriguez, Irene | | 89 | NKDA |
| 12·29·18 1354 Cont | Contractions. Pt instructed to tell me when her contractions start, & stop to get idea of any consistant contractions re: to labor. Between 1402 & 1434 pt had 9 contractions that ranged in length from 3 secs. to the longest 25 secs. lasting between 2 min & 6 min. The pattern very irreg & sporatic pt verbalized she believes they are "false labor pains" she also stated she has 2 mucous plugs c every preg she has had. Pt VS BP 103/74 P 112 T 98.4 R 16 O2 sat 97% pt request to go back to tank to lay down. Pt instructed to notify officer/medical if any further concerns. Pt voiced understanding | | | |
| 12·29·18 1500 | Spoke c on call OB/Gyn Dr. Cook to relay information re: this pt. Dr. Cook instructed if pt cont c this & has concerns to send to hosp to be checked if no further concerns @ this time ———— | | | |
| 1-2-18 1400 | Pt scheduled for OB/Gyn app on 1-9-18 c Dr. Spears who has seen the pt prior to incarceration for this pregnancy @ 1340 on Tues Jan 9th pt to have sono @ 1400 then to see Dr. p sono completed ———— | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| List Date/Time | Inmate's Name: (Last, First) | | D.O.B.: | Allergies: |

Southern Health Partners, Inc.   **CONFIDENTIAL MEDICAL INFORMATION**   Please print legibly.     Effective: July 2016

PLS.' APPX. 002

**PROGRESS NOTES**

SO# 054398

| List Date/Time | Inmate's Name: (Last, First) Rodriguez, Irene | D.O.B.: 89 | Allergies: NKDA |
|---|---|---|---|
| 12/27/17 1520 | S) G4 P3 Ab00 2nd child was premature was born at 33 weeks weighed 5#. Having from Braxton Hicks. This pregnancy is twins. LMP-? EDC in March. Dr. Spears is her obstetrician. Has appt tomorrow. In jail on probation hold. PO is Brenda Ross. O) Wt. 192# BP 106/70 P 95 O₂ sat 97% Pre pregnancy wt. 140# HEENT-nl ℅ large tonsils + small nasal polyp R post nl neck-nl cor-nl lungs-clear abd - 34 wks uterus s̄ tenderness ext-nl neuro-nl A) Twin pregnancy P) Will get in to OB ASAP + monitor here. | | |
| 1/2/18 1928 | I/m to medical. C/o having contractions @ this time. Timed contractions for 20 minutes - averaging contraction every 2-4 m that last 19-26 seconds apiece. BP 116/79 P 99 R 18 O² sat 98%. I/m does not appear to be in any pain or distress @ this time I/m also reports that the babies have been active and kicking for the past hour. I/m to return to cell and notify medical of any additional/worsening symptoms or concerns. I/m verbalized understanding. ————— PA Clark RN | | |
| late entry 1/29/18 1304 | Pt to medical c̄ ℅ having passed her mucas plug & being in labor. Pt on exam table fetal doppler used to assess FHT baby #1 HR 150 baby #2 HR 147 pt did not tight from any | | |
| List Date/Time | Inmate's Name: (Last, First) | D.O.B.: | Allergies: |

Southern Health Partners, Inc.  **CONFIDENTIAL MEDICAL INFORMATION**  Please print legibly.    Effective: July 2016

# Jail Incident Report

| Incident Number | Other Number | Printed Date/Time |
|---|---|---|
| 18-00000688 | | 01/17/2018 13:44 |
| **Date and Time of Incident** | **Date and Time Reported** | **ReportedBy** |
| 01/09/2018 04:50 | 01/09/2018 09:49 | Woodall, Robin |

| Location of Incident |
|---|
| ESF and Medical Cell E-52 |

| Offenses |
|---|

| Offenders |
|---|
| RODRIGUEZ, IRENE - 054398 |

| Victims |
|---|

| Witnesses |
|---|
| Martin, April - 959 |
| Rivera, Betty - 844 |

| Complaintants |
|---|

| Others |
|---|

| Incident Narrative |
|---|

On January 9, 2018 at approximately 0450, Officer Betty Heggins notified Sgt. Robin Woodall that an inmate in F1 was stating that Inmate Irene Rodriguez appeared to be having contractions approximately 3 minutes apart. Sgt. Woodall immediately contacted Nurse Linda Hullett, due to Nurse Hullett's knowledge of Inmate Rodriguez's current medical situation regarding her pregnancy. Sgt. Woodall knew Inmate Rodriguez had stated several times prior to this that she had been having contractions. Nurse Hullett advised Sgt. Woodall to allow Inmate Rodriguez to move to a medical cell so that she could be more closely monitored. Sgt. Woodall relayed this information to Officer Heggins and began moving inmates around to make room for Inmate Rodriguez in Medical. Neither medical nor separation had an empty cell available and inmates had to be moved in order to make a free cell for Inmate Rodriguez in medical. Once a cell was made available at approximately 0512, Sgt. Woodall went to Eastside Female to escort Inmate Rodriguez up. At approximately 0515, Sgt. Woodall began walking Inmate Rodriguez up the hallway. Sgt. Woodall spoke with Inmate Rodriguez to get a better understanding of how Inmate Rodriguez was feeling. Inmate Rodriguez explained that she felt like the contractions were coming regularly. At approximately 0516, Sgt. Woodall began timing Inmate Rodriguez's contractions. Inmate Rodriguez stated that her water had not broken yet. Sgt. Woodall timed the contractions for approximately 10 minutes and found that Inmate Rodriguez was reporting her contractions to come regularly at approximately 53 seconds to 1 minute and 3 seconds apart. Sgt. Woodall passed this information on to Nurse Hullett. Nurse Hullett advised to continue timing Inmate Rodriguez's contractions. During this time, Officer Betty Rivera came to E-52 to offer assistance to Sgt. Woodall. At approximately 0527, Inmate Rodriguez stated that she was feeling pressure and felt like she could have the baby very soon. At this time, Sgt. Woodall contacted Nurse Hullett again and Nurse Hullett advised to go ahead and call an ambulance to the jail. Sgt. Woodall immediately hung up with Nurse Hullett and advised Master Control Operator David Herrera to have an ambulance dispatched to the jail, as Inmate Rodriguez may be going into labor. At approximately 0528, Sgt. Woodall and Officer Rivera called for clean towels and blankets and Officer Rivera stated she thought Inmate Rodriguez's water had just broken. Inmate Rodriguez pulled her jumper down as Sgt. Woodall began to approach Inmate Rodriguez. Sgt. Woodall could see a baby's head became visible between Inmate Rodriguez's legs and Sgt. Woodall immediately reached down to cradle the baby as the baby was delivered. Sgt. Woodall held the baby as Officer Rivera assisted Inmate Rodriguez onto the mattress. The baby appeared to be a baby girl. The baby began to cry and appeared to be breathing. At this time Officer April Martin entered E-52 to assist and Officer Rivera called for clean towels and blankets and advised Master Control that the first baby had been born. Officer Martin then placed the baby girl into a clean blanket. At this time, the baby appeared to have difficulty breathing and Officer Martin began stimulating the baby by placing her on her stomach in her palm and gently patting her back. The baby appeared to have stopped breathing and Sgt. Woodall gently placed her pinky into the baby's mouth to clear her airway. Officer Martin continued to gently pat the baby's back in an attempt to keep the baby alert. The baby did not cry nor did she appear to be breathing. Sgt. Woodall quickly exited the cell to call Nurse Hullett and attempt to find a nasal aspirator in order to suck out anything that may have been blocking the baby's attempts to breathe. Sgt. Woodall could not locate anything in the medical room and Nurse Hullett advised that she did not believe that there was one. Sgt. Woodall then quickly returned to E-52 and advised Officer Martin that there was no nasal aspirator. At this time, Officer Martin delivered a rescue breath to the baby and the baby breathed and a small amount of mucus was expelled from the baby's nasal passages. Officer Martin then continued to gently pat the baby's back. The baby again appeared to stop breathing and Officer Martin delivered more rescue breaths. The baby then appeared to breathe and cry once again. At approximately 0535, Officer Herrera advised that EMS was on site. Sgt. Woodall then placed the jail on lockdown. At approximately 0536, EMS personnel entered the cell and responded to E-52. Sgt. Woodall quickly gave the EMT's the information regarding Inmate Rodriguez and her baby. EMS personnel then sucked out the baby's airways and began medical treatment on the baby. Sgt. Woodall then moved to the head of the mattress and stayed with Inmate Rodriguez to pass on important information that

Jail Report 100                              Page 1 of 2

PLS.' APPX. 004

# Jail Incident Report

| Incident Number | Other Number | Printed Date/Time |
|---|---|---|
| 18-00000688 | | 01/17/2018 13:44 |
| **Date and Time of Incident** | **Date and Time Reported** | **ReportedBy** |
| 01/09/2018 04:50 | 01/09/2018 09:49 | Woodall, Robin |

**Location of Incident**

ESF and Medical Cell E-52

was going on with her baby and to attempt to keep her calm as she attempted to deliver the 2nd baby. At approximately 0547, a second EMS unit as dispatched to the jail in order to allow one ambulance to transport the first baby to the hospital. Sgt. Woodall explained to Inmate Rodriguez, why another ambulance had been called to the jail. At approximately 0550, Inmate Rodriguez began pushing again and at approximately 0551, the second baby was born. The 2nd baby appeared to be a baby boy. The 2nd baby began to cry and appeared to be breathing. At approximately 0555, the first baby was taken out of the jail and transported to Navarro Regional Hospital for emergency medical treatment. Once the baby and Inmate Rodriguez were ready for transport, Inmate Rodriguez was moved onto the gurney and secured by EMS personnel. At approximately 0600, Inmate Rodriguez and her second baby were taken out of the jail escorted by Officer Rivera. Officer Rivera rode with Inmate Rodriguez and performed watch at the hospital. Sgt. Woodall then removed the jail from lockdown and secured E-52 and advised all officers not to enter the cell or tamper with the cell in any way. Sgt. Woodall then spoke with Captain Charlie York and updated him regarding the situation. EOR.

| Approving Official Name | Reporting Official Name |
|---|---|
| | |
| York, Charlie | Woodall, Robin |

PLS.' APPX. 005

# Jail Incident Report Supplement

| Agency Name | | Date and Time of This Report | Incident Number |
|---|---|---|---|
| Navarro County Justice Center | | 01/17/2018 13:44 | 18-00000688 |
| **Date and Time of Incident** | **Location of Incident** | | **Date and Time Reported** |
| 01/09/2018 04:50 | ESF and Medical Cell E-52 | | 01/09/2018 09:49 |
| **Nature of Incident** | | | |
| | | | |
| **Narrative** | | | |

On January 9, 2018 at approximately 0450, Officer Betty Heggins was working Eastside Female when a female inside F1 stated that Inmate Irene Rodriguez was having contractions and that they appeared to be about 3 minutes apart. At approximately 0451, Officer Heggins notified Sgt. Robin Woodall. Sgt. Woodall then advised that Inmate Rodriguez could be moved to medical per Nurse Linda Hullett. At approximately 0458, all of Inmate Rodriguez's belongings were packed by another inmate in F1. At approximately 0503, Officer Heggins advised Sgt. Woodall that Inmate Rodriguez was reporting that her contractions were 2 minutes apart. At approximately 0515, Sgt. Woodall escorted Inmate Rodriguez to medical. EOR.

**Reporting Official:**  Heggins, Betty

PLS.' APPX. 006

# Jail Incident Report Supplement

| Agency Name | | Date and Time of This Report | Incident Number |
|---|---|---|---|
| Navarro County Justice Center | | 01/17/2018 13:44 | 18-00000688 |
| **Date and Time of Incident** | **Location of Incident** | | **Date and Time Reported** |
| 01/09/2018 04:50 | ESF and Medical Cell E-52 | | 01/09/2018 09:49 |
| **Nature of Incident** | | | |
| | | | |

**Narrative**

At approximately 0515 on 1/9/2018, Officer Betty Rivera returned to the Navarro County Jail from a transport.  Officer Rivera passed Sergeant Robin Woodall standing outside the doorway of medical separation 52 in the main hallway.  Officer Rivera asked if Sergeant Woodall needed any help.  Officer Rivera then observed Inmate Rodriguez' water break.  Officer Rivera then observed Inmate Rodriguez begin to deliver a child at approximately 0520.  Officer Rivera instructed Inmate Rodriguez to lie down.  Sergeant Woodall then went over to where Inmate Rodriguez was lying down in order to assist with delivering the baby.  Officer Rivera observed that the baby was a girl who appeared to be having trouble breathing, and Sergeant Woodall called for Officer April Martin to assist.  Officer Martin and Officer Rivera alternated giving the baby breaths.  At approximately 0542 EMS arrived and took over giving breaths to the baby.  At approximately 0551, Inmate Rodriguez delivered another baby with assistance from EMTs. Officer Rivera observed that the second baby was a boy who also appeared to be having trouble breathing.  EMTs began performing breaths on the second baby until he was also stabilized.  Once both babies and Inmate Rodriguez were stabilized, Officer Rivera escorted Inmate Rodriguez and both babies to Navarro Regional Hospital in an ambulance.  Officer Rivera remained with Inmate Rodriguez at the hospital until Officer Rivera's shift ended and all information was passed on to the oncoming shift.  EOR

**Reporting Official:**  Rivera, Betty

Jail Report 102                                Page 1 of 1

PLS.' APPX. 007

# Jail Incident Report Supplement

| Agency Name | | Date and Time of This Report | Incident Number |
|---|---|---|---|
| Navarro County Justice Center | | 01/17/2018 13:45 | 18-00000688 |

| Date and Time of Incident | Location of Incident | | Date and Time Reported |
|---|---|---|---|
| 01/09/2018 04:50 | ESF and Medical Cell E-52 | | 01/09/2018 09:49 |

| Nature of Incident |
|---|
| |

| Narrative |
|---|
| On January 9, 2017 at approximately 0528, Officer April Martin was called to assist Sgt. Robin Woodall in Medical Cell E-52 with a labor in progress. Upon arrive, Officer Martin observed Inmate Irene Rodriguez laying on her mattress delivering a baby girl with Sgt. Woodall and Officer Rivera in the cell with Inmate Rodriguez. The first baby was delivered and Officer Martin observed the baby having difficulty breathing and began performing CPR. Officer Martin laid the baby chest down on her palm and began patting the babies back in order to stimulate the baby and assist her with her breathing. Officer Martin gave 4 rescue breaths and continued to pat the baby's back.  At approximately 0554 EMS arrived and took over.  At approximately 0550, the second baby was born. EOR. |

**Reporting Official:**  Martin, April

Jail Report 102                              Page 1 of 1

PLS.' APPX. 008

# Navarro County Justice Center
## Release Report - Without Booking Notes
RODRIGUEZ, IRENE

| NameID: 82213 | Local Identifier: 054398 | CORIS ID: | Local Number: | | Projected Release Date: |
|---|---|---|---|---|---|

| Security Class: Minimum | Booking Status: Released | Confined Date: 12/22/2017 13:12 | Released Date: 01/09/2018 13:02 | Confinement Reason: 10 | BookingID: 139160 |
|---|---|---|---|---|---|

| Home Address: 4330 NWCR 1150 | Home City: Corsicana | Home State: TX | Home Zip Code: 75110 |
|---|---|---|---|

| Race: White | Sex: Female | Eyes: Brown | Hair: Brown | Complexion: Medium | Height: 5'00" | Weight: 189 |
|---|---|---|---|---|---|---|

| Date of Birth: 1989 | Age: 28 | Place of Birth: DALLAS, TX |
|---|---|---|

| FBI Number: | SID Number: | Military: | Military Status: |
|---|---|---|---|

| SSN: -9170 | Driver's Lic. Number: | DL State: | DL Class: | Home Phone: (903)493-4558 |
|---|---|---|---|---|

| Occupation: UNEMPLOYED | Employer: | Employer Address: | Employer Phone: |
|---|---|---|---|

| Next of Kin: | Address: | Phone: |
|---|---|---|
| Emergency Contact: | Address: | Phone: |
| Doctor: | Address: | Phone: |
| Attorney: | Address: | Phone: |

## Confinements:

| Confinement Facility: Navarro | Confined Date/Time: 12/22/2017 13:12 | Held For Locality: Navarro | Housing Unit: | BookingID: 139160 |
|---|---|---|---|---|

| Confine Reason: Booking - General |
|---|

| Confinement Notes: |
|---|

| Releasing Officer: Martinez, Jose | Released Date/Time: 01/09/2018 13:02 | Released To: Street | Juvenile When Booked: No |
|---|---|---|---|

| Release Reason: To Bond |
|---|

| Release Notes: POSTED 2 PR BOND $1000.00 $10000.00 |
|---|

| Property Locations: |
|---|

| Booking Officer: Morales, Erica | Search Officer: Rivera, Sonia | Fingerprint Officer: |
|---|---|---|

## Charges:

PLS.' APPX. 009

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**DALLAS DIVISION**







_Powerful_
LITIGATION / SUPPORT

COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800) 528-3335

NAEGELIUSA.COM



IRENE RODRIGUEZ, individually and
as parent and legal guardian of A.R.,
and Maria Antonia Santos as
representative of the estate of B.R.,

       Plaintiffs,

vs.

SOUTHERN HEALTH PARTNERS,    Case No. 3:20-cv-00045-D
INC., LINDA HULLETT, and
DR. GRADY SHAW,

       Defendants.

_____

**DEPOSITION OF**

**GRADY SHAW, M.D.**

**TAKEN ON**
**THURSDAY, DECEMBER 9, 2021**
**2:37 P.M.**

**HOLIDAY INN AND SUITES**
**620 BRYANT'S WAY**
**CORSICANA, TEXAS 75109**

Case 3:20-cv-00045-D   Document 106   Filed 06/19/23   Page 13 of 121   PageID 1481

1  preceding Wednesday when you get there the next Wednesday?

2      A.   Not necessarily unless they had some new complaint.

3      Q.   Well, how would it be brought to your attention that

4  you need -- if they did have a new complaint that -- that --

5  that you need to review the chart?

6      A.   The nurses would tell me.

7      Q.   So when you say in your -- in your order there around

8  there or on the progress notes, "Will get in to see OB ASAP &

9  monitor here," what are you expecting to happen to satisfy the

10  monitor here part?

11     A.   I expect nurses to continue to monitor him and bring

12  any problems to my attention.

13     Q.   Would you consider two separate complaints by a woman

14  who's pregnant to be something that should be brought to your

15  attention?

16          MS. DRAKE:   Objection, form and foundation.

17     A.   Yes.

18     Q.   When you say your plan, "Will get to OB ASAP &

19  monitor here," those are two different things, right?

20     A.   Yes.

21     Q.   So focusing on the latter, "monitor here," to -- to

22  satisfy in that your mind you mean that the nurses are to

23  continue to monitor and to bring things -- something to your

24  attention if there's some new information, right?

25     A.   Yes.

1  you have independent of what Dr. Cook said or are you saying

2  that your translation of what Dr. Cook says would not include

3  what's written there?

4          MS. DRAKE:  Form and foundation.

5      A.   It just doesn't seem to me to be the type of

6  complaint that would require her to be sent to the hospital.

7      Q.   Would you agree that it's the type of information

8  that should have been brought to you pursuant to your plan to

9  monitor here?

10         MS. DRAKE:  Objection, form and foundation.

11     A.   Yes.

12     Q.   Do you know if on your -- assuming that January 3rd

13  was the next Wednesday after your 12/27 visit, and I'll

14  represent to you that's what the calendar says anyway, do you

15  know if either of the events memorialized in the records, the

16  1/2/18 or the 12/29, were brought to your attention?

17     A.   No, they were not.

18     Q.   If -- if both of those two events had been brought to

19  your attention as two separate events, would you have taken any

20  action?

21         MS. DRAKE:  Form and foundation.

22  BY MR. TITTLE:

23     Q.   Let me ask another way.

24         If either of those two events had been brought to

25  your attention based on your knowledge from 12/27 and that it's

1  a twin pregnancy, do you have a medical opinion as to whether

2  it would have warranted further action?

3          MS. DRAKE:  Form and foundation.

4      A.    Yes.  I would have tried to get her in to see OB --

5  OB sooner.

6      Q.    Sooner than what?

7      A.    Than the 1/9/18.

8      Q.    Dr. Shaw, in the -- in truth, it really screams out

9  that if -- if the information conveyed in those two visits had

10 been known by you, your medical opinion would have been to get

11 her to a obstetric expert immediately?

12     A.    Yes.

13         MS. DRAKE:  Form and foundation.

14 BY MR. TITTLE:

15     Q.    And even if that meant taking her by ambulance, that

16 would have not been excessive in light of what's conveyed in

17 those two notes?

18         MS. DRAKE:  Form and foundation.

19     A.    I think an ambulance would not have been required.  I

20 think just car transport would have been okay.

21     Q.    Okay.  But -- but in that instance you would say

22 immediately, right?

23         MS. DRAKE:  Form and foundation.

24     A.    Yes.

25     Q.    Would there be someone available at the hospital in

1  BY MR. TITTLE:

2      Q.   So fair to say that if you had been told on December

3  29th that this woman that has what you're characterizing as a

4  high-risk pregnancy has passed one of her mucus plugs, you

5  would urge immediate action, correct?

6           MS. DRAKE:   Form and foundation.

7      A.   Yes.

8      Q.   And that immediate action would be hospitalization?

9           MS. DRAKE:   Form and foundation.

10     A.   Transport to the hospital for evaluation, not

11  necessarily hospitalization.

12     Q.   Okay.   I mean when you -- hospitalization would be

13  going to the hospital and staying?

14     A.   Yes.

15     Q.   Okay.   Your immediate action then would be -- you

16  would -- believe would be required would be to get her to the

17  hospital to be examined by a trained -- someone trained in

18  obstetrics?

19     A.   Yes.

20     Q.   And in your opinion is that the standard of care?

21          MS. DRAKE:   Form and foundation.   He's not here as an

22  expert today.

23          MR. TITTLE:   Go ahead, you can answer the question.

24          THE WITNESS:   Yes.

25  BY MR. TITTLE:

Case 3:20 cv 00045 D  Document 106  Filed 06/19/23  Page 17 of 121  PageID 1485

1     Q.    Do you -- do you believe that you have an ongoing

2  obligation to a patient that you see at the jail while they

3  remain in the jail?

4     A.    Yes.

5     Q.    After you saw Ms. Rodriguez on the 27th and

6  recognizing that she's pregnant with twins, what would your

7  ongoing obligation look like?

8          MS. DRAKE:    Form.

9     A.    It would be that I was -- that I would be made aware

10  of any further problems.

11     Q.    Does your obligation to a patient while they're --

12  while they remain in the jail that you've seen require anything

13  more on your part than simply reacting if you're told?

14          MS. DRAKE:    Objection, form.

15     A.    I sometimes ask the nurses how a particular patient

16  that I've seen is doing.

17     Q.    Do you know if you did that regarding Ms. Rodriguez?

18     A.    No, I don't think I did.

19     Q.    Think I've asked you this, but I just want to

20  clarify.   So at no point did Linda Hullett or anyone else with

21  the jail ever bring to your attention that she has passed her

22  mucus plug or said she passed her mucus plug?

23     A.    No.

24     Q.    And no one at the jail, including Linda Hullett or

25  any of the other nurses, brought to your attention any of the

1    events that are memorialized in the two progress notes that

2    we've talked about?

3        A.    No.

4        Q.    I'm sorry, what time did you say you get to the jail

5    on Wednesdays?

6        A.    Usually around 1:30.

7        Q.    Do you know if Ms. Rodriguez's medical records,

8    progress notes, were made available to you on January 3rd when

9    you arrived at the jail?

10       A.    No, they weren't.

11       Q.    I'm sorry, what?

12       A.    No, they weren't.

13       Q.    They were not made available to you.  Meaning they

14   were -- let me -- let me clarify that.

15             They were available to you if you had gone and pulled

16   the chart, --

17       A.    Yes.

18       Q.    -- but no one brought the chart to your attention?

19       A.    Right.

20       Q.    And the system as it's currently set up relies on

21   these nurses to bring it to your attention?

22       A.    Yes.

23       Q.    And it's for that reason that you don't think that

24   you did anything wrong as it relates to this incident?

25       A.    Yes.

Case 3:20-cv-00045-D   Document 106   Filed 06/19/23   Page 19 of 121   PageID 1487

1    Q.   All right.  And then there's certain things that are

2    required according to SHP --

3    A.   Okay.

4    Q.   -- when someone has a chronic medical condition.  Can

5    you outline or identify what -- what the requirements are?

6         MS. DRAKE:  Objection, form.

7    BY MR. TITTLE:

8    Q.   With respect to chronic medical conditions or things

9    that are defined as chronic medical conditions by SHP, what do

10   the policy -- what does the policy of SHP require?

11   A.   It requires that I review them on a -- on a regular

12   basis.  For instance, hypertensive patients, I go through the

13   hypertension book every week.  Diabetic patients, same thing.

14   Q.   So every Wednesday you go through the -- the book of

15   those patients and look at their charts?

16   A.   I don't necessarily look at their charts.  I look at

17   their numbers.  Sometimes looking at their numbers requires me

18   to pull up their chart and write new orders or --

19   Q.   How do you make sure your orders are carried out?  By

20   orders I'm referring to, you know, your medical orders,

21   physician's orders.

22   A.   I just assume that they are.

23   Q.   How many Physician Orders a week would you say you

24   average?

25        MS. DRAKE:  Form.

Case 3:20-cv-00045-D   Document 106   Filed 06/19/23   Page 20 of 121   PageID 1488

1    A.   Four or five.

2    Q.   Is there any reason that on a subsequent Wednesday

3 you wouldn't look at the four or five orders that you'd given

4 the previous Wednesday to make sure that progress was being

5 made?

6    A.   No.  I would just assume that it was.

7    Q.   You will admit that you failed to take any follow-up

8 actions related to Irene Rodriguez following your December 27th

9 exam?

10    MS. DRAKE:  Form.

11    A.   I didn't take any follow-up action, no.

12    Q.   Other than the physician's order on the same date?

13    A.   Right.

14    Q.   But after the physician's order you didn't do any

15 follow-up of Irene Rodriguez or her pregnancy, correct?

16    A.   Right.

17    MS. DRAKE:  Objection, form.

18 BY MR. TITTLE:

19    Q.   Do you believe that you had an obligation to follow

20 up?

21    MS. DRAKE:  Form.

22    A.   No.

23    Q.   But that's only because of the way the contract is

24 set up, right?

25    MS. DRAKE:  Form.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

PLS.' APPX. 018

1     A.   Not sure what you're asking.

2     Q.   Well, I mean in this instance you have the -- an

3 individual who examined Ms. Rodriguez on January 2nd --

4     A.   Yes.

5     Q.   -- that did not have the benefit of the entire 12/29

6 note by Linda Hullett because it was entered late?

7     A.   Right.

8         MS. DRAKE:  Form and foundation.

9 BY MR. TITTLE:

10    Q.   At least as it -- at least with respect to what's on

11 the actual charts?

12    A.   Right.

13        MS. DRAKE:  Form and foundation.

14 BY MR. TITTLE:

15    Q.   That's potentially problematic, right?

16        MS. DRAKE:  Form and foundation.

17    A.   Yes.

18    Q.   I mean it's not hard to see in this exact case how

19 the nurse who wrote down information on January 2nd had she had

20 the information in front of her and actually read it on the

21 29th visit could have come to the conclusion that she needed to

22 be taken to the hospital?

23        MS. DRAKE:  Form and foundation, and he's not here

24 today as an expert.

25    A.   I'm not sure what you're asking again.

Case 3:20-cv-00045-D   Document 106   Filed 06/19/23   Page 22 of 121   PageID 1490

 1  BY MR. TITTLE:

 2      Q.   I'm not trying to stand over you, but I'm just --

 3  because we have this -- let me just point -- point to them,

 4  okay?

 5      A.   Yeah.

 6      Q.   So -- it's not hard to imagine that if this -- this

 7  information that Linda Hullett wrote and calls a late entry, --

 8      A.   Yes.

 9      Q.   -- starting there and going here, including the

10  language about Dr. Cook and a possible need to send to hospital

11  if certain things occurred, it's not hard to imagine that this

12  individual who wrote the January 2nd note that's there could

13  have seen that and thought she needs to go to the hospital?

14          MS. DRAKE:   Form and foundation, and he's not here as

15  an expert.

16      A.   Yes.

17      Q.   That's fairly obvious, right?

18          MS. DRAKE:   Form and foundation.

19      A.   Yes.

20      Q.   It's very obvious that a late-entered note can have a

21  very significant impact on a medical outcome, right?

22          MS. DRAKE:   Form and foundation, and he's not here as

23  an expert.

24      A.   Yes.

25      Q.   Okay.  What -- so what is -- is there any type of a

1  standard or guideline when entering notes late to avoid a

2  situation like this where the information was potentially

3  significant to someone who had -- had previous entered a note?

4          MS. DRAKE:  Form and foundation.

5      A.   I don't know.

6      Q.   Would you expect the person who entered the note late

7  to review the earlier entry?

8          MS. DRAKE:  Form and foundation.

9      A.   Would I expect the patient -- the nurse that wrote

10  the entry late to have what?

11     Q.   Reviewed the previous note, in other words, the note

12  that may have occurred later in time, but it precedes it on the

13  chart.

14     A.   Yes.

15          MS. DRAKE:  Form and foundation

16  BY MR. TITTLE:

17     Q.   So Linda Hullett has testified that she entered --

18  she wrote the late-entered note on the progress chart like that

19  and actually wrote it on there in the form that you have it --

20     A.   Mm-hmm.

21     Q.   -- on January the 3rd.

22          MS. DRAKE:  Form and --

23     A.   Mm-hmm.

24          MS. DRAKE:  -- foundation.

25  BY MR. TITTLE:

1    Q.    So with that representation, would you expect Linda

2    Hullett to review the preceding note that's dated 1/2 when

3    she's writing the late-entered note?

4        MS. DRAKE:    Form and foundation.

5    A.    Yes.

6    Q.    Is it standard practice with nurses to read a -- the

7    progress notes of a patient that would be preceding the one

8    that they're -- they're writing?

9    A.    Yes.

10    Q.    Good medical practice would require the person

11    writing the note in the progress chart to be familiar with the

12    other notes in the progress chart, correct?

13        MS. DRAKE:    Form and foundation, and he's not here as

14    an expert.

15    A.    Yes.

16        MS. DRAKE:    Is now a good time for a break?  I'm --

17    I'm holding it.

18        MR. TITTLE:    Huh?

19        MS. DRAKE:    I said I'm holding it.

20        MR. TITLE:    Yeah.  Yeah.  Let me think if there's

21    anything else to follow up with him.

22        MS. DRAKE:    Okay.

23    BY MR. TITTLE:

24    Q.    Nurse Hullett mentioned -- were you in here when she

25    was describing putting yellow stickies on a progress note and

1                          CERTIFICATE

2

3      I, Aria Mendoza, do hereby certify that I reported

4   all proceedings adduced in the foregoing matter and that

5   the foregoing transcript pages constitutes a full, true

6   and accurate record of said proceedings to the best of my

7   ability.

8

9      I further certify that I am neither related to

10  counsel or any party to the proceedings nor have any

11  interest in the outcome of the proceedings.

12

13     IN WITNESS HEREOF, I have hereunto set my hand this

14  23rd day of December, 2021.

15

16

17

18  _____

19                       Aria Mendoza

20

21

22

23

24

25

National Commission on Correctional Health Care

**J-F-05**
*essential*

### COUNSELING AND CARE OF THE PREGNANT INMATE

**Standard**

Pregnant inmates are given comprehensive counseling and care in accordance with national standards and their expressed desires regarding their pregnancy.

**Compliance Indicators**

1. Counseling and assistance are provided and documented in accordance with the pregnant inmate's expressed desires regarding her pregnancy, whether she elects to keep the child, use adoptive services, or have an abortion.
2. Prenatal care includes:
   a. Medical examinations by a provider qualified to provide prenatal care
   b. Prenatal laboratory and diagnostic tests in accordance with national guidelines
   c. Orders and treatment plans documenting clinically indicated levels of activity, nutrition, medications, housing, and safety precautions
   d. Counseling and administering recommended vaccines in accordance with national guidelines
3. Pregnant patients with active opioid use disorder receive evaluation upon intake, including offering and providing medication-assisted treatment (MAT) with methadone or buprenorphine.
4. Emergency delivery kits are available in the facility.
5. Custody restraints are not used during labor and delivery.
6. Custody restraints, if used, at other points of pregnancy and the postpartum period shall be limited to handcuffs in front of the body.
7. *Postpartum care* is provided and documented.
8. All aspects of the standard are addressed by written policy and defined procedures.

**Definition**

The *postpartum* period is the first 6 weeks after delivery. Postpartum care includes an examination at 2 weeks after cesarean delivery, 6 weeks after a vaginal delivery, or as specified by hospital staff. It addresses symptoms of breast engorgement and perineal or postoperative pain, provides lactation support for breastfeeding women, and includes screening for postpartum depression and discussion of family planning.

**Discussion**

The responsible health authority should ensure that pregnant inmates and their fetuses are provided every opportunity for healthy outcomes, and that the inmate is offered supportive comprehensive counseling and is not coerced into making any decision contrary to her expressed desires.

PLS.' APPX. 024

An arrangement should be established with a community facility as the site for delivery and for abortion care. Documentation of the patient's prenatal history should accompany her to the hospital; if a pregnant woman is released prior to delivery, efforts should be made to ensure community prenatal care and she should be given a copy of her prenatal records.

Due to the specialized nature of prenatal care, it may be provided off-site. Pregnant women who report bleeding or symptoms of labor such as pain or leaking fluid should be immediately evaluated by a qualified health care professional; when an appropriately trained health professional is not on-site, there should be consultation with or transportation to the hospital. Current recommendations are that all pregnant women should be vaccinated with the flu vaccine during flu season and tetanus, diphtheria, and pertussis during the third trimester, regardless of whether they were vaccinated outside of pregnancy. Women should be counseled on these recommendations and the vaccines must be available to them.

Before incarceration, many female inmates have limited access to prenatal care and have high-risk pregnancies because of chronic health concerns, including drug and alcohol use; tobacco use; HIV and other sexually transmitted infections; histories of abuse and mental illness; malnutrition; obesity; and stress and anxiety. As a result, specialized obstetrical staff and other resources are often needed. Medications should be reviewed by qualified providers to balance the benefit to the pregnant woman with the risk of harm for the fetus. Prenatal vitamins contain important nutrients such as folic acid and should be given to all pregnant women. Pregnant women must be given a bottom bunk or equivalent bed assignment to avoid the risk of falls. Women should be counseled on appropriate activity levels in pregnancy, such as recommendations that moderate exercise is healthy for most pregnant women. Diets should reflect national guidelines. When possible, additional food in between meal times should be provided as physiologic changes and nausea may create a need for more frequent meals.

Because alcohol exposure is harmful to the fetus, pregnant inmates should be counseled on the dangers of alcohol use while pregnant. Since withdrawal from opioids can be dangerous for the pregnancy and leads to high relapse, MAT with methadone or buprenorphine, along with counseling on benefits and risks, must be available to pregnant women who have opioid use disorder. Given the risks of opioid withdrawal in pregnancy, it is advisable that all pregnant women receive a urine drug screen in a timely fashion in order to initiate proper care.

Pregnant women have physical and physiologic changes throughout gestation that increase their risk of falls. In addition, obstetrical emergencies such as hemorrhage, eclamptic seizures, and preterm labor can arise at any point in pregnancy. Such emergencies require immediate medical intervention and/or movement of the woman. The postpartum period can involve exhaustion, dehydration, difficulty in urination or defecation, and complications such as hemorrhage.

National Commission on Correctional Health Care

The use of restraints is potentially harmful to the pregnant woman and fetus, especially in the third trimester and during labor and delivery. Restraint during transport to the hospital or during labor and delivery should not be used except when necessary due to serious threat of harm to the patient, staff, or others. If custody restraints are deemed necessary, abdominal restraints, leg and ankle restraints, and wrist restraints behind the back should not be used. Restraints are to be removed immediately when a medical professional who is responsible for the care of a pregnant inmate during a medical emergency, labor, delivery, or postpartum determines that removal is medically necessary. At a minimum, facilities must comply with state statutes or regulations limiting the use of restraints in pregnancy. Instances where restraints are used on pregnant women should be documented and reviewed.

Restraints at other times during pregnancy and postpartum are strongly discouraged and used under policies and procedures that are developed for the safety of mother and child and with consultation from medical staff. Abdominal restraints, leg and ankle restraints, wrist restraints behind the back, and four-point restraint should not be used, nor should pregnant inmates be placed in a facedown position. Postpartum, restraints should allow for the mother's safe handling of her infant and for mother–infant bonding, when appropriate.

To maximize compliance at the hospital, facilities should communicate their policies on restraints in pregnancy with the appropriate hospital units. To maintain privacy during childbirth, custody staff should be positioned outside the labor and delivery room.

Women should be informed of whether they have the option to breastfeed and/or express breast milk in the postpartum period. Consultation with a health professional knowledgeable about breastfeeding should be available to support lactating women. Appropriate nutrition and prenatal vitamins should be given to lactating women, and advice on symptom management for women who are not breastfeeding. Facilities should consider support for lactating mothers and those with breast engorgement who are not nursing.

Postpartum depression may manifest itself in different ways, particularly when the woman is separated from her newborn immediately after birth. Women who experience miscarriages, stillbirth, and other losses may also have difficulties. Medical staff should work with the mental health staff to address these issues and provide appropriate treatment.

Pregnancy care and outcomes should be monitored through the continuous quality improvement process.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IRENE RODRIGUEZ, individually and as parent and legal guardian of A.R., and MARIA ANTONIA SANTOS as representative of the estate of B.R., | § § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | CIVIL ACTION NO. 3:20-cv-00045-D |
| SOUTHERN HEALTH PARTNERS, INC. LINDA HULLETT, and DR. GRADY SHAW, | § § § § | |
| *Defendants.* | § § | |

---

## DECLARATION OF DR. ROBERT CARPENTER

---

I, Dr. Robert Carpenter, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I graduated 'from Baylor College of Medicine in May 1973 and completed my internship and residency there (1973-1977) and serving as Chief Resident in OB/GYN from July 1976 to June 1977. I completed my Fellowship in Maternal Fetal Medicine at Baylor in June 1979 and performed additional study in OB Ultrasound and Fetoscopy at Yale University School of Medicine and Hospital from September to October 1977. I am Board Certified in in obstetrics and gynecology and in the subspecialty of Maternal Fetal Medicine by the American Board of Obstetrics and Gynecology. My Curriculum Vitae is attached as an exhibit to the brief of Plaintiffs' Response to Defendants' Motion for Summary Judgment, with additional details concerning my educational and professional activities. I have been in the active practice of OB/GYN since graduation and am currently in private practice. My license to practice medicine is currently active in the state of Texas and on record with the Texas Medical Board.

2.  My opinions in this case are outlined in my report, which is incorporated in full herein and attached as an exhibit to the brief of Plaintiffs' Response to Defendants' Motion for Summary Judgment.

3.   Regarding the standard of care applicable to medical practitioners, all such practitioners are subject to the same standards, and the same obligations to their patients, regardless of the setting in which they provide medical care.

4.   The fact that Irene Rodriguez was incarcerated during the time at issue in this case does not alter in any way the standard of care applicable to anyone providing medical care to her inside the jail, including Defendants Linda Hullett, Dr. Grady Shaw, and Southern Health Partners.

5.   The fact that Irene Rodriguez was an inmate at the time in question does not change the fact that she was also a patient under the care of Defendants Linda Hullett, Dr. Grady Shaw, and Southern Health Partners.

6.   The breaches of the standard of care in this case include, as outlined in my opinion, (a) the failure of a nurse to follow physician's orders; (b) the failure of a nurse to communicate critical patient information to a physician; (c) the failure of a nurse to timely document examinations of a patient, that patient's reports of medical problems, and a doctor's instructions regarding that patient; (c) the failure of a nurse to timely call for emergency transport when it was indicated; (d) the failure of a nurse to recognize the limits of her own training, licensing, and expertise and ensure examination of a patient by a physician when it was required; and (e) the failure of a physician to follow up with a patient known to have a high-risk twin pregnancy.  Each of these failures are breaches of the standard of care regardless of the setting in which they occur.

7.   To further illustrate this point, if I was asked today to provide medical care to an incarcerated person, I would believe that in doing so, I would have the exact same obligations to that person as I would were I to treat her in my normal free world practice.

8.   Moreover, my opinions on medical causation are purely scientific in nature and therefore wholly independent of the setting in which the medical issues or treatment occur.

9.   I am familiar with the standard of care for nurses because I have extensive experience with standard nursing practices in the field of obstetrics, gynecology, and maternal fetal medicine.

10.   As a physician who has practiced for decades alongside nurses, my own obligations as a medical practitioner require me to know the limits of what a nurse is qualified and trained to do, and where the medical care in question requires participation by a physician or other higher-level practitioner.

DECLARATION OF DR. ROBERT CARPENTER                                                                    2

11.   The same experience has provided me with extensive knowledge as to how a nurse must conduct herself (for instance, regarding following physician's orders, communicating critical information, and maintaining thorough and timely documentation) so that I may, in turn, effectively provide medical care. As such, I have directed nurses on how to perform their responsibilities throughout my career.

12.   Although the fact that Irene Rodriguez was incarcerated may have presented additional logistical considerations in arranging for her medical care, any such considerations must be accommodated in such a way as to allow the medical care provided to Ms. Rodriguez to conform to the ordinary standard of care for medical providers.

I, Dr. Robert Carpenter, declare under penalty of perjury that the foregoing is true and correct.

Executed on   16-JUN-23   in Harris County, Texas.
                    DATE


ROBERT CARPENTER

DECLARATION OF DR. ROBERT CARPENTER                                             3

# ROBERT J. CARPENTER, JR., M.D., P.A.

Maternal Fetal Medicine
6624 Fannin, Suite 2720
Houston, Texas 77030

Office Phone:  (713) 795-4600                                                                    Fax:  (713) 795-4422

**June 22, 2020**

**Mr. Roger Topham**                                   **VIA FACSIMILE: (214) 389-1002**
**Law offices of Don Tittle, PLLC**
**6301 Gaston Ave., Suite 440**
**Dallas, TX 75214**

> Re: Cause # 3:20-CV-0045-D, *Irene Rodriguez at al v. Southern Health Partners,*
> *Inc. et al*, in the United States District Court, Northern District of Texas, Dallas
> Division

Dear Mr. Topham,

I reviewed the medical records pertaining to Irene Rodriguez and her twins. The Navarro County
jail, Navarro Regional Medical Center, Baylor University Medical Center-Dallas, and Children's
Medical Center- Dallas as well as information from Olmstead Medical Center in Rochester,
Minnesota as listed in Addendum A. Additional records reviewed included the EMS notes from
the Corsicana Fire Rescue service.

This letter will provide my opinions, based upon the information currently available, concerning
the obstetrical care and treatment rendered to Ms. Rodriguez and her twins by Grady Shaw, MD
and nurse Linda Hullett and my opinions relating to the cause of her twins' neurological injuries.
These opinions are based upon reasonable medical probability.  I reserve the right to amend or
supplement these opinions as additional information becomes available.

I graduated from Baylor College of Medicine in May 1973 and completed my internship and
residency there (1973-1977) and serving as Chief Resident in OB/GYN from July 1976 to June
1977.  I completed my Fellowship in Maternal Fetal Medicine at Baylor in June 1979 and
performed additional study in OB Ultrasound and Fetoscopy at Yale University School of
Medicine and Hospital from September to October 1977.  I am Board Certified in in obstetrics
and gynecology and in the subspecialty of Maternal Fetal Medicine by the American Board of
Obstetrics and Gynecology.  My Curriculum Vitae is attached with additional details concerning

Case 3:20-cv-00045-D Document 106 Filed 06/19/23 Page 33 of 121 PageID 1501

my educational and professional activities. I have been in the active practice of OB/GYN since graduation and am currently in private practice. My license to practice medicine is currently active in the state of Texas and on record with the Texas Medical Board.

I am familiar with the standard of care of for physicians, nurses, and other health care personnel in caring for pregnant women. I have worked extensively with nurses and obstetricians in obstetrical clinics, in labor and delivery, in postpartum units, and in other obstetrical sites. I am familiar with the standard of care as to the responsibility of physicians and nurses regarding appropriate patient and fetal assessment, evaluation, monitoring and intervention. Additionally, I am familiar with the standard of care regarding the nurses' responsibility for communicating with and notification of her supervising physician and other health care providers or responsible superiors as it relates to care of the obstetrical patient.

I have also been in clinical circumstances of both transferring patients to hospitals for higher level of care and in receiving patients from other hospitals who required higher level of obstetrical and other medical care in my respective facility.

Additionally, since 1973 in beginning my postgraduate medical training and during the entire interval since, I have had occasions, both within labor and delivery and in the obstetrical clinic at multiple hospitals associated with the Harris County Hospital District (Harris Health System) to encounter pregnant women who were inmates in the Harris County jail system who presented to the hospital for labor and delivery and for outpatient care in the obstetrical high risk clinics. I am aware of the interaction between the Hospital District medical personnel and the jail medical personnel in arranging obstetrical visits - both those scheduled and those requiring emergent assessment of the pregnant woman.

## FACTS OF THE CASE

Ms. Irene Rodriguez was a 29-year-old G4 P2-1-0-3 with an LMP of June 25, 2017 and an EDC of April 1, 2018. Her prior obstetric history included 3 vaginal deliveries on March 14, 2008, March 25, 2012, and March 29, 2017 of infants weighing 6# 6oz, 5# 6oz, and 6# 6oz at 40, 34, and 40 weeks gestational age (WGA).

In this pregnancy, her new patient intake occurred on August 14, 2017 (7.3 WGA) and August 30, 2017 (9.4 WGA). She was seen initially on September 5, 2017 in the Olmstead Medical Center, in Rochester, Minnesota at 10.3 weeks gestation for new patient evaluation. A diagnosis of a twin gestation is made as reflected by the radiology referral planned for September 12. Subsequent visits on September 15, September 19, and October 17, demonstrated normal blood pressures and an initial weight of 179 pounds with a height of 4 foot 11 (BMI 35.4). A weight gain of 4.5 kg occurred during that interval.

On the visit of October 17, 2017, she related a two-week history of bilateral carpal tunnel syndrome which had been evaluated in the ER on October 12, 2017 by Mary Call, PA-C. She was wearing hand splints (Velcro wrist braces). A twin multifetal gestation was recognized as a dichorionic, diamniotic placentation. Her initial laboratory data demonstrated a normal CBC with a hemoglobin/hematocrit of 13.0/39.9, normal red blood cell indices, and a platelet count of 277,000. She was A positive with a negative indirect Coombs.

Ultrasound evaluations were performed on September 15 and September 19, 2017 demonstrating fetuses with apparent normal anatomy and growth and all scans were concordant with her LMP dating.

By the planned visit of November 13, 2017 at Olmstead, transfer of her care to the Medical Associates in Corsicana occurred with translocation of Ms. Rodriguez from Minnesota to Texas. From annotations present on the medical records the Olmstead medical records were transmitted to Navarro County Medical Associates on November 13, 2017 (1253h).

In the medical records in Corsicana an examination of a single fetus dated November 16, 2016 is present ordered by Dr. Kenneth Palmer and signed by Dr. Diya Odeh. A normal transabdominal cervical length of 45 mm was noted. This exam was performed in the Olmstead Clinic concerning the prior pregnancy delivered in March 2017.

In Corsicana, Texas, on November 29, 2017 at 22.4 weeks gestation her blood pressure was 122/70 with a weight of 190 pounds, and the ultrasound exam demonstrated viable twins with

normal amniotic fluid, and a notation of a cervical length of 55 mm is present. Prior to this ultrasound exam, she established obstetrical care with the Medical Associates of Navarro County and Dr. Michelle Spears. She was noted to be A-positive with a negative indirect Coombs and with a positive rubella and hepatitis B surface antigen. No known allergies were present, and the history of a prior preterm delivery at 34 weeks gestation following a fall in March 2012 was noted. The twin pregnancy was affirmed. This visit of November 29, 2017 is the only antenatal visit documented before her arrest and incarceration at the Navarro County Jail. A later note of a phone call of December 29, 2017 is written by Dr. Charles Cook.

Medical records are available from the Navarro County jail with a notation on December 22, 2017 indicates Ms. Rodriguez had a twin pregnancy at six months gestation without complication. Her use of obstetrician Dr. Spears is noted, and the use of prenatal vitamins was approved by the nurse, Linda Hullett.

On December 27, 2017, a notation is made by Dr. Grady Shaw that her second child was premature at 33 weeks gestation with a weight of 5 pounds. Ms. Rodriguez was noted to be having contractions and that she was to see Dr. Spears, her obstetrician, on December 28, 2017, "appointment tomorrow.". The note indicates that she is in jail for a probation hold, and her parole officer is Brenda Ross. Her weight was 192 pounds, her blood pressure 106/70, and a maternal heart rate of 95 bpm with an oxygen saturation of 97% was present. A prepregnancy weight of 140 pounds is noted. Examination was performed, and a 34-week uterus was found without tenderness.

The next note on December 29, 2018 at 1354 hrs. indicates that Ms. Rodriguez was having contractions and she was instructed to tell Ms. Hullett when contractions started and stopped. Between 1403 and 1434 hrs. Ms. Rodriguez had nine contractions ranging from 3 to 25 seconds and lasting 2 to 6 minutes. The pattern was described as irregular and spastic.

Other notes are subsequently present under the indication of late notes. The first of these is noted on December 29, 2018 at 1500 hrs., approximately one hour after the previous note. She indicated that she spoke to the on-call obstetrician, Dr. Charles Cook, to relay information on

Ms. Rodriguez. Dr. Cook instructed her that if the patient continued with contractions and has concern that she is to be sent to the hospital L&D to be checked. The note was signed by Linda Hullett.

The next note which is also under the heading of late entry was on January 2, 2018 at 1400, where an indication of an obstetrical appointment on January 9, 2018 with Dr. Spears is noted. The appointment would be preceded by an ultrasound at 1400, and she would see Dr. Spears afterwards. Linda Hullett was the signing nurse. On January 2, 2018 at 1928 contractions at 2 to 4-minute intervals over 20 minutes were noted which lasted 19 to 26 seconds. Her blood pressure was 116/76, and a notation indicating that Ms. Rodriguez had neither pain nor distress was seen. She was returned to her cell and they were to notify the medical section if worsening symptoms occurred.

Two orders are noted within the medical section notes. On November 23, 2017, an order for one prenatal vitamin daily to be administered to Irene Rodriguez is noted. The second order on December 27, 2017 at 1538 hrs. signed by Dr. Grady Shaw states "get in to see Dr. Spears ….. ASAP". Nothing in the records indicates that this visit to Dr. Spears, or any examination by an obstetrician, ever occurred.

The next set of notes from the Navarro County jail are within a jail incident report of January 9, 2018. A distinct timeline beginning at 0450 and concluding at 0600 are related.

An abstracted summary of the notes indicates that at 0450 Officer Betty Heggins notified Sgt. Robin Woodall of contractions in Ms. Rodriguez that were occurring at three-minute intervals. Sgt. Woodall contacted nurse Hullett, and Sgt. Woodall knew that Irene Rodriguez had stated several times that she was having contractions. Nurse Hullett said to transfer Ms. Rodriguez to a medical cell for observation, and the jail staff began accomplishing that move.

At 0512 a medical cell was available, and Sgt. Woodall went to escort Irene Rodriguez to the medical section.

At 0515 in walking Irene Rodriguez to the medical cell, Ms. Rodriguez indicated the contractions were coming regularly. At 0516 Sgt. Woodall began timing her contractions and the contraction frequency over approximately 10 minutes with contractions noted at approximately one-minute intervals (53 – 63 seconds apart). The data was given to nurse Hullett who said to continue timing contractions. Officer Betty Rivera was present to assist Sgt. Woodall.

At 0528 Sgt. Woodall heard water hitting the floor. The baby's head was visible under the patient's jumper and Sgt. Woodall help the baby who began to cry and breathe. Ofc. April Martin arrived, and officer Rivera called for clean towels and blankets. The baby was placed in a clean blanket and the baby was having difficulty breathing. The baby was placed in an officer's hand in the back was rubbed; however, the baby continued to not breathe. The little girl did not cry or appear to breathe. Sgt. Woodall called nurse Hewitt and attempted to find a nasal aspirator, but none was available. Ofc. Martin began rescue breathing for the baby and the baby expelled mucus from the nose and stopped breathing, so additional rescue breathes were administered by officer Martin.

At 0535 EMS was on site and at 0536 EMS entered the jail to respond to the E-52 alert. Sgt. Woodall gave the EMTs information concerning Irene Rodriguez and the baby. The baby's airway was suctioned. At 0547, a second EMS unit was dispatched.

At 0550 Irene Rodriguez began pushing again and at 0551, the second baby, a little male, was born.

At 0555 the female infant was transferred to the hospital, and at 0600 Irene Rodriguez and the second twin were placed in the EMS unit for transfer to Navarro County Regional Medical Center, accompanied by officer Rivera.

Capt. Charlie York was informed of the clinical situation by Sgt. Woodall.

Corresponding notes from the Corsicana Fire Rescue unit dated January 9, 2018 were available for review. On arrival of EMS unit one, the patient was supine with her knees bent upward. The

baby was partially delivered with the legs and hips inside mother and the sac was not intact, with bloody show present. The baby girl was being supported by the jail staff. MS delivered the baby girl (twin one) and the cord was clamped, cut, and the mouth was suctioned till clear. They suctioned the nose with the bulb syringe and a week cry, which declined in status was noted. Mask ventilation was begun with high flow oxygen initially and with subsequent warming and physical stimulus a positive response occurred within 10 minutes.

M-4 arrived, and care of Irene Rodriguez was assumed. The E-1 crew transferred the care to the M-4 unit who continued to take care of the baby girl "A".

The E-1 unit prepared for delivery of twin two. The baby was cephalic with the face down with swift delivery of the baby's body. The baby was warmed, stimulated, and assisted with breathing by bag and mask (BVM). Nonsterile but clean cord cutting technique was used for the umbilical cord of twin B.

Fundal massage was applied to Ms. Rodriguez but was not effective in hemorrhage control. The placenta was ultimately delivered at Navarro Regional Hospital. Ms. Rodriguez had an 18-gauge IV line placed in the left-hand with 1 liter of normal saline begun. The note by the EMS team shows notification at 0532, time on scene at 0538, and with the patient at 0540. They subsequently departed for Navarro Regional Hospital at 0610 with arrival at the hospital at 0615.

I will not recite the further care of the babies both at the jail by the correctional officers, or by the EMS personnel, or at the hospital or review information in any detail concerning the care of Ms. Rodriguez at Navarro Regional Medical Center. Difficulty was encountered in caring for both twins including at least 33 minutes of CPR performed on Twin "AA" from 0730 to 0803, and that information is reflected within the medical records available from the hospital. Notes and appropriate documentation for the care of Mrs. Rodriguez at Navarro Regional Medical Center are also available and were reviewed.

Case 3:20-cv-00045-D   Document 106   Filed 06/19/23   Page 39 of 121   PageID 1507

## ANALYSIS

The medical care provided to Irene Rodriguez while at the Navarro County jail by both Dr. Shaw and nurse Hullett was below the standard of care. There are rules in the jail medical section that it was to serve as recipients of information from the correctional officers and from inmate complaints (and specifically Hullett was to receive such information, as she was the nurse in charge of the medical section and the only medical employee present most of the time). Information was clearly available to Dr. Shaw and to nurse Hullett that Irene Rodriguez had a twin pregnancy, a prior preterm delivery, and medical care that was appropriate was scheduled for December 28, 2017 by Dr. Spears. That information was noted by Dr. Shaw in his note of December 27 with the additional notation that she was to be seen ASAP by the obstetrical personnel. That order was not executed which is a clear breach of the standard of care.

Both Dr. Grady Shaw and nurse Linda Hullett knew or should have known that a twin pregnancy having frequent contractions over multiple days or weeks was an extremely high-risk circumstance that required appropriate evaluation by trained obstetrical personnel. For over 4 decades the known preterm delivery rate for twin gestations has remained in the 45-50% range. Their general knowledge should have included that increased risk for prematurity especially when caring for a pregnant woman with twins in their jail and that knowledge should have applied to what was occurring to Ms. Rodriguez. Shaw also notes that Rodriguez should continue to be monitored at the jail. This was necessary due to the high-risk nature of a twin pregnancy, compounded by Rodriguez's prior preterm delivery and the fact that she was already showing indicators of possible preterm labor. Shaw and Hullett had a continuing duty to monitor Rodriguez; however, records indicate that Rodriguez was not examined by anyone after January 2.

The note by Dr. Grady Shaw on December 27, 2017 at 1520 is followed temporally by a note of January 2, 2018 at 1928, and I am unable to read the name of the signer (? P. Clark).

The January 2, 2018 note indicates Ms. Rodriguez was complaining of having contractions and the contractions were timed for 20 minutes with contractions occurring every 2 to 4 minutes.

The signer did not consider the patient to be in any pain or distress. Because of that information no further action was taken with the contractile activity that occurred at 1928.

However, the late entry notes which all have a year of 2018 annotated begins with a note of 12-29-18 at 1354 that indicates the presence of mucous plug passage and being in labor. Nurse Hullett also indicates in a later note at 1500 that she spoke with the on-call physician, Dr. Cook, to relay information concerning Ms. Rodriguez. Dr. Cook instructed nurse Hullett that if the patient continued with "this" and has concerns that she is to be sent to the hospital L&D to be checked. This series of late notes appear to be written at the same time and with the same pen. I do not see a signature following the 1354 note which suggests that it was written by Ms. Hullett.

Due to the failure to appropriately annotate the chart with contemporaneous medical records that were of substantial importance to later caregivers, the RN observer (? P. Clark) who wrote the note on January 2, 2018 was unaware of Dr. Cook's instructions that if other contractions occurred that Ms. Rodriguez was to be seen and evaluated at the hospital L&D. This critical lapse prevented that nurse from seeing and carrying out Dr. Cook's request for transfer of Ms. Rodriguez to the Navarro Regional Medical Center L&D for further evaluation. More likely than not, on January 2, 2018, a finding of preterm labor and likely maternal cervical change would have been ascertained and appropriate obstetrical care instituted.

Due to the absence of depositions, affidavits, or any other demonstrable evidence, I am unable to determine when the late entry notes were written since a standard notation of when a late entry is incorporated within the medical record is absent from these records. Standard rules of medical record annotation require a late entry to be timed and dated. No such data is seen.

Given the facts of the last paragraph, it is not possible to know whether the information designated as late entry was written on January 2, 2018 or at some other time, but it was certainly entered sometime after the note from January 2 at 1928.

The totality of the information available suggests that at multiple occasions between December 27 and her ultimate delivery on January 9, 2018, the potential for interdiction of the ultimate

preterm delivery in the Navarro County jail was possible. I understand from looking at the limited notes of the jail incident report that the correctional officers including Sgt. Woodall knew that Ms. Rodriguez was having contractions. After the delivery of the twins occurred on January 9, Woodall reported that Hullett had "knowledge of Inmate Rodriguez's current medical situation regarding her pregnancy" and that "Rodriguez had stated several times prior to this that she had been having contractions." It is reasonable to believe that nurse Hullett was also aware of that contractile activity as the correctional officers would be bound to inform the medical personnel of such events occurring to their inmate population.

If timely notes had been applied to the medical record with the instructions as noted from Dr. Cook that the patient was to be seen if further contractions occurred had been known to the nurse observer on January 2, 2018, a reasonable nurse faced with such information would likely have arranged evaluation of Ms. Rodriguez by medical personnel at the Navarro Regional Medical Center. The rapidity of her labor and delivery suggests that at some time prior to her delivery substantial change in the cervix occurred and such information was not known to the medical personnel at the Navarro County jail since they were neither obstetricians nor obstetrical nurses.

Because of the absence of specific knowledge, further communication with obstetrical caregivers that should have occurred that would likely have prevented the unassisted vaginal delivery of twins in the jail cell, would have allowed the potential for an immediate neonatology evaluation and management, and a significant probability of a far better outcome than occurred as reflected in the numerous records from both the Navarro County Hospital, Baylor University Medical Center, and Children's Medical Center in Dallas.

Most specifically, evaluation and management by an obstetrician would likely have led to the administration of Celestone Soluspan which is administered to any woman who is believed to be at increased risk for early preterm delivery in an effort to allow for maturation of the fetal lungs, for a decreased incidence of necrotizing enterocolitis (NEC), and for a substantial reduction in incidence of interventricular hemorrhage or other forms of intracranial hemorrhage. The failure of appropriate obstetrical evaluation over this approximate two-week

window of contractile activity and cryptic cervical change allowed for rapid labor and delivery within the jail itself which deprived the unborn twins of appropriate immediate neonatal care that more likely than not would have changed their ultimate medical course.

It is highly probable that if appropriate obstetrical referral had been made to the Navarro Regional Medical Center obstetrical personnel including Doctors Cook and Spears that evaluation would have suggested an increased probability of preterm delivery. Just as transfer of the babies post-delivery occurred to the Baylor University Medical Center for neonatal care, it is highly probable that a maternal transfer would have been accomplished which would have placed Ms. Rodriguez in the care of the obstetrical and neonatal staff at Baylor University Medical Center where appropriate level 3/4 neonatal care would have been immediately available. More likely than not, this advanced level of neonatal care would have prevented the adverse neonatal outcomes subsequently experienced by both twins. The obstetrical and neonatal literature has a robust database concerning the importance of local hospital transfer of mothers at increased risk for early delivery to more specialized regional obstetrical and neonatal centers that is known to substantially decrease both maternal and neonatal adverse outcomes. At the time of this incident, that antenatal, predelivery transfer was standard of care in Texas

The need for obstetrical evaluation is clear from the records that are available. It is likely that as evidence is acquired during the discovery phase of this case that a better view of the timeline of patient contractions and the information that was given to and known by both correctional officers and medical personnel at the Navarro County jail will become available.

## OPINION

Given the totality of the information available from the current records reviewed, both nurse Hullett and Dr. Grady Shaw failed in their medical responsibilities to provide appropriate care to Ms. Irene Rodriguez and her unborn twins during her stay in the Navarro County jail. This failure of providing appropriate care directly led to the pre-term delivery of Ms. Rodriguez at the Navarro County jail on January 9, 2018 unattended by appropriate medical personnel who could

provide appropriate resuscitation and other acute medical and neonatal management to both Miss Rodriguez and her newborn twins.

Additionally, failure to have timely obstetrical evaluation prevented the administration of appropriate medications such as Celestone Soluspan and magnesium sulfate which are known to improve neuroprotection due to an early preterm delivery and decrease the ultimate incidence of cerebral palsy and other severe preterm neonatal afflictions such as necrotizing enterocolitis and intracranial hemorrhage. This same failure to provide timely obstetrical evaluation likely lead to failure to have Miss Rodriguez medically transported to a higher level obstetrical and neonatal unit where appropriate care for her preterm infants would be available.

It is clearly reflected in the available data from the notes by the correctional officers involved in her transfer from her jail cell to the medical section on January 9, 2018 and the notes reflected by the Corsicana Fire Rescue EMS personnel that both twins were without oxygen, had difficulty breathing, required warming, and were likely deprived of oxygen and heat normally required to maintain normal neonatal bodily functions that can decrease the potential for adverse physiologic effects in the newborn preterm infant.

With reasonable probability, if nurse Hullett had instructed Sgt. Woodall to call the Corsicana Fire Rescue unit upon her first notification that contractions were present at a one minute interval, the EMS unit would have been present on scene when Miss Rodriguez delivered twin "AA" as they were subsequently for the delivery of twin "BB." The documented timeline from notification to arrival on the scene at Ms. Rodriguez's bedside was eight (8) minutes. The presence of the EMS crew at her delivery may well have changed the outcome for baby girl Rodriguez.

As a direct result of the failure of appropriate obstetrical medical care provision/referral, untimely delivery at the Navarro County jail, and non-availability of trained resuscitative personnel, the severe neurologic and other outcomes suffered by the Rodriguez twins occurred.

More likely than not, if proper medical care by nurse Hullett and Dr. Grady Shaw had been provided, much of the neonatal and subsequent neurologic and other injuries experienced by the Rodriguez twins would have been prevented. Shaw failed to follow up on Rodriguez in any way, thus breaching his duty to monitor her health and verify that she had seen an obstetrician as he had ordered. Hullett breached the standard of care by failing to follow both Shaw's order to have Rodriguez seen by Dr. Spears and Dr. Cook's subsequent instruction, failing to record critical notes in a timely manner, failing to monitor Rodriguez after January 2, and generally failing to ensure Rodriguez received appropriate obstetrical care.

I fully understand that other information will become available as this case is being developed. If my opinions change concerning any element of the current analysis, I will notify you as Ms. Rodriguez's attorney so that those opinions can be shared with all parties in this action.

A signed copy of this letter will be transmitted by fax and a copy will be sent by USPS.

Thank you for the opportunity to have reviewed this matter.

*Robert J Carpenter Jr*

Robert J. Carpenter, JR. MD JD

## Addendum A

**Analeyah Marie Rodriguez/Lopez:**

| | |
|---|---|
| **Analeyah Marie Rodriguez – Navarro 01-09-2018 MR** | **6,177 KB** |
| **Ana Rodriguez – Navarro Reg Hosp – part 2** | **13,941 KB** |
| **MR – Baylor University Medical Center at Dallas – A.R. – Part 1** | **17,587 KB** |
| **MR – Baylor University Medical Center at Dallas – A.R. – Part 2** | **17,239 KB** |
| **20200527_173342 Analeyah Rodriguez (JPEG images)** | **2,242 KB** |

**Benjamin Ramon Rodriguez/Lopez:**

**Navarro Regional Hospital**

| | |
|---|---|
| **BR_NRH 1** | **8,490 KB** |
| **BR_NRH 2** | **9,262 KB** |
| **BR_NRH 3** | **7,157 KB** |
| **BR_NRH 4** | **5,277 KB** |
| **BR_NRH 5** | **7,112 KB** |
| **BR_NRH 6** | **3,947 KB** |

| | |
|---|---|
| **MR - Baylor University Medical Center at Dallas – B.R.-Part 1 – (No Aff)** | **22,778 KB** |
| **MR - Baylor University Medical Center at Dallas – B.R.-Part 2** | **23,829 KB** |
| **MR – Children's Medical Center Dallas – BR 1** | **194 KB** |
| **MR – Children's Medical Center Dallas – BR 2** | **462 KB** |

**Irene Rodriguez:**

| | |
|---|---|
| **Navarro County Jail Records** | **1,944 KB** |
| **MR – Corsicana Fire EMS – Irene** | **937 KB** |
| **MR – Medical Associates of Navarro County – Dr. Spears** | **4,205 KB** |
| **MR – Olmstead Medical Center Hospital – Irene** | **1,895 KB** |

| | |
|---|---|
| **1 Complaint** | **240 KB** |

# CURRICULUM VITAE

## PERSONAL HISTORY

| | |
|---|---|
| Name and Address | **Robert James Carpenter, Jr., M.D., J.D.**<br>101 Westcott Street, Unit 803<br>Houston, TX  77007-7031 |
| Date & Place of Birth | November 7, 1945<br>Dallas, TX |
| Marital Status | Married:  Addie Flowers Carpenter<br>Children:  Craig Barrett Carpenter |
| Social Security #: | Not Released |
| Texas Medical Lic #: | E 0847 |

## EDUCATION

| | | |
|---|---|---|
| Hardin-Simmons University<br>Abilene, Texas | September 1965 – August 8, 1968 | B.A. Magna Cum Laude<br>Biology Chemistry |
| Baylor College of Medicine<br>Houston, Texas | September 9, 1968 - June 6, 1973 | M.D. Degree<br>with honors |
| University of Houston Law Center | May 22, 2002 to May 12, 2006 | J.D. |

### Fellowships

| | | |
|---|---|---|
| National Science Foundation<br>Atomic Energy Commission<br>Summer Training Fellowship<br>Oak Ridge Associated Universities<br>Oak Ridge, Tennessee | June 1967 – August, 1967 | Radiophysics &<br>Radiochemistry<br>(Clarence C. Lushbaugh MD/PhD) |
| University of Texas<br>M.D. Anderson Hospital<br>Houston, Texas | June 1968 – August 1968 | Molecular Biology |

### Military Service

| | | |
|---|---|---|
| U.S. Naval Reserve (Enlisted) | 11/19/62 – 07/03/68 | Disbursing Clerk 2nd Class |
| U.S. Naval Reserve (Officer) | 07/03/68 – 07/03/92 | Medical Corps – Commander |

## POSTGRADUATE TRAINING

| | | |
|---|---|---|
| Baylor College of Medicine<br>Department of Anatomy<br>"Physiology of Lipid Metabolism<br> in Pregnancy and During Lactation" | 1969 - 1971 | M.D., Ph.D. Program<br>Under Robert A. Liebelt, M.D., Ph.D. |
| Baylor College of Medicine<br>Houston, Texas | June 1973 – June 1974 | Rotating Intern-OB/GYN |
| Baylor College of Medicine<br>Houston, Texas | July 1974 – June 1976 | Resident in OB/GYN |
| Baylor College of Medicine | July 1976 – June 1977 | Chief Res. in OB/GYN |

Houston, Texas

| | | |
|---|---|---|
| Baylor College of Medicine | July 1977 – June 1979 | Fellow in Maternal |
| Houston, Texas | | Fetal Medicine |
| | | |
| Yale University | September – October 1977 | OB Ultrasound |
| New Haven, Connecticut | | and Fetoscopy |
| Under Dr. John Hobbins | | |

## BOARD CERTIFICATION

American Board of Obstetrics and Gynecology, Diplomat (1980)
American Board of Obstetrics and Gynecology, Subspecialty, Maternal Fetal Medicine (1982)
American Board of Obstetrics and Gynecology, (Recertification-Aug 1993)
AIUM Ultrasound Practice Accreditation Obstetrics (April 15, 1998-Oct 15, 2004)

## APPOINTMENTS (June 1979-Aug 2006)

Assistant Professor, Baylor College of Medicine, Dept of OB/GYN, July 1979-Nov 1987
Assistant Professor, Institute of Molecular Genetics, Baylor College of Medicine, Nov 1985-June 1994
Associate Professor, Baylor College of Medicine, Dept of OB/GYN, Nov 1987-June 1994
Program Director, Maternal Fetal Medicine, Baylor College of Medicine, Jan 1991-Dec 1992
Clinical Associate Professor, Baylor College of Medicine, Dept of OB/GYN, July 1994-Aug 2006
Clinical Associate Professor, Baylor College of Medicine, Dept of Molecular & Human Genetics, July 1994-Aug 2006
Clinical Associate Professor, Baylor Center for Ethics & Health Policy, 2004-2006
Clinical Professor, University of Texas Medical Branch, Galveston, TX, 2000-2006

Examiner, American Board of Obstetrics and Gynecology (1995)

## APPOINTMENTS (Sept 2006-Present)

Associate Professor, Baylor College of Medicine, Department of OB/GYN, Sept 2006-Present
Associate Professor, Baylor College of Medicine, Department of Molecular & Human Genetics – Sept 2006-Present

## PROFESSIONAL SOCIETIES

American College of Obstetricians and Gynecologists, Fellow 1980
Society of Maternal Fetal Medicine
Central Association of Obstetrics and Gynecology
American Society of Human Genetics (End 2006)
Fetoscopy Study Group
International Fetal Medicine & Surgery Society
American Institute of Ultrasound in Medicine
American Diabetes Association (end 2006)
Harris County Medical Society
Texas Medical Association
Texas Perinatal Association
Houston Obstetrics & Gynecology Society

## BASIC CARDIAC LIFE SUPPORT FOR HEALTHCARE PROVIDERS

American Heart Association — Feb 2, 1998-Feb 2, 2000

## HOSPITAL AFFILIATIONS

| | |
|---|---|
| St. Luke's Episcopal Hospital/Baylor St. Luke's Medical Center<br>6720 Bertner Avenue<br>Houston, Texas 77030 | Attending OB/GYN<br>1977 to present |
| Texas Children's Hospital<br>6621 Fannin Street<br>Houston, TX 77030 | Active – Gynecology Service<br>1979 to present |
| Houston Methodist Hospital<br>6565 Fannin Street<br>Houston, Texas 77030 | Senior Attending OB/GYN<br>1978 to present |
| HCA Woman's Hospital of Texas<br>7600 Fannin Street<br>Houston, Texas 77054 | Consultative Staff<br>1979 to present |
| Harris County Hospital District<br>Harris Health System<br>Ben Taub General Hospital<br>1504 Taub Loop<br>Houston, Texas 77030 | Active OB/GYN<br>1977 to Present |
| Memorial Hermann Hospital – TMC<br>1203 Ross Sterling Avenue<br>Houston, Texas 77030 | Courtesy Staff<br>1980 to 1985<br>2011 to 2012 |

## COMMITTEES-STANDING

Harris County Hospital District — Ended June 30, 1994

> Transfusion Committee
> Quality Assurance Committee - OB/GYN
> Ob/Gyn Records Committee

Harris County Medical Society

> Medical Student Committee (Dates not known)

St. Luke's Episcopal Hospital

> OB Collaborative, Pharmacy, & Nursing Committee (1990 – present)
> OB/GYN Service Committee
> Perinatal Morbidity & Mortality Committee (1990 – present)
> OB/GYN Medical Record Screening Committee – (1980-1998, 2001, 2011 - )
> Transfusion Committee (1990 – 2006)
> Ethics Committee (Chair) ended 12/31/06
> Credentials Committee (1999 – present)
> Institutional Review Board (Vice-Chair) (1999-2003)
> Medical Executive Committee (2000-2001) (2011-2012)
> Nutrition Subcommittee of Quality of Care Committee (1998 – 2006)
> Pharmacy, Nutrition, and Therapeutics Committee (2010-present)

Houston Methodist Hospital

Perinatal Morbidity & Mortality Committee (2013 to present)
Transfusion Committee (ended)
Termination of Pregnancy Committee

Texas Children's Hospital

OB/GYN Service Committee
Perinatal Morbidity & Mortality Committee (1990 – present)
Ethics Committee (2008 – present)
Collaborative Practice Committee (2012 to present)
OB/GYN Quality Review Committee (2012 to present)

Baylor College of Medicine
Curriculum Committee (ended)
Student Promotions Committee - 1988-1990
Professional Practices Activities Committee (1984-1994) (2007 – present)
Medical Liability Insurance Committee (2008 to present)
Nurse Midwifery Selection Committee (ended)
Medical Student Elective Committee (ended)
Liaison Committee on Medical Education-1993

Baylor College of Medicine Obstetrics/Gynecology Departmental Committees
Fellow Selection Committee
Resident Selection Committee
(All concluded June 1994)

Resident Selection Committee (New) Sept 2006 to present

Central Association of Obstetricians & Gynecologists
Bylaws Committee (1993-1994) (2016 to present)
Program Committee (1999-2001)

## REVIEWER

1. American Journal of OB/GYN
2. Obstetrics and Gynecology
3. Journal of Clinical Ultrasound
4. The Journal of Maternal-Fetal Medicine
5. Journal of Reproductive Medicine
6. Fetal Therapy
7. Texas Heart Institute Journal

## CHAPTERS

Hadlock, FP, Deter, RL, **Carpenter RJ Jr**.  Sonography of Fetal Genitourinary Tract in:  *Seminars in Ultrasound*.  Raymond, HW, Zwiebel, WJ, Ed. New York, 1984 Gruen and Stratton Publishers.  Volume 5, Number 3, pp. 213-228

**Carpenter RJ Jr**:  Habitual Abortion In:  *The Biochemistry of the Reproductive Years*.  Besch PK, Goldzier JW, Gibbons WE, ed.  Washington, DC, 1985, The American Association for Clinical Chemistry, pp. 51-65.

Hadlock, FP, Rothchild, S, **Carpenter RJ Jr**:  Use of Ultrasound in Invasive Procedures In: *Ultrasound in Obstetrics and Gynecology*.  Athey PA, Hadlock FP, ed. St. Louis, MO, 1985. C.V. Mosby Company Publishers.

Huhta JC, **Carpenter RJ Jr**:  Segmental Diagnosis of Congenital Heart Disease: Application to Fetal Echocardiography**.  *Fetal Echocardiography*, New York: Futura, (1987)

Glasow, PF, **Carpenter RJ Jr**:  Pregnancy and Cardiovascular Disease In:  *The Science and Practices of Pediatric Cardiology* Volume III, pp. 2374-2396. Philadelphia/London, 1990.  Lea and Febiger.

Smith L Jr., **Carpenter RJ Jr**, Adams J:  Emergency Transport of the Obstetrical Patient In:  *Problems in Critical Care*; Kirby RR, Taylor RW, ed., Fromm RE, guest ed. Vol 4, No 4, pp 570-580.  J B Lippincott Company - Philadelphia.

**Carpenter RJ Jr,** Belfort MA**.  High Risk Obstetrical Monitoring, In, Levine R, Fromm R, *Critical Care Monitoring*, Mosby-Year Book, Inc. (1995) 18:289-318.

**Carpenter RJ Jr**.  Pregnancy, In, Varon J, *Practical Guide to the Care of the Critically Ill Patient*, Mosby-Year Book, Inc. (1994) 14: 251-268.

**Carpenter RJ Jr,** Fetal Urology and Development in Gonzales, E et al *Principles and Practice of Pediatric Urology*, Lippincott (1999)

## PUBLICATIONS

1. Hinkley CM, Wait RB, Christopherson MB, and **Carpenter RJ Jr**: Amniocentesis. Compr Ther. 1978 Mar; 4(3):52-3.

2. Hadlock FP, Deter RL, Garcia-Prats, J, Athey PA, **Carpenter RJ Jr**, and Hinkley CM: The role of ultrasound in the diagnosis and management of fetal ascites not associated with Rhesus incompatibility. Am J Roentgenol. 143: 1225-1230, 1980.

3. Hadlock FP, Deter RL, **Carpenter RJ Jr**, Park SK, and Athey PA: Hypervascularity of the uterine wall during pregnancy: incidence, sonographic appearance and obstetrical significance. J Clin Ultrasound 8:399-403, 1980.

4. Deter RL, Harrist RB, Hadlock FP, and **Carpenter RJ Jr**:  The use of ultrasound in the assessment of normal fetal growth - a review. J Clin Ultrasound. 1981 Nov-Dec;9(9):481-93.

5. Hadlock FP, Deter RL, **Carpenter RJ Jr**, Park SK. The effect of head shape on the accuracy of the BPD in estimating fetal gestational age. Am J Roentgenol. 1981 Jul;137(1):83-5.

6. Deter RL, Hadlock FP, Harrist RB and **Carpenter RJ Jr**: Evaluation of three methods for obtaining fetal weight estimates using dynamic image ultrasound.  J Clin Ultrasound. 1981 Oct;9(8):421-5.

7. Hadlock FP, Deter RL, **Carpenter RJ Jr**, Gonzales ET, and Park SK:  Prenatal detection of anomalous development of the fetal urinary system using ultrasonography. AJR 137:261-267, 1981.

8. Deter RL, Harrist RB, Hadlock FP, and **Carpenter RJ Jr.** The use of ultrasound in the detection of intrauterine growth retardation: a review. J Clin Ultrasound. 1982 Jan;10(1):9-16.

9. Deter RL, Hadlock FP, **Carpenter RJ Jr**, Klima TF, Kim H, and Park SK: The use of dynamic image ultrasonography in the detection of fetal anomalies. Perinat Neonat. 6(2):35-46, 1982.

10. Finegold MJ, and **Carpenter RJ Jr.** Obliterative cholangitis due to cytomegalovirus: a possible precursor of paucity of intrahepatic bile ducts. Hum Pathol. 1982 Jul;13(7):662-5.

11. Deter RL, Harrist RB, Hadlock FP, and **Carpenter RJ Jr.** Fetal head and abdominal circumferences: I. Evaluation of measurement errors. J Clin Ultrasound. 1982 Oct;10(8):357-63.

12. Deter RL, Harrist RB, Hadlock FP, and **Carpenter RJ Jr.** Fetal head and abdominal circumferences: II. A critical re-evaluation of the relationship to menstrual age. J Clin Ultrasound. 1982 Oct;10(8):365-72.

13. **Carpenter RJ Jr.** Preterm labor: Cause and management. Compr Ther. 1982 Jun;8(6):37-46.

14. Greenburg F, **Carpenter RJ Jr,** and Ledbetter DH: Cystic hygroma and hydrops fetalis in a fetus with trisomy 13. Clin Genet. 1983 Nov;24(5):389-91.

15. Athey PA, **Carpenter RJ Jr**, Hadlock FP, Hedrick TD. Ultrasonic demonstration of ectopic ureterocele. Pediatrics. 1983 Apr;71(4):568-71.

16. **Carpenter RJ Jr**, Hinkley CM, Carpenter AF: Midtrimester genetic amniocentesis. Use of ultrasound direction vs blind needle insertion. J Reprod Med. 1983 Jan;28(1):35-40.

17. Hadlock FP, Harrist RB, **Carpenter RJ Jr**, Deter RL. Park SK. Sonographic estimation of fetal weight. The value of femur length in addition to head and abdomen measurements. Radiology. 1984 Feb;150(2):535-40.

18. Perone N, **Carpenter RJ Jr,** Robertson JA. Legal liability in the use of ultrasound by office-based obstetricians. Am J Obstet Gynecol. 1984 Dec;1;150(7):801-4.

19. Claman P, **Carpenter RJ Jr**, Reiter A. Uterine rupture with the use of vaginal prostaglandin E2 for induction of labor. Am J Obstet Gynecol. 1984 Dec;150(7):889-90.

20. **Carpenter RJ Jr,** Decuir P. Cardiovascular collapse associated with oral terbutaline tocolytic therapy. Am J Obstet Gynecol. 1984 Mar 15;148(6):821-3.

21. Antonarakis SE, Copeland KL, **Carpenter RJ Jr,** Carta CA, Hoyer LW, Caskey CT, Toole JJ, Kazazian HH Jr. Prenatal diagnosis of hemophilia A by factor VIII gene analysis. Lancet. 1985 Jun 22;1(8443):1407-9.

22. Huhta JC, Strausburger J, **Carpenter RJ Jr**, Reiter AA, Abinmader E. Pulsed Doppler-fetal echocardiography. J Clin Ultrasound. 1985 May;13(4)247-54.

23. Reiter AA, **Carpenter RJ Jr**, Dudrick SJ, Hinkley CM. Pregnancy associated with advanced adenocarcinoma of the lungs. Int J Gynaecol Obstet. 1985 Feb;23(1):75-8.

24. Reiter AA, Huhta JC, **Carpenter RJ Jr**, Klima T. Prenatal diagnosis of endocardial fibroelastosis in a monozygotic twin. J of Cardiovascular Ultrasound. 1985 Vol 4, No 3, 225-28.

25. Huhta JC, Vick GW, **Carpenter RJ Jr**, Gutgesell HP: Transient neonatal tricuspid regurgitation: possible relation with premature closure of the ductus arteriosus. J Am Coll Cardiol. 1984 (4)3:651.

26. Abinader EG, Huhta JC, Reiter A, Strasburger J, **Carpenter RJ Jr**:  The contribution of pulsed Doppler in the cardiac evaluation of the human fetus.  Israel J Med Sci 1985.

27. Reiter AA, Huhta JC, **Carpenter RJ Jr**, Segall GK, Hawkins EP. Prenatal diagnosis of arteriovenous malformation of the vein of Galen. J Clin Ultrasound. 1986 Oct:14(8)L623-8.

28. Strasburger JF, Huhta JC, **Carpenter RJ Jr,** Garson A, McNamara DG. Doppler echocardiography in the diagnosis and management of persistent fetal arrhythmias. J Am Coll Cardiol. 1986 Jun;7(6):1386-91.

29. Greenberg F, Gresik MV, **Carpenter RJ Jr**, Law S, Hoffman L, Ledbetter DH. The Gardner-Silengo-Wachtel or genito-palato syndrome: male pseudohermaphroditism with micrognathia, cleft palate, and conotruncal cardiac defect. Am J Med Genet. 1987 Jan;26(1):59-64.

30. Warda A, Deter RL, Rossavik IK, **Carpenter RJ Jr**, Hadlock FP. Fetal femur length: a critical re-evaluation of the relationship to menstrual age. Obstet Gynecol. 1985 Jul;66(1):69-75.

31. Greenberg F, Stein F, Gresik MV, Finegold MJ, **Carpenter RJ Jr**, Riccardi VM, Beaudet AL.  The Perlman familial nephroblastomatosis syndrome. Am J Med Genet. 1986 May;24(1):101-10.

32. **Carpenter RJ Jr**, Strasburger JF, Garson A, Smith RT, Deter RL, Engelhardt HT. Fetal ventricular pacing for hydrops secondary to complete atrioventricular block. J Am Coll Cardiol. 1986 Dec;8(6):1434-6.

33. Cox SM, Bost JE, Faro S, **Carpenter RJ Jr.**  Epidural anesthesia during labor and the incidence of forceps delivery. Tex Med. 1987 Apr;83(4):45-7.

34. Lee W, **Carpenter RJ Jr**, Phillips LE, Faro S.  Gardnerella vaginallis chorioamnionitis, a report of two cases and a review of the pathogenic role of Gardnerella vaginalis in obstetrics. Diagn Microbiol Infect Dis. 1987 Oct;8(2):107-11.

35. Lee W, **Carpenter RJ Jr**, Phillips LE, Faro S.  Pyelonephritis and sepsis due to Staphylococcus saprophyticus. J Infect Dis. 1987 May;155(5):1079-80.

36. Moise KJ Jr, **Carpenter RJ Jr,** Huhta JC, Deter RL.  Umbilical cord hematoma secondary to in utero intravascular transfusion for Rh isoimmunization. Fetal Ther. 1987;2(2):65-70.

37. Huhta JC, **Carpenter RJ Jr**, Moise KJ Jr, Deter RL, Ott DA, McNamara DG.  Prenatal diagnosis and postnatal management of critical aortic stenosis. Circulation. 1987 Mar;75(3):573-6.

38. Spence JE, Buffone GJ, Rosenbloom CL, Fernbach SD, Currey MR, **Carpenter RJ Jr**, O'Brien WE, Beaudet AL.  Prenatal diagnosis of cystic fibrosis using linked DNA markers and microvillar intestinal enzyme analysis. Hum Genet. 1987 May;76(1):5-10.

39. Moise KJ Jr, **Carpenter RJ Jr**. Methylergonovine-induced hypertonus in a term pregnancy. J Rep Med. 1988 Sep; 33(9):771-3.

40. Deter RI, Rossavik IK, Harrist RB, Cortessoz C, **Carpenter RJ Jr**, Hadlock FP. Development of individual growth standards for estimated Fetal Weight: II. Weight predictions during the third trimester and at birth. J Clin Ultrasound. 1989 Feb;17(2):83-8.

41. Moise KJ Jr, **Carpenter RJ Jr**, Milam JD. Changing trends in the diagnosis and treatment of Rhesus alloimmunization. Tex Med. 1987 Nov;83(11):27-32.

42. Moise KJ Jr, **Carpenter RJ Jr,** Deter RL, Kirshon B, Diaz SF. The use of fetal neuromuscular blockade during intrauterine procedures. Am J Obstet Gynecol. 1987 Oct;157(4 Pt 1):874-9.

43. Moise KJ Jr, **Carpenter RJ Jr**, Cotton DB, Wasserstrum N, Kirshon B:  Percutaneous umbilical cord blood sampling in the evaluation of fetal platelet counts in pregnant patients with autoimmune thrombocytopenia purpura. Obstet Gynecol. 1988 Sep;72(3 Pt 1):346-50.

44. Baker CJ, Rench MA, Edwards MS, **Carpenter RJ Jr**, Hays BM, Kasper DL. Immunization of pregnant women with type III capsular polysaccharide of group B streptococcus. N Engl J Med. 1988 Nov 3;319(18):1180-5.

45. Greenberg F, Courtney KB, Wessels RA, Huhta J, **Carpenter RJ Jr**, Rich DC, Ledbetter DH. Prenatal diagnosis of deletion 17p13 associated with DiGeorge anomaly. Am J Med Genet. 1988 Sep;31(1):1-4.

46. Cox SM, **Carpenter RJ Jr**, Cotton DB. Placenta percreta: ultrasound diagnosis and conservative surgical management. Obstet Gynecol. 1988 Mar;71(3 Pt 2):454-6.

47. Kirshon B, Faro S, Zurawin RK, Samo TC, **Carpenter RJ Jr**.  Favorable outcome after treatment with amantadine and ribavirin in a pregnancy complicated by influenza pneumonia. J Reprod Med. 1988 Apr;33(4):399-401.

48. Rhoads GG, Jackson LG, Schlesselman SE, de la Cruz FF, Desnick RJ, Golbus MS, Ledbetter DH, Lubs HA, Mahoney MJ, Pergament E, Simpson JL, **Carpenter RJ Jr**, Elias S, Ginsberg NA, Goldberg JP, Hobbins JC, Lynch L, Shiono PH, Wapner RA, Zachary JM:  The safety and efficacy of chorionic villus sampling for early prenatal diagnosis of cytogenetic abnormalities.  N Engl J Med 320(10) 609-617.

49. Dildy GA, Moise KJ Jr, **Carpenter RJ Jr**, Klima T.  Maternal malignancy metastatic to the products of conception:  A review. Obstet Gynecol Surv. 1989 Jul;44(7):535-40.

50. Mari G, Moise KJ Jr, Deter RL, Kirshon B, **Carpenter RJ Jr**, Huhta JC:  Doppler assessment of the pulsatility index in the cerebral circulation of the human fetus. Am J Obstet Gynecol. 1989 Mar;160(3):698-703.

51. Mari G, Moise KJ JR, Deter RL, Kirshon B, **Carpenter RJ Jr**, Huhta JC:  Doppler assessment of the fetal cerebral circulation during constriction of the ductus arteriosus after Indomethacin therapy. Am J Obstet Gynecol. 1989 Dec,161(6):1528-31.

52. Fine J-David, Robin AJ, Eady MB, Levey ML, Hejtmancik F, Courtney KB, **Carpenter RJ Jr,** Holbrook KA, Hawkins HK.  Prenatal diagnosis of dominant and recessive dystrophic epidermolysis bullosa: applications and limitations in the use of KF-1 and LH 7:2 monoclonal antibodies and immunofluorescence mapping technique. J Invest Dermatol. 1988 Nov;91(5):465-71.

53. Gonsoulin WJ, Moise KJ Jr, Sala JD, **Carpenter RJ Jr**, Milam JD, Weber VW: Serial maternal blood donations for intrauterine transfusion. Obstet Gynecol 1990 Feb;75(2):158-62.

54. Katz JA, Moake JL, McPherson PD, Weinstein MJ, Moise KJ Jr, **Carpenter RJ Jr**, Sala DJ. The relationship between human development and disappearance of unusually large von Willebrand factor multimers from plasma. Blood. 1989 May; 15;73(7):1951-8.

55. Moise KJ Jr, Deter RJ, Kirshon B, Adam K, Patton D, **Carpenter RJ Jr.**  Intravenous pancuronium bromide for fetal neuromuscular blockade during intrauterine transfusion for red cell alloimmunization. Obstet Gynecol. 1989 Dec;74(6):905-8.

56. Copeland KL, **Carpenter RJ Jr**, Fenolio KR, Moise KJ Jr, Ledbetter DH. Integration of the transabdominal technique into an ongoing chorion villus sampling program. Am J Obstet Gynecol. 1989 Nov;161(5):1289-94.

57. Gonsoulin W, Copeland KL, **Carpenter RJ Jr**, Hughes MR, Elder FB. Fetal blood sampling demonstrating parent chimerism in monozygotic twins discordant for sex and karyotype (46,XY and 45,X). Prenat Diagn. 1990 Jan;10(1):25-8.

58. Gonsoulin W, Moise KJ Jr, Kirshon B, Cotton DB, Wheeler JM, **Carpenter RJ Jr**: Outcome of twin-twin transfusion diagnosed before 28 weeks of gestation. Obstet Gynecol. 1990 Feb;75(2):214-6.

59. Mari, G, Moise KJ Jr, Deter L, **Carpenter RJ Jr**.  Flow velocity waveforms of the vascular system in the anemic fetus before and after intravascular transfusion for severe red cell allommunization. Am J Obstet Gynecol. 1990 Apr;162(4):1060-4.

60. Mari G, Moise KJ Jr, Deter RL, **Carpenter RJ Jr**.  Flow velocity waveforms of the umbilical and cerebral arteries before and after intravascular transfusion. Obstet Gynecol. 1990 Apr;75(4):584-9.

61. Moise KJ Jr, Ou Ching-Nan, Kirshon B, Cano LE, Rognerud C, **Carpenter RJ Jr**: Placental transfer of indomethacin in the human pregnancy. Am J Obstet and Gynecol. 1990 Feb;162(2):549-54.

62. Rao PN, Copeland KJ, **Carpenter RJ Jr**, Moise KJ Jr, Ledbetter DH.  Fetal blood sampling for cytogenetic analysis:  A four year experience.  Am J Human Genetics 1989; 45S:A266.

63. Mari G, Moise KJ Jr, Deter RL, Kirshon B, **Carpenter RJ Jr.**  Doppler assessment of the renal blood flow velocity waveforms during indomethacin therapy for preterm labor and polyhydramnios. Obstet Gynecol 1990 Feb;75(2):199-201.

64. Moise KJ Jr, **Carpenter RJ Jr**, Deter RL, Kirshon B.  Icteric serum as an indicator of fetal vascular access during intravascular transfusion for hemolytic disease. Am J of Perinatol. 1990 Jul;7(3):279-80.

65. Patton DE, Lee W, Cotton DB, Miller J, **Carpenter RJ Jr**, Huhta JC, Hankins G. Cyanotic maternal heart disease in pregnancy. Obstet Gynecol Surv. 1990 Sep;45(9):594-600.

66. Smith LG Jr., **Carpenter RJ Jr**, Gonsoulin W, Mari G, Reiter AA, Greenberg F, Powell C.  Prenatal diagnosis of a chest wall mass using ultrasonography and Doppler velocimetry: A case report. Am J Obstet Gynecol. 1990 Aug;163(2):567-9.

67. Gonsoulin W, Mason B, **Carpenter RJ Jr**. Colon cancer in pregnancy with elevated maternal serum alpha-fetoprotein at presentation. Am J Obstet Gynecol. 1990 Oct;163(4 Pt 1):1172-3.

68. Moise KJ Jr, **Carpenter RJ Jr**, Kirshon B, Adam K, Patton DE, Deter R, Sala JD, Cano L.  A comparison of four types of intrauterine transfusion: effect on fetal hematocrit. Fetal Ther. 1989;4(2-3):126-37.

69. Smith LG, Moise KJ Jr, Dildy GA III, **Carpenter RJ Jr**, Peters C.  Spontaneous rupture of liver during pregnancy: current therapeutic modalities. Obstet Gynecol. 1991 Feb;77(2):171-5. Review.

70. Perry JC, Ayres NA, **Carpenter RJ Jr**.  Fetal supraventricular tachycardia treated with flecainide acetate. J Pediatr. 1991 Feb;118(2):303-5.

71. Moise KJ Jr, Mari G, Fisher DJ, Huhta JC, Cano LE, **Carpenter RJ Jr**.  Acute fetal hemodynamic alterations after intrauterine transfusion for severe red cell alloimmunization. Am J Obstet Gynecol. 1990 Sep;163(3):776-84.

72. Mari G, Moise KJ Jr, Deter RL, **Carpenter RJ Jr**:  Doppler assessment of the renal blood flow velocity waveforms in the anemic fetus before and after intravascular transfusion for severe red cell alloimmunization. J Clin Ultrasound. 1991 Jan;19(1):15-9.

73. Leduc L, Moise KJ Jr, **Carpenter RJ Jr**. Fetoplacental blood volume estimation in pregnancies with Rh alloimmunization. Fetal Diagn Ther. 1990;5(3-4):138-46.

74. Moise KJ Jr, **Carpenter RJ Jr**. Increased severity of fetal hemolytic disease with known rhesus alloimmunization after first-trimester transcervical chorionic villus biopsy. Fetal Diagn Ther. 1990;5(2):76-8.

75. Mari G, Deter RL, Moise KJ Jr, Wasserstrum N, **Carpenter RJ Jr**. Fetal heart rate does influence the pulsatility index in the middle cerebral artery. J Clin Ultrasound. 1991 Mar-Apr;19(3):149-53.

76. Mari G, Moise KJ Jr, Deter RL, **Carpenter RJ Jr**.  Doppler assessment of the renal blood flow velocity waveforms in the anemic fetus before and after intravascular transfusion for severe red cell alloimmunization.  J Clin Ultrasound 1991 Jan;19(1):15-9.

77. Hata T, Mari G, **Carpenter RJ Jr.**  Doppler assessment of fetal circulation in a case of fetal death. Am J Roentgenol. 1991 Mar;156(3):636.  No abstract available.

78. Owerbach D, Drazin MB, **Carpenter RJ Jr,** Greenberg F.  Prenatal diagnosis of 21-hydroxylase deficiency congenital adrenal hyperplasia using the polymerase chain-reaction. Hum Genet. 1992 Apr;89(1):109-10.

79. Moise KJ Jr, **Carpenter RJ Jr**. Chorionic Villus sampling for Rh typing: clinical implications. Am J Obstet Gynecol. 1993 Mar;168(3 Pt 1):1002-3. No abstract available.

80. Moise KJ Jr, Sala DJ, Zurawin RK, Cano LE, Hesketh DE, **Carpenter RJ Jr**.  Continuous subcutaneous terbutaline pump therapy for premature labor: safety and efficacy. South Med J. 1992 Mar;85(3):255-60.

81. Moise KJ Jr, **Carpenter RJ Jr**, Hesketh DE. Do abnormal Starling forces cause fetal hydrops in red cell alloimmunization? Am J Obstet Gynecol. 1992 Oct;167(4 Pt 1):907-12.

82. Dildy GA, Moise KJ Jr, Smith LG, Kirshon B, **Carpenter RJ Jr**. Indomethacin for the treatment of symptomatic leiomyoma uteri during pregnancy. Am J Perinatol. 1992 May;9(3):185-9.

83. Hallak M, Moise KJ Jr, Hesketh DE, Cano LE, **Carpenter RJ Jr.**. Intravascular transfusion of fetuses with Rhesus incompatibility: prediction of fetal outcome by changes in umbilical venous pressure. Obstet Gynecol. 1992 Aug;80(2):286-90.

84. Moise KJ, Belfort MA, Saade GR, Van den Veyver IB, **Carpenter RJ Jr**.  Intrauterine transfusion for Rhesus alloimmunization: A review of current methods.  Video Journal of Color Flow Imaging.  1992;2:36-46.

85. Pergament E, Schulman JD, Copeland K, Fine B, Black SH, Ginsberg NA, Frederiksen MC and **Carpenter RJ Jr.**  The risk and efficacy of chorionic villus sampling in multiple gestations. Prenat Diagn. 1992 May;12(5):377-84.

86. Edmondson SR, Hallak M, **Carpenter RJ Jr,** Cotton DB.  Evolution of hydranencephaly following intracerebral hemorrhage. Obstet Gynecol. 1992 May;79(5 Pt 2):870-01.

87. Belfort MA, **Carpenter RJ Jr**, Kirshon B, Saade G, Moise KJ Jr.  The use of nimodipine in a patient with eclampsia: color flow Doppler demonstration of retinal artery relaxation. Am J Obstet Gynecol. 1993 Jul;169(1):204-06.

88. Woo SY, Fuller LM, Cundiff JH, Hagemeister FB, Bondy ML, Allen PK, **Carpenter RJ Jr.**  Radiotherapy during pregnancy for clinical stages IA-IIA Hodgkin's Disease.  Int. J Radiation Oncology Biol Phys. 1992;23 (2): 407-412.

89. Van Den Veyver IB, Moise KJ Jr, Ou CN, **Carpenter RJ Jr**  The effect of gestational age and fetal indomethacin levels on the incidence of contriction of the fetal ductus arteriosus. Obstet Gynecol. 1993 Oct;82(4 Pt 1):500-03.

90. Van Den Veyver IB, Macha ME, McCaskill C, **Carpenter RJ Jr**, Shaffer LG.  Prenatal diagnosis and clinical findings in a case of hexasomy 12p. Am J Med Genet. 1993 Dec 1;47(8):1171-74.

91. Levin ML, Lupski JR, **Carpenter RJ Jr,** Gerson LP, Greenberg F.  An additional case of pachygyria, joint contractures, and facial abnormalities.  Clinical Dysmorphology 1993;2:365-368.

92. Margraf LR, Landers S, Langston C, Reiter A, **Carpenter RJ Jr**. Successful prenatal therapy of thoracic lesions. Pediatr Pathol. 1993 Sept-Oct;13(5):613-20.

93. Muszynski CA, **Carpenter RJ Jr**, Armstrong DL.  Prenatal sonographic detection of basilar aneurysm. Pediatr Neurol, 1994 Feb;10(1):70-2.

94. Saade GR, Moise KJ Jr, Copel JA, Belfort MA, **Carpenter RJ Jr.**  Fetal platelet counts correlate with the severity of the anemia in red cell alloimmunization. Obstet Gynecol. 1993 Dec;82(6):987-91.

95. Saade GR, Moise KJ Jr, Belfort MA, Hesketh DE, **Carpenter RJ Jr**.  Fetal and neonatal hematologic parameters in red cell alloimmunization: predicting the need for late neonatal transfusions. Fetal Diagn Ther. 1993 May-Jun;8(3):161-64.

96. Moise KJ Jr, Perkins JT, Sosler SD, Brown SJ, Saade G, **Carpenter RJ Jr**, Thorp JA, Ludomirski A, Wilkins IA, Grannum PA, et al. The predictive value of maternal serum testing for the detection of fetal anemia in red cell alloimmunization. Am J Obstet Gynecol. 1995 Mar;172(3):1003-09.

97. Evans MI, Dommergues M, Wapner RJ, Goldberg JD, Lynch L, Zador IE, **Carpenter RJ Jr**, Timor-Tritsch I, Brambati B, Nicolaides K, Dumez Y, Monteagudo A, Johnson MP, Golbus MS, Brambati L, Polak S, Berkowitz R.  International, collaborative experience of 1789 patients having multifetal pregnancy reduction: a plateauing of risks and outcomes.  J Soc Gynecol Investi. 1996 Jan-Feb;3(1):23-6.

98. Yaryura RA, **Carpenter RJ Jr**, Duncan JM, Wilansky S.  Management of mitral valve stenosis in pregnancy: case presentation and review of the literature. J Heart Valve Dis. 1996 Jan;5 (1):16-9. Review.

99. Goodrum LA, Saade GR, Belfort MA, **Carpenter RJ Jr,** Moise KJ Jr. The effect of intrauterine transfusion on fetal bilirubin in red cell alloimmunization. Obstet Gynecol. 1997 Jan;89(1):57-60.

100. Goodrum LA, Moise KJ Jr, Saade GR, Belfort MA, Ayres NA, **Carpenter RJ Jr**.  Effects of intravascular transfusion for red cell alloimmunization on fetal arterial blood pressure. Fetal Diagn The. 1997 May-June;12(3):149-52.

101. McLean LK, Evans MI, **Carpenter RJ Jr**, Johnson MP, Goldberg JD.  Genetic amniocentesis following multifetal         pregnancy reduction does not increase the risk of pregnancy loss. Prenat Diagn. 1998 Feb;18(2):186-8.

102. Wilansky S, Belcik T, Osborn R, **Carpenter RJ Jr**.  Hypertrophic cardiomyopathy in pregnancy. The use of two-dimensional and Doppler echocardiographic imaging during labor and delivery: a case report.  J Heart Valve Disease. (1998) 7: 355-357.

103. Saade, G R, Gray, G, Belfort, M A, **Carpenter, RJ**; Moise, KM, Jr. Ultrasonographic measurement of crown-rump length in high-order multifetal pregnancies. Ultrasound Obstet Gynecol. 1998 Jun;11(6):438-44.

104. Van den Veyver IB, Ni J, Bowles N, **Carpenter RJ Jr**, Weiner CP, Yankowitz J, Moise KJ Jr, Henderson J, Towbin JA. Detection of intrauterine viral infection using the polymerase chain reaction. Mol Genet Metab. 1998 Feb;63(2):85-95.

105. Hudon L, Moise KJ Jr, Hegemier SE, Hill RM, Moise AA, Smith EO, **Carpenter RJ Jr.**  Long-term neurodevelopmental outcome after intrauterine transfusion for the treatment of fetal hemolytic disease. Am J Obstet Gynecol. 1998 Oct;179(4):858-63.

106. Mari G, Deter RL, **Carpenter RL Jr,** *et al.* Noninvasive diagnosis by Doppler ultrasonography of fetal anemia due to maternal red-cell alloimmunization.  New Engl J Med. 2000 Jan 6;342(1):9-14.

107. Evans MI, Berkowitz RL, Wapner RJ, **Carpenter RJ Jr**, Goldenberg JD, Ayoub MA, Horenstein J, Dommerques M, Brambati B, Nicolaides KII, Holzgreve W., Timor-Trisch IE. Improvement in outcomes of multifetal pregnancy reduction with increased experience. Am J Obstet Gynecol. 2001 Jan;184(2):97-103.

108. Zimmermann R, Durig P, **Carpenter, RJ, Jr,** Mari G.  Longitudinal measurement of peak systolic velocity in the fetal middle cerebral artery for monitoring pregnancies complicated by red cell alloimmunization: a prospective multicentre trial with intention-to-treat.
Br J Obstet Gynaecol 2002 109:  746-752.

## REVIEWS

1. **Carpenter RJ Jr Jr**:  Preterm labor: cause and management.  Comprehensive Therapy. 8(6):37-46, 1982.
2. Reiter A, **Carpenter RJ Jr**.  Antenatal Fetal Monitoring.  AACC Vol 5 No 5, p. 1-9, November, 1986.

## TAPES

1. Management of the Pregnant Diabetic. "Gestational Diabetes Mellitus" Audio-Digest Foundation. Obstetrics and Gynecology.  Vol 26, No 5, March 6, 1979.
2. Great Debates in OB/GYN - Part II.  "Should a 32 year old gravida 1, para 0 with no identifiable risk factor, requesting genetic studies be given an amniocentesis?"  Pro:  Paul G. McDonough, Augusta.  Con:  Robert J. Carpenter, Houston.  Audio-Digest Foundation.  Obstetrics and Gynecology.  Vol 26, No 23, December 4, 1979.

## LETTERS TO EDITORS

Ledbetter DH, Dumars KW, **Carpenter RJ Jr**, Caskey CT:  Amniotic-fluid-cell-culture failure and syringe toxicity revisited.  Am J Hum Genet. 1982;34(5):823.

**Carpenter RJ Jr**:  Rh Immune Prophylaxis. *Physician Update*.  1982.

## ABSTRACTS (Published)(On file before 1999)

Evans MI, Nicolaides K, Goldberg JD, Wapner RJ, Horenstein J, Dommergues M, Holzgreve W, Timor-Tritsch I, **Carpenter RJ,** Baker C, Ayoub M, Shalhoub A, Snijders R, Monteagudo A, Berkowitz R. BIRTH WEIGHT DISCORDANCY AMONG REMAINING FETUSES AFTER MULTIFETAL PREGNANCY REDUCTION (MFPR): CORRELATION WITH STARTING NUMBER.  J Soc Gynecol Invest Vol. 6 No. 1 (Supplement) Jan/Feb 1999.

Evans MI, Nicolaides K, Goldberg JD, Wapner RJ, Horenstein J, Dommergues M, Timor-Tritsch I, **Carpenter RJ**, Baker C, Ayoub M, Shalhoub A, Dumez Y, Stone J, Snijders R, Monteagudo A, Berkowitz R. METHODS OF INITIATION OF MULTIFETAL PREGNANCIES: IMPLICATIONS FOR OUTCOMES FOLLOWING MULTIFETAL PREGNANCY REDUCTION.  Submitted to Society for Gynecologic Investigation on October 26, 1998.

Evans MI, Nicolaides K, Goldberg JD, Wapner RJ, Horenstein J, Dommergues M, Timor-Tritsch I, **Carpenter RJ**, Baker C, Ayoub M, Shalhoub A, Dumez Y, Stone J, Snijders R, Monteagudo A, Berkowitz R. METHODS OF INITIATION OF MULTIFETAL PREGNANCIES: IMPLICATIONS FOR OUTCOMES FOLLOWING MULTIFETAL PREGNANCY REDUCTION.  J Soc Gynecol Invest Vol. 6, No. 1 (Supplement), Jan./Feb. 1999.

## ABSTRACTS PRESENTED (On file before 1998)

Moise KJ Jr, **Carpenter RJ**, Deter RL:  COMBINED INTRAPERITONEAL AND INTRAVASCULAR APPROACH TO FETAL TRANSFUSION FOR RHESUS ISOIMMUNIZATION.  7th Annual Meeting of the Society of Perinatal Obstetricians.  Orlando, Florida.  February, 1987.

**Carpenter RJ**, Moise KJ Jr, Deter RL:   COMBINED INTRAPERITONEAL AND INTRAVASCULAR APPROACH TO FETAL BLOOD TRANSFUSION FOR RED CELL ISOIMMUNIZATION.  Fourth Annual Meeting of the International Fetal Medicine and Surgery Society.  Mackinac Island, Michigan.  June, 1987.

**Carpenter RJ**, Moise KJ Jr, Copeland KL, Ledbetter DH:  COMPARISON OF THE TRANSABDOMINAL AND TRANSCERVICAL METHODS OF CHORION VILLUS SAMPLING.  American Society of Human Genetics. San Diego, California.  October, 1987.

Mari G, Moise KJ Jr, Deter RL, **Carpenter RJ**.  FLOW VELOCITY WAVEFORMS OF THE VASCULAR SYSTEM OF THE HUMAN FETUS BEFORE AND AFTER INTRAVASCULAR TRANSFUSION FOR SEVERE RED CELL ALLOIMMUNIZATION.  2nd International Meeting: Fetal-Doppler. Paris, September, 1989.

Mari G, Moise KJ Jr, Deter RL, **Carpenter RJ**.   DOPPLER ASSESSMENT OF FLOW VELOCITY WAVEFORMS OF THE VASCULAR SYSTEM OF THE ANEMIC FETUS AND ITS RELATION TO FETAL HEMATOCRIT.  Tenth Annual Meeting of the Society of Perinatal Obstetricians;  Houston, Texas; January, 1990.

Moise KJ Jr, Deter RJ, Kirshon B, Adam K, Patton D, **Carpenter RJ**:  INTRAVENOUS PANCURONIUM BROMIDE FOR FETAL NEUROMUSCULAR BLOCKADE DURING INTRAUTERINE TRANSFUSION FOR RED CELL ALLOIMMUNIZATION.  Clinical Digest Series.

Margraf L, Langston C, Landers S, **Carpenter RJ,** Reiter AA, Fowler C.   IN UTERO THORACIC DECOMPRESSION.  Society for Pediatric Pathology Meeting. Spring 1991.

Mari G, Kirshon B, **Carpenter RJ,** Gonsoulin WJ, Cotton DB.  FETAL URINE OUTPUT AND RENAL ARTERY VELOCIMETRY IN TWIN-TWIN TRANSFUSION SYNDROME.  37th Annual Meeting of the Society of Gynecologic Investigation.  St. Louis, MO.  March, 1990.

Woo SY, Fuller LM, Cundiff JH, Hagemeister FB, Bondy ML, Allen PK, **Carpenter RJ.**  RADIOTHERAPY DURING PREGNANCY FOR STAGES IA - IIA HODGKINS'S DISEASE.  Presented at the 32nd annual meeting of the American Society for Therapeutic Radiology and Oncology, Miami Beach, FL, October, 1990.

Smith LG, **Carpenter RJ**, Reiter A, Kirshon B:  AN EVALUATION OF 15-METHYL PROSTAGLANDIN F2 ALPHA (HEMABATE$^{TM}$) AND DILAPAN$^{TM}$  FOR TERMINATION OF ABNORMAL PREGNANCIES.   11th Annual Meeting of the Society of Perinatal Obstetricians; San Francisco, CA.  January, 1991.

Smith LG, Jr., Faro S. Reiter A, Gonsoulin W, **Carpenter RJ.**  BACTERIOLOGY ASSAY OF PATIENTS WHO UNDERWENT CHORIONIC VILLUS SAMPLING.   11th Annual Meeting of the Society of Perinatal Obstetricians; San Francisco, CA.  January, 1991.

Hallak M, Moise KJ Jr., Hesketh DE, Cano LE, **Carpenter RJ**.  INTRAVASCULAR TRANSFUSION OF FETUSES WITH RHESUS INCOMPATIBILITY: PREDICTION OF FETAL OUTCOME BY CHANGES IN UMBILICAL VENOUS PRESSURE.  SPO MEETING, ORLANDO, FL, FEBRUARY, 1992.

Moise KJ Jr, Saade G, Goodrum L, Belfort M, **Carpenter RJ**.   THE EFFECT OF ADVANCING GESTATIONAL AGE ON FETAL ARTERIAL PRESSURE.  Annual SPO Meeting, Las Vegas, Nevada.  January 24-29, 1994.

Goodrum L, Saade G, Belfort M, Knudsen L, **Carpenter RJ**, Moise KJ.  THE EFFECT OF INTRAUTERINE TRANSFUSIONS ON FETAL SERUM BILIRUBIN IN RED CELL ALLOIMMUNIZATION.  Annual SPO Meeting. Las Vegas, Nevada.  January 24-29, 1994.

Saade G, Belfort M, Gray G, **Carpenter RJ**, Moise KJ Jr.  ULTRASONOGRAPHIC MEASUREMENT OF CROWN-RUMP LENGTH IN HIGH ORDER MULTIFETAL PREGNANCIES.  Annual SPO Meeting, Las Vegas, Nevada.  January 24-29, 1994.

PLS.' APPX. 056

## ABSTRACTS

Evans MI, Nicolaides K, Goldberg JD, Wapner RJ, Horenstein J, Dommergues M, Holzgreve W, Timor-Tritsch I, **Carpenter RJ Jr,** Baker C, Ayoub M, Shalhoub A, Snijders R, Monteagudo A, Berkowitz R. BIRTH WEIGHT DISCORDANCY AMONG REMAINING FETUSES AFTER MULTIFETAL PREGNANCY REDUCTION (MFPR): CORRELATION WITH STARTING NUMBER.   J Soc Gynecol Invest Vol. 6 No. 1 (Supplement) Jan/Feb 1999.

Evans MI, Nicolaides K, Goldberg JD, Wapner RJ, Horenstein J, Dommergues M, Timor-Tritsch I, **Carpenter RJ Jr**, Baker C, Ayoub M, Shalhoub A, Dumez Y, Stone J, Snijders R, Monteagudo A, Berkowitz R. METHODS OF INITIATION OF MULTIFETAL PREGNANCIES: IMPLICATIONS FOR OUTCOMES FOLLOWING MULTIFETAL PREGNANCY REDUCTION. Submitted to Society for Gynecologic Investigation on October 26, 1998.

Evans MI, Wapner R, **Carpenter RJ Jr**, et al.   INTERNATIONAL COLLABORATION ON MULTIFETAL PREGNANCY REDUCTION (MFPR): DRAMATICALLY IMPROVED OUTCOMES WITH INCREASED EXPERIENCE. Submitted to Society for Gynecologic Investigation on October 26, 1998.

## ABSTRACTS PRESENTED

Moise KJ Jr, **Carpenter RJ Jr**, Deter RL:   COMBINED INTRAPERITONEAL AND INTRAVASCULAR APPROACH TO FETAL TRANSFUSION FOR RHESUS ISOIMMUNIZATION.  7th Annual Meeting of the Society of Perinatal Obstetricians.  Orlando, FL. February 1987.

**Carpenter RJ Jr**, Moise KJ Jr, Deter RL:   COMBINED INTRAPERITONEAL AND INTRAVASCULAR APPROACH TO FETAL BLOOD TRANSFUSION FOR RED CELL ISOIMMUNIZATION.  Fourth Annual Meeting of the International Fetal Medicine and Surgery Society. Mackinac Island, MI. June, 1987.

**Carpenter RJ Jr**, Moise KJ Jr, Copeland KL, Ledbetter DH:   COMPARISON OF THE TRANSABDOMINAL AND TRANSCERVICAL METHODS OF CHORION VILLUS SAMPLING. American Society of Human Genetics.  San Diego, California.  October, 1987.

Mari G, Moise KJ Jr, Deter RL, **Carpenter RJ Jr**.  FLOW VELOCITY WAVEFORMS OF THE VASCULAR SYSTEM OF THE HUMAN FETUS BEFORE AND AFTER INTRAVASCULAR TRANSFUSION FOR SEVERE RED CELL ALLOIMMUNIZATION.  2nd International Meeting: Fetal-Doppler.  Paris, September, 1989.

Mari G, Moise KJ Jr, Deter RL, **Carpenter RJ Jr**. DOPPLER ASSESSMENT OF FLOW VELOCITY WAVEFORMS OF THE VASCULAR SYSTEM OF THE ANEMIC FETUS AND ITS RELATION TO FETAL HEMATOCRIT.  Tenth Annual Meeting of the Society of Perinatal Obstetricians;  Houston, TX. January, 1990.

Moise KJ Jr, Deter RJ, Kirshon B, Adam K, Patton D, **Carpenter RJ Jr**:   INTRAVENOUS PANCURONIUM BROMIDE FOR FETAL NEUROMUSCULAR BLOCKADE DURING INTRAUTERINE TRANSFUSION FOR RED CELL ALLOIMMUNIZATION.  Clinical Digest Series.

Margraf L, Langston C, Landers S, **Carpenter RJ Jr**, Reiter AA, Fowler C.  IN UTERO THORACIC DECOMPRESSION.  Society for Pediatric Pathology Meeting. Spring 1991.

USNICHD Collaborative CVS Study Group.   TRANSCERVICAL AND TRANSABDOMINAL CHORIONIC VILLUS SAMPLING ARE COMPARABLY SAFE PROCEDURES FOR FIRST TRIMESTER PRENATAL DIAGNOSIS: PRELIMINARY ANALYSIS. Am J Hum Genet 1990;47:A278

Mari G, Kirshon B, **Carpenter RJ Jr,** Gonsoulin WJ, Cotton DB.   FETAL URINE OUTPUT AND RENAL ARTERY VELOCIMETRY IN TWIN-TWIN TRANSFUSION SYNDROME.   37th Annual Meeting of the Society of Gynecologic Investigation.   St. Louis, MO.   March, 1990.

Woo SY, Fuller LM, Cundiff JH, Hagemeister FB, Bondy ML, Allen PK, **Carpenter RJ Jr.** RADIOTHERAPY DURING PREGNANCY FOR STAGES IA - IIA HODGKINS'S DISEASE.   Presented at the 32nd annual meeting of the American Society for Therapeutic Radiology and Oncology, Miami Beach, FL, October, 1990.

Smith LG, **Carpenter RJ Jr**, Reiter A, Kirshon B:   AN EVALUATION OF 15-METHYL PROSTAGLANDIN F2 ALPHA (HEMABATE™) AND DILAPAN™   FOR TERMINATION OF ABNORMAL PREGNANCIES.   11th   Annual Meeting of the Society of Perinatal Obstetricians; San Francisco, CA.  January, 1991.

Smith LG, Jr., Faro S. Reiter A, Gonsoulin W, **Carpenter RJ Jr.**  BACTERIOLOGY ASSAY OF PATIENTS WHO UNDERWENT CHORIONIC VILLUS SAMPLING.  11th Annual Meeting of the Society of Perinatal Obstetricians; San Francisco, CA.  January, 1991.

Hallak M, Moise KJ Jr., Hesketh DE, Cano LE, **Carpenter RJ Jr**.   INTRAVASCULAR TRANSFUSION OF FETUSES WITH RHESUS INCOMPATIBILITY: PREDICTION OF FETAL OUTCOME BY CHANGES IN UMBILICAL VENOUS PRESSURE.   SPO MEETING, ORLANDO, FL, FEBRUARY, 1992.

Moise KJ Jr, Saade G, Goodrum L, Belfort M, **Carpenter RJ Jr**.   THE EFFECT OF ADVANCING GESTATIONAL AGE ON FETAL ARTERIAL PRESSURE.   Annual SPO Meeting, Las Vegas, Nevada. January 24-29, 1994.

Goodrum L, Saade G, Belfort M, Knudsen L, **Carpenter RJ Jr**, Moise KJ Jr.  THE EFFECT OF INTRAUTERINE   TRANSFUSIONS   ON   FETAL   SERUM   BILIRUBIN   IN   RED   CELL ALLOIMMUNIZATION.  Annual SPO Meeting.  Las Vegas, NE.  January 24-29, 1994.

Saade G, Belfort M, Gray G, **Carpenter RJ Jr**, Moise KJ.   ULTRASONOGRAPHIC MEASUREMENT OF CROWN-RUMP LENGTH IN HIGH ORDER MULTIFETAL PREGNANCIES. Annual SPO Meeting, Las Vegas, NE.  January 24-29, 1994.

## LECTURES or PRESENTATIONS GIVEN (1994 - Present)

City of Houston Health Department. "Maternal Fetal Health - Myth or Reality" March 30, 1994. Houston, TX.

Annual Meeting of the American Association of Legal Nurse Consultants:  "Medical Legal Issues in Obstetric Practice." April 23, 1994.  Houston, TX.

City Health Department.  "Fetal Anomalies" July 27, 1994. Houston, TX.

St. Luke's Episcopal Hospital Labor & Delivery.  "Diabetes in Pregnancy."  November 14, 1994. Houston, TX.

St. Luke's Episcopal Hospital.  "Beyond Case Management: Gearing Up for Outcomes Management." March 9-10, 1995, Houston, TX.

Costa Rican OB/GYN Society.  (1) "Ethical Implications of Prenatal Diagnosis."  Primary Care:  (2) Asthma: Medical Management and Complications."  (3) "Cardiovascular Disease in Pregnancy." June 7-9, 1995, Costa Rica.

Baylor College of Medicine.  "Primary Care: Asthma/Pregnancy" July 19, 1995. Houston, TX.

Nineteenth Annual Houston Perinatal Nursing Symposium.  *The Operating "Womb" : Surgery on the Pregnant Woman.*  October 27, 1995, Houston, TX.

Fetal Assessment Grand Rounds Series.  "*Perinatal Asphyxia*"  April 25, 1997, Houston, TX.

Twenty First Annual Houston Perinatal Nursing Symposium.  "Tuggin' on Mom's Heart Strings: Management of Maternal Cardiac Disease."  October 24, 1997, Houston, TX.

Grand Rounds, Baylor Department Pediatrics: "Twin-twin Transfusion Syndrome" January 16, 1998. Houston, TX.

Columbia Kingwood Hospital "Diabetes Mellitus/Shoulder Dystocia" January 19, 1998, Kingwood, TX.

Columbia Woman's Hospital: "Diabetes Mellitus/Shoulder Dystocia" March 16, 1998, Kingwood, TX.

Columbia Kingwood Hospital: "Risk Management Issues in Obstetrics" April 6, 1998, Houston, TX

Columbia Kingwood Hospital: "Asthma in Pregnancy", July 20, 1998, Kingwood, TX

Advance Med Education: "Management of OB patient with U/S", September 26,1998. Kingwood, TX.

Columbia Kingwood Hospital: "Obstetrical Ultrasound" October 26, 1998, Kingwood, TX

"Vaginal Delivery after Cesarean Section – Maternal Neonatal Outcomes."  Texas Children's Hospital, December 8, 1998. Houston, TX

Columbia Kingwood Hospital, Monday February 8, 1999, Kingwood, TX

"Multigestations" Ben Taub Hospital, February 18, 1999, Kingwood, TX.

"Antenatal Fetal Assessment." Adams Mark Hotel, April 28, 1999, Houston, TX

"Woman's Hypertension in Pregnancy" June 18, 1999, Houston, TX

Columbia Kingwood, August 9, 1999, Kingwood, TX

"Tea for Thyroid" The Thyroid Society for Education and Research. January 23, 2000.

"Preterm Labor", Indiana School of Medicine, Grand Rounds.  May 17, 2000. IN.

"Medical/Legal Implications of Hospital Charting", Surgery Grand Rounds Woman's Hospital, September 22, 2000, Houston, TX.

"Management of Multiple Birth Pregnancies."  Women's Services at Kingwood Medical Center. September 25, 2000. Kingwood, TX.

"When the Red Goes Down the Drain: Etiology of Bleeding in Pregnancy". Twenty-fourth Baylor Perinatal Outreach Nursing Symposium. October 27, 2000, Houston, TX.

"Outpatient Implications of Diabetes Mellitus and Pregnancy Induced Hypertension" Harris County Health Department, Nursing Symposium, April 20,2001. Houston, TX.

"Heart to Heart", Texas Heart Institute, May 12, 2001, Houston, TX.

"Obstetrical Use of Ultrasound", Baylor College of Medicine, Depart of Neonatoloby, August 22, 2001, Houston, TX

Preceptorship/Out-of-State rotations.  Midwestern University, July 29, 2002 to August 23, 2002. Glendale, AZ.

"Ultrasound Evaluation and Management of Rh Disease", Baylor College of Medicine, Perinatal Center Conference, October 4, 2002, Houston, TX

"Pregnancy Induced Hypertension and Preterm Labor", Baylor College of Medicine, August 7, 2002, Houston, TX.

"Perinatal Ultrasound and Diagnosis", Baylor College of Medicine, Neonatology Conference, September 5, 2002, Houston, TX.

"Effects of Pregnancy on Maternal Cardiac Disease", Baylor College of Medicine Perinatal Outreach Program, 26th Annual Symposium, October 25, 2002, Houston, TX.

"Shoulder Dystocia", Baylor College of Medicine Perinatal Outreach Programs, 27th Annual Nursing Symposium, October 24, 2003, Houston, TX.

"Discussant Department of Obstetrics & Gynecology", Baylor College of Medicine, Residents Day, May, 2004 Houston, TX.

"Interface Between Medicine and the Law", Baylor College of Medicine, Perinatal Center Conference, November 5, 2004, Houston, TX.

"Legal and Ethical Implications of the Very Premature Infant." March of Dimes, 10th Annual Visiting Professorship in Nursing.  Memorial Hermann Hospital, May 10-11, 2005, Houston, TX.

"Medical Emergencies in Women and Children", Via Christi Regional Medical Center, June 25, 2005, Wichita, KS.

"Electronic Fetal Monitoring", Baylor College of Medicine, Physiology Conference,  June 22, 2005, Houston, TX.

"Texas Advances Directives Act and Futility", Baylor College of Medicine, Introduction to Clinical Medical Ethics,  August 31, 2005, Houston, TX.

"Medico-Legal Aspects of Perinatal Asphyxia", Baylor College of Medicine, Physiology Conference, September 14, 2005, Houston, TX.

"Legal Pitfalls in the Intrapartum Record", "Chain of Command: A Bulldog Waiting to Bite You", Twenty-Ninth Annual Nursing Symposium, Baylor Perinatal Outreach Program, October 28, 2005, Houston, TX.

"Discussant:  Department of Obstetrics & Gynecology", Baylor College of Medicine, Residents Day, May 12, 2006, Houston, TX.

"Twin-Twin Transfusion Syndrome" Perinatal Center Conference, Texas Children's Hospital, August 8, 2006, Houston, TX.

"Twin-Twin Transfusion Syndrome", The Woman's Hospital of TX, OB Grand Rounds, August 15, 2006, Houston, TX.

"Intrahepatic Cholestasis of Pregnancy", The Woman's Hospital of TX, Medicine Grand Rounds, June13, 2008.

"Diseases of the Liver, Biliary system, Pancreas & GI tract in Pregnancy,  Houston, TX, February 10, 2010

"Shoulder Dystocia – A Mock Trial"; Kenneth Moise, M.D., Karen Moise, R.N., Susan Raine, M.D., Robert J. Carpenter, Jr., M.D.; Houston, TX, June 2, 2010.

"Diagnosis & Management of Gestational Diabetes Mellitus", Texas Heart Institute, 9th Annual St. Luke's Episcopal Hospital Diabetes Symposium: Diabetes for Primary Care in 2013, September 14, 2013

"Timing of Delivery: Management of Twins, Di-Chorionic and Mono-Chorionic Gestations", Multifetal Pregnancies: a Multidisciplinary Update May 11, 2013, Brown Foundation Institute  of Molecular Medicine for the Prevention of Human Diseases, Houston, TX

## **MEETINGS ATTENDED** (1994 – Present)

Annual Meeting of the Society of Perinatal Obstetricians.  January 25-30, 1994.  Las Vegas, NV

St. Luke's Episcopal Hospital CME Conference.  "An Approach to Achiness:  Update on Rheumatic Diseases." March 12, 1994, Houston, TX

Fetoscopy Study Group, September 23 - September 26, 1994, Quebec, Canada.

Annual Meeting Central Association of Obstetricians and Gynecologists, October 13-15, 1994, Memphis, TN

Texas Children's Hospital - Pediatric Division.  "Ultrasound Diagnosis of Triploidy."  November 1994, Houston, TX

Annual Meeting of the Society of Perinatal Obstetricians.  January 25-29, 1995.  Atlanta, GA

International Fetal Medicine & Surgery Society Meeting.  May 3-7, 1995.  Newport, RI

Third Annual Meeting of the OB/GYN Association of Costa Rica.  June 7-9, 1995.  Costa Rica.

Fetoscopy Study Group.  August 27-29, 1995.  Copenhagen, Denmark.

Annual Meeting of the Central Association of Obstetricians and Gynecologists.  October 18-21, 1995.  Desert Palms, CA.

Nineteenth Annual Houston Perinatal Nursing Symposium.  October 27, 1995.  Houston, TX

Annual Meeting of the Society of Perinatal Obstetricians.  February 3-11, 1996.  Kamuela, HI

International Fetal Medicine and Surgery Society. May 15-18, 1996.  Italy.

Fetoscopy Study Group.  September 5-7, 1996.  Birmingham, England.

Twentieth Annual Houston Perinatal Nursing Symposium.  October, 1996.  Houston, TX

Annual Meeting of the Central Association of Obstetricians/Gynecologists, October 17-19, 1996.  Houston, TX

13th Biennial Conference on Diseases of the Vulva and Vagina.  January 16-18, 1997.  Houston, TX

Annual Meeting of the Society of Perinatal Obstetricians.  January 23 - 24, 1997.  CA

4th International Working Group on Gestational Diabetes, March 14-16, 1997.  Chicago, IL

Protease Inhibitors in HIV Infections, March 25, 1997.  Houston, TX

Current Trends in Hormone Replacement Therapy, June 14, 1997.  Houston, TX

Fetoscopy Study Group.  September 7-15, 1997. Athens, Greece.

Twenty First Annual Houston Perinatal Nursing Symposium.  October, 1997.  Houston, TX

Annual Meeting of the Central Association of Obstetricians/Gynecologists, October 29-31, 1997.  Phoenix, AZ

Annual Meeting of the Society of Perinatal Obstetricians.  February 4 - 7, 1998.  Miami, FL

Annual Meeting of the International Fetal Medicine and Surgery Society. May 5-15, 1998.  Australia

Fetoscopy Study Group; September 4-6,1998, Santa Fe, NM

Annual Meeting Central Association of Ob/Gyn; October 15-18, 1998; Kansas City, KS

Twenty-Second Annual Houston Perinatal Symposium, October 30, 1998; Houston, TX

Annual Meeting of the Society for Maternal-Fetal Medicine, January19-23, 1999, San Francisco, CA

International Fetal Medicine and Surgery Society, May 17, 1999-May 31, 1999, Scotland

Society of Perinatal Obstetricians, February 1-5, 2000, Miami, FL

Insulin Pump Therapy and Glucose Sensing Symposium, April 7, 2000.  Houston, TX

International Fetal Medicine and Surgery Society Meeting, September 11-15, 2000, Nantucket

Fetoscopy Study Group Meeting, October 10-16, 2000, Munich

Central Association of Obstetricians and Gynecologists, October 18-20, 2000, Chicago, IL

"Preterm Labor Management", Kingwood Medical Center, October 30, 2000, Kingwood, TX

Society for Maternal Fetal Medicine Annual Meeting, February 5-9, 2001, Reno, NV

Diabetes Symposium at The Houstonian, May 18, 2001, Houston, TX

Asthma & Risk Management Symposium, OMNI Hotel, May 19, 2001, Houston, TX

Houston Gynecological & Obstetrical Society Meeting. "Controversies in HRT & ERT", May 29, 2001, Houston, TX

Texas Medical Association Annual Continued Medical Education (CME), June 21-22, 2001, Dallas, TX.

International Fetal Medicine and Surgery Society Meeting. September 21-28, 2001.  Africa

Houston Gynecological & Obstetrical Society Meeting. "Medical Ethics in Obstetrics & Gynecology", October 30, 2001, Houston, TX

Prenatal Nursing Symposium, "Celebrating Perinatal Nursing", Baylor College of Medicine, November 2, 2001, Houston, TX

Fetoscopy study Group Meeting, November 7-10, 2001, Puerto Rico

Continuing Medical Education, "Weapons of Mass Destruction and Bioterrorism: What You Must Know., St. Luke's Episcopal Hospital, December 8, 2001, Houston, TX

Society for Maternal Fetal Medicine Annual Meeting, January 15-19, 2002, New Orleans, LA

International Study Group, To determine the association of fetal nasal bone abnormalities and the possibility of diagnoses of trisomy 21 in the third trimester.  University of Toronto School of Medicine, February 1, 2002, Toronto Canada

Houston Gynecological & Obstetrical Society, "Postpartum Depression", March 19, 2002, Houston, TX

Risk Management Class, Baylor College of Medicine, April 9, 2002, Houston, TX

Baylor College of Medicine, Residents Day, "Retrospective Analysis of Glyburide Use in Gestational Diabetes, Discussant for Jennifer Breazeale, M.D., May 31, 2002, Houston, TX

Texas Woman's Hospital of Texas, "Umbilical Cord Stem Cell", Kurt Gunter, M.D., July 19, 2002, Houston, TX

Houston Gynecological & Obstetrical Society, August 20, 2002, Houston, TX

Society for Maternal Fetal Medicine Annual Meeting, February 3-8, 2002, San Francisco, CA

Texas Children's Hospital, "Ethics of Physician", September 16, 2002, Houston, TX

University of Wisconsin Medical School. "Postmenopausal Cardiovascular Health & Diabetes", April 9, 2003, Houston, TX

Society for Maternal-Fetal Medicine, 24th Scientific Meeting, February 5-7, 2004, New Orleans, LA

"New Guidelines for Cervical Cancer Screening & HPV Testing", Houston Gynecological & Obstetrical Society, March 23, 2004, Houston, TX.

"Treating Difficult Patients – Techniques and Strategies to Reduce Risk.  Texas Medical Liability Trust, April 07, 2004, Houston, TX.

Twenty-eighth Annual Nursing Symposium, Baylor College of Medicine, Perinatal Outreach Program, October 29, 2004, Houston, TX.

"Ethics of Sex Selection", Seminars in Women's Health, Baylor College of Medicine, Department of Obstetrics and Gynecology, Laurence McCullough, Ph.D., December 16, 2004, Houston, TX.

March of Dimes, 10th Annual Visiting Professorship in Nursing.  Memorial Hermann Hospital, May 10-11, 2005, Houston, TX.

"Medical Emergencies in Women & Children", Via Christi Regional Medical Center, June 25, 2005, Wichita, KS.

"Recent Developments in Ethics". St. Luke's Episcopal Hospital, Ethics Conference, Texas Children's Hospital, September 13, 2005, Houston, TX.

Annual Meeting of the Central Association of Obstetricians and Gynecologists, Camelback Inn Resort, October 19-22, 2005, Scottsdale, AZ,

Houston's Third Annual Conference.  "An Ethical Post-Mortem on the Terri Schiavo Case", Rabbi Akiva Tatz, M.D., Laurence B. McCullough, Ph.D.. Thursday, March 2, 2006, Houston, TX.

Health Subcommittee Meeting, House of Representatives, Texas,– "Consideration of change in HSC 166.046 – with specificity to 10 day notice" Austin, Texas, August 09, 2006

2nd Annual Diabetes Symposium for Primary Care Providers, "Prevention, Detection and Management of Diabetic Complications" Houston, TX, September 30, 2006

Annual Meeting of The Central Association of Obstetrics & Gynecology, Las Vegas, NV. October 18-20, 2006.

30th Annual Nursing Symposium, Baylor College of Medicine, Perinatal Outreach Program.  Houston, TX. October 27, 2006.

Netlearn Baylor College of Medicine, The Medical Center, A0203C1.1 HIPAA 101: An Introduction; C0203C3.1 Security Fundamentals; B0203C2 Code of Conduct; F080556 Acceptable Use Policy; Blood Borne Pathogens; Security Department Orientation Program; Employee Relations Training-NEO.  November 19, 2006, Houston, TX.  1.00 CEUS and 4.00 credit hours.

Annual Meeting of the Society of Maternal Fetal Medicine, San Francisco, CA. February 5-10, 2007.

International Fetal Medicine Surgery Society Meeting, Aruba, April 30-May 2, 2007.

Fetoscopy Surgery Meeting, Mexico City, October 4-5, 2007.

Annual Meeting of the Central Association of Obstetricians and Gynecologists, Chicago, IL, October 17, 2007

Annual Meeting of the Maternal Fetal Medicine Society, Dallas, TX, January 29th – February 2nd, 2008.

Annual Fetoscopy Surgery Meeting, Argentina, September 24-27, 2008.

Annual Meeting of the Central Association of Obstetricians and Gynecologists, New Orleans, October 22-24, 2008.

Texas Medical Liability Trust, Health Care Rock 'N' Roll: Medicine in Transition", Houston, TX, October 30, 2008.

Annual Meeting of the Society of Maternal Fetal Medicine, San Diego, CA, January 28-31, 2009

Annual Fetoscopy Surgery Meeting, Italy, October 6-10, 2009.

Annual Meeting of the Society of Maternal Fetal Medicine, Chicago, IL, February 3-5, 2010

HCHD Medical Staff Retreat & Educational Update, Houston, TX; June 05, 2010.

30th Annual International Fetal Medicine and Surgery Society Meeting, Sedona, AZ, May 13-18, 2011

The 78th Annual Meeting, Central Association of Obstetricians and Gynecologists, Nassau, Bahamas, October 26, 2011

Multifetal Pregnancies: A Multidisciplinary Update, Houston, TX, May 11, 2013

Cyber Liability, HIPAA, HITECH, HB300 and HIE: What Does All this Mean to Me?, Houston, TX, May 22, 2013

Reimbursement & Revenue: New Possibilities, New Pitfalls, Houston, TX, August 3, 2013

The 80th Annual Meeting, Central Association of Obstetricians and Gynecologists, Napa, CA, October 17, 2013

The Center for Medical Ethics and Health Policy Annual Center Retreat, May 22, 2015

The 82nd Annual Meeting, Central Association of Obstetricians and Gynecologists, Charleston, SC, October 21, 2015

Baylor College of Medicine General Compliance Training, December 18, 2015

SMFM's 36th Annual Pregnancy Meeting, February 4-6, 2016, Hilton Atlanta, Atlanta, GA

Reimbursement Under MACRA: Value based purchasing and your practice, Houston, TX, April 22, 2017

Expanding the Healthcare Workforce: Working with APRNs and Pas 2018 & Beyond, Houston, TX October 3, 2018

The 84th Annual Meeting, Central Association of Obstetrics and Gynecologists, Scottsdale, AZ, October 18, 2017

Annual Medical Staff Meeting, In Pursuit of Professionalism and a Culture of Safety and Respect, January 9, 2018

St. Luke's Independent Practice Association 26th Annual Meeting of the Members, February 27, 2018

The 85th Annual Meeting, Central Association of Obstetricians & Gynecologist, Minneapolis, MN, October 18, 2018

SMFM 39th Annual Pregnancy Meeting, Caesar's Palace, Las Vegas, NV, February 11-16, 2019

The Houston Gynecological & Obstetrical Society (HGOS), September General Meeting, "Maternal and Perinatal Risks of IVF", Houston, TX, September 17, 2019

Central Association of Obstetricians and Gynecologists, "Changing the Face of Women's Health", The Pyramid at the Oasis Resort, Cancun, Mexico, October 16-19, 2019

**Revised 01/24/2020**

PLS.' APPX. 066

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION
 3   IRENE RODRIGUEZ,              )
     individually and as parent   )
 4   and legal guardian of        )
     A.R., and Maria Antonio      )
 5   Santos as representative     )
     of the estate of B.R.,       )
 6              Plaintiffs,   ) CIVIL ACTION
                                  )
 7   VS.                          ) NO.: 3:20-CV-00045-D
                                  )
 8   SOUTHERN HEALTH PARTNERS,    )
     INC., LINDA HULLETT, and     )
 9   DR. GRADY SHAW,              )
                Defendants.   )
10   -----------------------------------
11         ORAL AND VIDEOTAPED DEPOSITION OF
12           ROBERT J. CARPENTER, JR., MD
13                  JUNE 20, 2022
14              (REPORTED REMOTELY)
     -----------------------------------
15       ORAL AND VIDEOTAPED DEPOSITION OF ROBERT J.
16   CARPENTER, JR., MD, produced as a witness at the
17   instance of the Defendants, and duly sworn, was taken in
18   the above-styled and numbered cause on June 20, 2022,
19   from 10:12 a.m. to 3:49 p.m., before Julie G. Davault,
20   CSR in and for the State of Texas, reported by machine
21   shorthand, at 6624 Fannin Street, Houston, Texas,
22   pursuant to the Federal Rules of Civil Procedure, the
23   Texas Supreme Court Orders Regarding Covid, and the
24   provisions stated on the record or attached hereto.
25   Job No. 5282981
```

Page 1

```
 1    that those ultrasounds were read by an obstetrician, or
 2    a maternal fetal medicine person.  There was an
 3    ultrasound on November 29th of both of the fetuses at
 4    the OB clinic there in Navarro County.  And I think the
 5    obstetrician herself looked at those, but I don't recall
 6    who signed it out.  If it was a radiologist, then I will
 7    accept that a radiologist read that.  But many times the
 8    obstetrician will look at that because they have the
 9    appropriate training and education to do so with respect
10    to normal scans.
11        Q.  Did you look at any original ultrasounds, or
12    other films in this case?
13        A.  No.  The only things that were available are
14    the written documents.
15        Q.  Okay.
16        A.  I'm sorry.  I wasn't responsive, and I
17    apologize.  You asked a clear question, and I did not
18    answer that.
19        Q.  It's fine.  That's my job to follow up and make
20    sure that I -- that I ask the right thing and heard the
21    right answer, so no apology is needed.
22             Are you the supervisor for the nurses at
23    any of the medical facilities in which you work?
24        A.  If you're talking about direct supervisor, the
25    answer is no.  If you're talking about directly related
```

Page 70

1    in nursing quality of care, the answer is I have been in

2    various situations over the course of the last 40-plus

3    years, but not supervisor in the normal sense that

4    you're using the word "supervisor."  That would normally

5    be a nurse, and a nurse administrator who would be

6    responsible for the various aspects of nursing care,

7    too.  But in training nurses, and supervising them, and

8    educating them when things aren't done perhaps the way

9    they should be, yes, I've done that for all of my life.

10        Q.  And that's in your capacity not necessarily as

11   their direct supervisor, but in working alongside them;

12   is that fair to say?

13        A.  Yes, ma'am, it is.

14        Q.  Do you know the difference between the scopes

15   of practice of an RN and an LPN?

16        A.  Oh, massive difference.  There are some LVNs

17   who are exceedingly good, and they do a single area of

18   practice.  There are some who -- like we talk about a

19   general medical officer, or a general practitioner,

20   whatever they're assigned, they go do, but they do not

21   have in-depth knowledge of that particular area.

22   Nursing, by the nature of an RN, she has had, in most

23   cases now, a BSN, and so that she has had a full three

24   or four-year degree program, has then taken her

25   licensure examinations to receive her RN, and then many

Page 71

1   Ms. Rodriguez's other pregnancies to determine what she

2   considered to be two mucus plugs, that's right?

3        A.  I -- as you asked earlier today, I have

4   reviewed no records for any prior pregnancy, and that

5   would address that issue as well.

6        Q.  Rather than going by your report, Exhibit 2,

7   page-by-page, I think it may speed things up if I give

8   you the opportunity to tell me at this point what are

9   your opinions as to how both Dr. Shaw and Nurse Hullett

10  breached the standard of care with regard to treatment

11  of Ms. Rodriguez at the jail, and how you believe that

12  affected her outcome.

13       A.  With Hullett, she failed to communicate

14  important information to Dr. Shaw.  He affirmed that in

15  his deposition multiple places, multiple circumstances.

16  He was also surprised in her comments about different

17  things, which as I mentioned earlier show a substantial

18  lack of medical information and medical judgment.

19            One of the major ones I've already

20  addressed, and that is her belief that a patient with

21  twins was no greater risk than a patient with singleton.

22  That is a critical error because if you program your

23  brain that this person really has no greater problem

24  possibility compared to anybody else who is pregnant,

25  you don't see the proverbial forest for the trees.

PLS.' APPX. 070

1            The other thing that I have to do is I have

2    to take the comments of Ms. Rodriguez where she

3    indicates that, repetitively, on mornings when the med

4    checks and med passes that she told Hullett that she was

5    having contractions.  So there were multiple times

6    outside of the very limited medical records, and the

7    late note keeping that we have in this circumstance,

8    that Hullett was forearmed with the information

9    concerning contractions.  This data is also presented in

10   the context of the sergeant, on the day of delivery,

11   indicating that there was knowledge amongst the various

12   jail staff that Ms. Rodriguez had been complaining of

13   contractions.  Ms. Hullett did nothing about that.  She

14   should have informed Dr. Shaw.  She should have had that

15   note on the chart so that it would have served as having

16   Dr. Cook's statement up front that if she has any other

17   problems she needs to be sent to the hospital.  The

18   second nurse who saw her on the evening of January 2nd

19   had no such forewarning.  For all she knew this was the

20   first time that this really had happened because there

21   was no note.

22            I've already indicated that I have no idea

23   when the appointment was scheduled.  Well, the order was

24   written on the 27th.  She should have made sure, since

25   she was the lead nurse in this unit, that an ASAP

Page 137

1  appointment was, in fact, acquired when two weeks down

2  the road for a patient who has a set of twins, who was

3  having contractions, who has passed their mucus plug,

4  putting all of that data together, and had some bleeding

5  with that event, those are a forewarning that should

6  have been acted upon.  And Nurse Hullett did not have

7  the medical judgment or capability to recognize that and

8  to do what needed to be done, which was, at minimum,

9  communicate with Dr. Shaw about this.  And, again, from

10 Dr. Shaw's deposition, he would wish to have known that

11 information.  Communication, evaluation, assessment is a

12 critical issue with Nurse Hullett.

13             Dr. Shaw I have less problems with after

14 his deposition.  I think that he should have maintained

15 Ms. Rodriguez in his mind as a patient with twins in the

16 hos -- in the jail, and just asked open -- any problems

17 with that pregnant patient, anything ongoing.  Perhaps a

18 simple question like that may have made Nurse Hullett

19 respond in an affirmative manner.

20             But he is responsible for the overall

21 circumstances of the jail.  He may not be assigned as

22 the lead, quote, nurse person, but he's responsible for

23 the people under his supervision.  And it should have

24 been, and I don't know what their normal means of

25 communication were, communication usually gets you in

Page 138

PLS.' APPX. 072

1    trouble in medicine.  Failure to communicate most

2    commonly.  And this is a com -- this is a classic

3    situation of failure to communicate, failure to

4    evaluate.  I'll stop there with Dr. Shaw because I don't

5    really have very much other information adverse to him,

6    other than supervision, and asking the question, how is

7    that young lady, Ms. Rodriguez.  He was clear in his

8    deposition that he wanted to be informed.  He wasn't

9    informed, but the structure and process with Nurse

10   Hullett as the -- one of the primary gatekeepers kept

11   that from happening.  I'll stop there.

12        Q.  I want to make sure you completed your opinion

13   is that --

14        A.  I said, I will stop there.

15        Q.  Is that your complete opinion?

16        A.  Yes, ma'am.

17        Q.  Okay.  You said at the end, a failure to

18   evaluate.  Is it your opinion that Dr. Shaw should have

19   had another evaluation of Ms. Rodriguez on a certain

20   date that he failed to see her on?

21        A.  No.  The failure to evaluate is that of

22   Hullett.  And failure to get her evaluated, that's

23   probably a better way of saying it.  If that happened to

24   be because she talked with Dr. Shaw and told him, and

25   then he evaluated her again, and with high probability

Page 139

PLS.' APPX. 073

```
 1        That the amount of time used by each party at the
 2   deposition is as follows:
 3   Don Tittle, Esq......00 HOUR(S):00 MINUTE(S)
     Jo Beth Drake, Esq......04 HOUR(S):56 MINUTE(S)
 4        That pursuant to information given to the
 5   deposition officer at the time said testimony was taken,
 6   the following includes counsel for all parties of
 7   record:
 8   FOR THE PLAINTIFFS:
          Don Tittle, Esq. (Remote-Durango, CO)
 9        LAW OFFICES OF DON TITTLE
          8350 N. Central Expressway
10        Suite M1085
          Dallas, Texas 75206
11        (214) 680-9578
          don@dontittlelaw.com
12
     FOR THE DEFENDANTS:
13        Jo Beth Drake, Esq. (Remote-Flower Mound, TX)
          QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
14        1700 Pacific Avenue
          Suite 4545
15        Dallas, Texas 75201
          (214) 754-8755
16        jobeth.drake@qpwblaw.com
17        That $_____ is the deposition officer's
18   charges to the Defendants for preparing the original
19   deposition transcript and any copies of exhibits;
20        I further certify that I am neither counsel for,
21   related to, nor employed by any of the parties or
22   attorneys in the action in which this proceeding was
23   taken, and further that I am not financially or
24   otherwise interested in the outcome of the action.
25
```

Page 189

1      Certified to by me this 30th day of June, 2022

2

3

                    _____

4                    Julie G. Davault, CSR, No. 2092

                    Expiration Date:  8/31/23

5                    Veritext Legal Solutions

                    Firm Registration No. 571

6                    300 Throckmorton Street

                    Suite 1600

7                    Fort Worth, Texas 76102

                    (817) 336-3042

8  Job No. 5282981

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                      Page 190

PLS.' APPX. 075

## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IRENE RODRIGUEZ, individually and as parent and legal guardian of A.R., and MARIA ANTONIA SANTOS as representative of the estate of B.R., | § § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | CIVIL ACTION NO. 3:20-cv-00045-D |
| SOUTHERN HEALTH PARTNERS, INC. LINDA HULLETT, and DR. GRADY SHAW, | § § § § | |
| *Defendants.* | § § | |

---

## DECLARATION OF DR. DONALD MEYN

---

I, Dr. Donald Meyn, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am licensed to practice medicine in the State of Louisiana, I am a Diplomate of the American Board of Pediatrics in both General Pediatrics and Neonatal-Perinatal Medicine, and I am a Fellow of the American College of Pediatrics. I completed residency at the University of Alabama at Birmingham in 2006 and a fellowship in Neonatology also at the University of Alabama at Birmingham in 2009. I am Board Certified in Pediatrics and Sub-Board Certified in Neonatal–Perinatal Medicine. I have been in full time practice as a Neonatologist since 2009 with Infamedics. My current practice includes inpatient care of infants at a Level 3 Surgical Neonatal Intensive Care Unit which admits approximately 1500 patients and 140 very low birth weight infants yearly. I am a member of the active medical staff of 3 Baton Rouge area hospitals: Woman's Hospital, Baton Rouge General Medical Center, and Ochsner Medical Center Baton Rouge. My Curriculum Vitae is attached as an exhibit to the brief of Plaintiffs' Response to Defendants' Motion for Summary Judgment with further details on my experience and qualifications.

2.     My opinions in this case are outlined in my report, which is incorporated in full herein and attached as an exhibit to the brief of Plaintiffs' Response to Defendants' Motion for Summary Judgment.

3.     I have reviewed the National Commission on Correctional Health Care's standards regarding "Counseling and Care of the Pregnant Inmate," as published in the 2018 edition of their Standards for Health Services in Jails.   These standards are attached as an exhibit to the brief of Plaintiffs' Response to Defendants' Motion for Summary Judgment.

4.     The NCCHC standards regarding the care of pregnant inmates consist of only three pages.  The standards provide suggested policies to be implemented by the administration of a correctional facility.  Overall, they are very general in nature, and in no way supplant or replace the ordinary standard of care with respect to the manner in which medical providers are to respond or act in a given situation.

5.     In fact, elements of the ordinary standard of care are incorporated into the NCCHC standards in obvious ways.   For example, the standards state, "obstetrical emergencies such as hemorrhage, eclamptic seizures, and preterm labor can arise at any point in pregnancy.  Such emergencies require immediate medical intervention and/or movement of the woman."   They also state, "Pregnant women who report bleeding or symptoms of labor such as pain or leaking fluid should be immediately evaluated by a qualified health care professional; when an appropriately trained health professional is not on-site, there should be consultation with or transportation to the hospital."  These are simply restatements of obvious elements of the ordinary standard of care, described in terms of the policies a facility should have in place to ensure it complies with that ordinary standard of care.  This is clear from the plain text of the standards, combined with my knowledge of the ordinary standard of medical care for pregnant women and childbirth.

6.     Nothing about these standards suggest some kind of "lesser" standard of care that applies to correctional facilities.  They only reiterate the fact that the ordinary standard of medical care applies in a correctional setting just as it does anywhere such care is being provided.

7.     Dr. Grady Shaw and Linda Hullett, as well as Southern Health Partners, took on Irene Rodriguez as a patient when they took on the obligation to provide her medical care while she was in the Navarro County Jail.  Thus, they are subject to the same standard of care as any medical provider is subject to regarding the care provided to their patients.

8.     Linda Hullett's failure to follow physician's orders, failure to arrange timely transportation to a hospital or evaluation by an appropriately trained specialist

DECLARATION OF DR. DONALD MEYN                                                                    2

when it was necessary, failure to maintain accurate and timely records, failure to recognize that Irene Rodriguez's medical needs exceeded her own expertise and training, and, ultimately, failure to take all reasonable measures to ensure the twins were born in an appropriate environment are universal and would be breaches of the standard of care in any context.

9. Moreover, my opinions on medical causation are purely scientific in nature and therefore wholly independent of the setting in which the medical issues or treatment occur.

10. I am familiar with the standard of care for nurses because I have extensive experience with standard nursing practices in the field of labor and delivery, pediatrics and neonatology.

11. As a physician who has practiced for years alongside nurses, my own obligations as a medical practitioner require me to know the limits of what a nurse is qualified and trained to do, and where the medical care in question requires participation by a physician or other higher-level practitioner.

12. The same experience has provided me with extensive knowledge as to how a nurse must conduct herself (for instance, regarding following physician's orders, communicating critical information, maintaining accurate and timely documentation, and responding appropriately to emergencies) so that I may, in turn, effectively provide medical care. As such, I have directed nurses on how to perform their responsibilities throughout my career.

13. Although the fact that Irene Rodriguez was incarcerated may have presented additional logistical considerations in arranging for her medical care, any such considerations must be accommodated in such a way as to allow the medical care provided to Ms. Rodriguez to conform to the ordinary standard of care for medical providers.

I, Dr. Donald Meyn, declare under penalty of perjury that the foregoing is true and correct.

Executed on ___06/17/2023___ in East Baton Rouge Parish, Louisiana.
                     DATE

_____
DONALD MEYN

DECLARATION OF DR. DONALD MEYN             3

# Donald F. Meyn Jr., MD, FAAP

June 19, 2020

Don Tittle, JD
6301 Gaston Avenue, Suite 440
Dallas, Texas 75214

Mr. Tittle,

You have asked me to review various records regarding the medical care provided to Ms. Irene Rodriguez and her twin children Analeyah Rodriguez and Benjamin Rodriguez and share my opinion regarding the quality of that care with you in the form of an expert report . As such, this report is tendered with the intent to clearly provide a fair summary of my opinion as of the date of the report regarding applicable standard of care, the manner in which the care rendered failed to meet that standard, and the relationship between that failure and the resultant harm.

All of the opinions expressed in this report are based on my review of records and the other documents listed below, and I reserve the right to amend these opinions in the event that additional records or information is forthcoming.  The opinions and conclusions herein are made to a standard of "reasonable degree of medical probability" unless otherwise indicated.

Qualifications

I am qualified by education, training and experience to opine the standard of care and causation issues in this case.  I have attached a copy of my Curriculum Vitae for your review and it should be included by reference herein.  I am licensed to practice medicine in the State of Louisiana, I am a Diplomate of the American Board of Pediatrics in both General Pediatrics and Neonatal-Perinatal Medicine, and I am a Fellow of the American College of Pediatrics.  I completed residency at the University of Alabama at Birmingham in 2006 and a fellowship in Neonatology also at the University of Alabama at Birmingham in 2009.  I am Board Certified in Pediatrics and Sub-Board Certified in Neonatal–Perinatal Medicine.

1415 CAMPDEN DR, BATON ROUGE, LA 70810
M(225) 993-1274, DMEYNJR@GMAIL.COM

I have been in full time practice as a Neonatologist since 2009 with Infamedics. My current practice includes inpatient care of infants at a Level 3 Surgical Neonatal Intensive Care Unit which admits approximately 1500 patients and 140 very low birth weight infants yearly. I am a member of the active medical staff of 3 Baton Rouge area hospitals: Woman's Hospital, Baton Rouge General Medical Center, and Ochsner Medical Center Baton Rouge. I am also an active participant in quality improvement initiatives organized through the Vermont Oxford Network with recent projects directly related to management of micropremature infants at the time of delivery.

Materials reviewed

In preparation of this report, I have reviewed medical records for Ms. Irene Rodriguez from Southern Health Partners and Navarro Regional Hospital. I have also reviewed medical records for her twin children Analeyah and Benjamin Rodriguez from Corsicana Fire Rescue, Navarro Regional Hospital, Baylor University Medical Center Dallas, TX, and Children's Medical Center Dallas TX. Finally, I have reviewed the First Amended Complaint. This information is that which is routinely and reasonably relied upon by experts in forming opinions regarding the issues at hand.

Background

Infants born preterm require special measures at delivery and are at risk for complications not seen in their term-born counterparts. The Textbook of Neonatal Resuscitation notes that "The likelihood that a preterm newborn will need help making the transition to extrauterine life is related to gestational age" and that "babies born at lower gestational ages are more likely to require additional interventions." (1) Preterm infants have a higher risk of complications including a limited metabolic response to cold; rapid heat loss; weak chest muscles decreasing the efficiency of spontaneous breathing effort; immature lungs; and immature blood vessels in the brain that cannot adjust to rapid changes in blood flow which may cause damage from bleeding or insufficient blood supply. (1) Infants born at term often begin to breathe spontaneously and require only contact with their mother's body to maintain a normal body temperature. Very low birth-weight infants (VLBW), those premature infants born weighing

2

less than 1500 grams, frequently require assistance breathing immediately following delivery and require special measures to maintain body heat including placement under a radiant heat warmer, use of thermal mattresses and wrapping the body with polyethylene plastic wrap to limit heat loss. (1)

There are many complications faced by preterm infants not seen in those born at term. Among these complications are germinal matrix-intraventricular hemorrhage (IVH) and periventricular leukomalacia (PVL). IVH occurs due to hemorrhage in the subependymal germinal matrix within the brain and extension of that hemorrhage into the lateral ventricles. (2) IVH is classified into grades 1 through 4 with grade 3 and grade 4 hemorrhages considered to be severe and much more likely to be associated with an adverse neurologic outcome including post hemorrhagic hydrocephalus. (2) Hypothermia is a risk factor for the development of IVH. The ideal neonatal body temperature is between 97.7F (36.5C) and 99.5F (37.5C). Studies have shown higher odds of severe IVH with moderate hypothermia – temperature between 91.2F (32.9C) and 96.6F (35.9C). (2)

Periventricular leukomalacia (PVL) is focal necrosis occurring in the periventricular white matter of the preterm brain. (3) PVL can be defined as cystic or diffuse with cystic PVL being characterized by focal cystic, necrotic lesions deep in the periventricular white matter generally appearing 2-4 weeks after birth. (3) PVL is thought to arise from the effect of hypoxia, ischemia, and inflammation on progenitor cells within the periventricular area of infants born 23 to 32 weeks. (3) Several maternal risk-factors are also associated with the development of PVL including multiple gestation and lack of maternal antenatal steroids. An adverse outcome often associated with PVL is cerebral palsy with spastic diplegia in milder cases and quadriplegia in the most severe cases.

Out of hospital delivery of preterm infants is associated with adverse neonatal outcomes; it is therefore of paramount importance that it is avoided. Preterm infants born from gestational ages 22 to 31 weeks prior to arrival at a hospital have been shown to have increased rates of stillbirth, death within 28 days of birth and death within the first year of life. (4) Additional data has shown that for those infants delivered outside of a hospital or birthing center, multiparity, prematurity, and hypothermia are associated with increased risk for neonatal morbidity and mortality. (5)

There are clear perinatal interventions that when given to the expectant mother greatly reduce the risk of both IVH and cerebral palsy in the preterm neonate. Guidelines for Perinatal Care

3

published by the American Academy of Pediatrics and American College of Obstetricians and Gynecologists recommend antenatal steroid administration to pregnant women between 24 weeks and 34 weeks who are at risk of delivery within 7 days. (6) Antenatal steroid administration has been shown to decrease the risk of overall neonatal mortality and morbidity and to independently decrease the risk of IVH. (2) These guidelines also recommend administration of magnesium sulfate to the mother prior to expected preterm delivery as evidence suggests that this reduces the risk of cerebral palsy in the neonate. (6)

(1) American Heart Association Textbook of Neonatal Resuscitation 7th Edition. American Academy of Pediatrics, 2016.
(2) Lim J., E. Hagen. Reducing Germinal Matrix-Intraventricular Hemorrhage: Perinatal and Delivery Room Factors. NeoReviews 2019;29;e452-e463.
(3) Bass, W.T. Periventricular Leukomalacia. NeoReviews 2011;12;e76-e84
(4) Boland, R.A, et al. Very Preterm Birth Before Arrival at Hospital. Aust N Z J Obstet Gynaecol. 2018; 58:197-203.
(5) Javaudin, F. et al. Unplanned Out-of-Hospital Birth and Risk Factors of Adverse Perinatal Outcome: Findings from a Prospective Cohort. Scand J Trauma Resusc Emerg Med. 2019; 27:26
(6) Guidelines for Perinatal Care 7th ed. American Academy of Pediatrics and American College of Obstetricians and Gynecologists, 2012.


Summary of Events

Irene Rodriguez

Irene Rodriguez had received prenatal care at Olmsted Medical Center in Rochester, MN prior to relocation to Corsicana, TX. After arrival in Corsicana and prior to her incarceration, she had established prenatal care with Dr. Michelle Spears at Medical Associates of Navarro County. Medical records provided by Navarro County Jail show that she was seen by Nurse Linda Hullett and Dr. Grady Shaw prior to delivery. On December 27, 2017 Dr. Shaw examined Ms. Rodriguez, and noted that she was pregnant with twins and had history of prior preterm delivery. He also notes that she is having contractions, but incorrectly identifies them as false contractions. He notes that a prenatal visit was scheduled for December 28, 2017. He states in a physician's order that she should be taken to her Obstetrician as soon as possible. However, there is no evidence in the record that this visit took place, and Ms. Rodriguez states in her Complaint that it did not. Shaw further states that they must continue to monitor Ms. Rodriguez. A notation by Hullett into the medical record dated December 29 at 1:54 PM states

4

that Ms. Rodriguez complained of passing her mucous plug and of being in labor.  Fetal heart rates were documented within normal ranges and contractions were reported as sporadic. Another note by Nurse Hullett dated for December 29 at 3:00 PM, documents a telephone consultation with Dr. Charles Cook, an Obstetrician at Navarro Regional Hospital.  Dr. Cook advised transfer of Irene Rodriguez to the hospital if contractions continue.   A follow-up examination on January 2, 2018 notes contractions every 2-4 minutes lasting 19-26 seconds. No fetal monitoring is documented at this time.  Jail records contain no evidence that its medical staff took any action other than the provision of prenatal vitamins between January 2 and the birth of the twins on January 9.  Records do not indicate that Ms. Rodriguez ever saw an Obstetrician the entire time she was incarcerated.  The Jail Incident Report of January 9, 2018 reported by Sgt. Robin Woodall notes that at 4:50 AM the morning of January 9, 2018 Irene Rodriguez began to have contractions approximately 3 minutes apart.   Sgt. Woodall reports contacting Nurse Linda Hullett to advise her of the contractions.  Nonetheless, no ambulance was called.  Sgt Woodall next reports that Irene Rodriguez's contractions were one minute apart at 5:16 AM and that she advised Nurse Hullett of this change; Nurse Hullett still did not authorize transport to a hospital at this time.  At 5:27 AM, Woodall states that Ms. Rodriguez felt delivery was imminent.  Nurse Hullett was contacted again with this information and at this time recommended contacting EMS.  Rupture of membranes was reported at 5:28 AM and Baby Analeyah, twin A, delivered at 5:40 AM prior to the arrival of EMS.  Baby Benjamin, twin B, delivered at 5:51 AM with EMS in attendance.

Analeyah Rodriguez

Analeyah Rodriguez is a female twin #1 born at 28 and 2/7 weeks gestation with birthweight of 1130 grams (2lb 7.8oz) who delivered via spontaneous vaginal delivery at 5:28 AM on January 9, 2018.  The delivery occurred at the Navarro County Jail and was attended by corrections officers prior to the arrival of Emergency Medical Services (EMS). An incident report was filed by Sgt. Robin Woodall describing the infant's delivery. The officers noted that the infant began to cry and appeared to be breathing immediately following delivery but soon stopped breathing and was resuscitated with "rescue breaths" after which improvement was noted and the infant was handed off to EMS.  EMS notes the use of bag-mask ventilation and blow-by oxygen. The EMS documentation noted a heart rate of 105 and a respiratory rate of 32 and that she was crying with stimulation, cool to touch, and had "good capillary refill" with spontaneous movement of the extremities. Apgar scores were not clearly evident in the EMS documentation; however, Apgar scores of 1 at one minute and 5 at five minutes are noted after admission to

5

Navarro Regional Hospital.  She was transported quickly by EMS to Navarro Regional Hospital where she arrived at 6:12 AM.  Vital signs on admission at 6:20 AM show heart rate 120, respiratory rate 32, oxygen saturation of 89%, and a rectal temperature noted as "not reading". She was placed onto a radiant warmer with warm blankets on arrival and her temperature and oxygen saturation had improved at 6:30 AM but her heart rate had decreased to 90. Vapotherm was then initiated to support her breathing and her heart rate improved to 120. The attending physician, Dr. Thomas Sawyerr, MD was notified of the delivery at 6:20 AM and arrived in the nursery at 6:45 AM. An IV was placed and intravenous fluid was started at 6:47 AM.   Positive pressure ventilation was initiated at 7:25 AM due to apnea and oxygen saturations decreased to "80's".  Endotracheal intubation was attempted unsuccessfully at 7:50 AM and cardiopulmonary resuscitation (CPR) was started at 7:54 AM due to heart rate of less than 60 and oxygen saturations less than 50%.  The infant was intubated by a nurse anesthetist at 8:03 AM and her condition began to improve with CPR discontinued at 8:04 AM.  Baylor University Medical Center (BUMC) reports that call for transport from Navarro Regional Hospital was received at 6:45 AM and that the transport team arrived at 8:55 AM. The infant was then secured for transport to BUMC where she arrived at 1:55 PM.  On January 12, 2018, 3 days after birth, records at BUMC indicate a worsening clinical status, metabolic acidosis and concern for posturing.  A cranial ultrasound was done at that time showing a right grade 3 to 4 and left grade 1 intracranial hemorrhage.   A repeat cranial ultrasound on January 15, 2018 showed extension of the IVH to right grade 4 and left grade 2.  Progress notes document a concern for hydrocephalus due to splitting cranial sutures on January 28, 2018 and a follow-up cranial ultrasound on January 31, 2018 showed markedly enlarged ventricles indicating the diagnosis of post-hemorrhagic hydrocephalus.  The infant was then transferred to Children's Medical Center (CMC) in Dallas, TX for neurosurgical consult.  While at CMC she underwent placement of a ventricular reservoir with daily drainage to relieve the ongoing hydrocephalus. The ventricular reservoir was converted to a permanent ventriculoperitoneal shunt on March 23, 2018.  MRI scan of the infant's brain have shown significant volume loss in the right cerebral hemisphere with multiple areas of cystic leukomalacia in the periventricular white matter indicating cystic PVL.  This loss of brain matter and cystic PVL have in turn caused cerebral palsy with left sided hemiplegia, hydrocephalus, and developmental delay.

Benjamin Rodriguez

 Benjamin Rodriguez is a male twin B, born at 28- and 2/7-weeks gestation with birthweight of 1190g (2lb 9.9oz) who delivered vaginally on January 9, 2018 at 5:51 AM.  He delivered in the

6

Navarro County Jail with EMS in attendance.  EMS reports that his mouth and nose were suctioned with a bulb syringe, that he was dried and was warmed.  They note that he was crying, moving all extremities, and was placed skin to skin with his mother.  An acute "deterioration" of his condition was recognized, and he was taken from his mother so that his breathing could be assisted with bag-mask ventilation. EMS further notes that bag-mask ventilation was continued until his arrival at Navarro Regional Hospital.   No vital signs were recorded due to "multiple patients and active delivery".  Apgar scores of 7 at one minute and 4 at 5 minutes were assigned by EMS.  Records from Navarro Regional Hospital note the infant's arrival at 6:20 AM and that he was carried to the nursery by EMS with bag-mask ventilation ongoing.  Vital signs on admission were heart rate 60, cuff blood pressure of 63/30 with oxygen saturation of 84% with cyanosis.  CPR was initiated immediately after arrival. Two unsuccessful intubation attempts were made and a laryngeal mask airway (LMA) was placed at 6:42 AM.  The infant's temperature on admission was not recorded.  An umbilical venous catheter was placed at 6:55 AM due to emergent need for intravenous access and a normal saline bolus was given. The medical record notes improvement in the infant's saturations following LMA placement and that he was transitioned to vapotherm.  At 8:30 AM his saturations were noted to drop and positive pressure ventilation was initiated and was continued until the arrival of the BUMC transport team.  BUMC reports that call for transport from Navarro Regional Hospital was received at 6:45 AM and that they arrived at 8:55 AM.   Upon arrival BUMC notes that the infant was pale and dusky with increased capillary refill indicating poor perfusion.  He was intubated by the BUMC transport team at 9:20 AM and given two additional normal saline boluses due to poor perfusion.  He remained in critical condition after arrival to BUMC needing high-frequency ventilation, two doses of Curosurf surfactant and inhaled nitric oxide for pulmonary hypertension.  An EEG performed on January 12, 2018 due to worsening clinical status and concern for seizure was abnormal with premature and poorly sustained background suggestive of encephalopathy.  A cranial ultrasound was done on January 17, 2018 showing a right-sided grade 3 IVH.  Cranial ultrasound from January 26, 2018 showed marked progression of bilateral lateral ventricular dilation with grade 3 hemorrhages bilaterally.  The cranial sutures were noted to be separated on January 30, 2018 indicating post-hemorrhagic hydrocephalus and the infant was transferred on that date to Children's Medical Center Dallas, TX.  Additional complications occurring while at BUMC include a large patent ductus arteriosus requiring treatment and spontaneous perforation of the intestine requiring placement of an intraabdominal drain and later exploratory laparotomy.  While at CMC a ventricular reservoir was placed on February 7, 2018 due to post-hemorrhagic hydrocephalus.  A ventricular

7

peritoneal shunt was placed on May 15, 2019 but failed to operate properly and was replaced with a ventricular-atrial shunt.  Follow-up MRI exams of the brain have shown marked paucity of periventricular white matter with atrophy of the corpus callosum and cystic encephalomalacia in the right frontal and temporal areas.   His hospital course at CMC was further complicated by seizures and sensorineural hearing loss of both ears.  He has been diagnosed with microcephaly, global developmental delay and spastic quadriparesis making lifelong neurodevelopmental disability likely.


Standard of Care and Breach of Standard of Care

Guidelines for Perinatal Care states that incarcerated women who wish to continue their pregnancies should have access to readily available and regularly scheduled obstetric care beginning early in pregnancy and continuing through the postpartal period.  Incarcerated pregnant women also should have access to unscheduled or emergency obstetric visits on a 24-hr basis. (6)   The guidelines also state that patients with suspected preterm labor should be examined and observed for 1-2 hours, have their uterine activity monitored and undergo serial cervical examinations to document the presence or absence of cervical change. (6)  Assessment for maternal urinary tract infections and ultrasonic examination of the fetus is also recommended. (6)

In addition to the above, I am familiar with the standard of care for a nurse when dealing with a pregnant woman based on my experience as a physician practicing in the areas of pediatrics and neonatology.  I regularly interact with and supervise nurses who are responsible for pregnant women, and in particular, those with high-risk pregnancies.  The standard of care for a nurse in Linda Hullett's position, when attending to a pregnant individual, includes the following:

- Recognizing that a twin pregnancy is always a high-risk pregnancy, especially one who had a prior preterm delivery;
- Recognizing indicators of potential imminent labor, such as a passed mucous plug, regular contractions; and contractions of increasing intensity and frequency
- Immediately referring the patient to an obstetrician when these indicators are observed;
- Recognizing that the jail is extremely underequipped to deliver very low birth weight babies;
- Following all physician's orders;

8

- Regularly monitor the medical condition of an individual who is presenting with indicators of potential imminent labor;

Nurse Hullett breached the above-described standards of care when she:

- Failed to follow Dr. Shaw's order from December 27 that Irene Rodriguez needed to see an Obstetrician as soon as possible;
- Failed to ensure that Rodriguez attended her pre-scheduled appointment with Dr. Spears on December 28;
- Failed to ensure Rodriguez was examined by an Obstetrician or transferred to a hospital despite numerous signs of impending labor.
- Failed to call urgently for EMS when first learning of regular contractions at 3 minute intervals on January 9.

As for Dr. Grady Shaw, the standard of care requires him to monitor any patient who has a high-risk pregnancy and ensure that she is examined by an obstetrician if a risk of premature delivery manifests, as indicated by such symptoms as observed contractions. As with Nurse Hullett, the standard of care requires that Shaw recognize that a jail is extremely underequipped to deliver very low birth weight babies, and that every reasonable precaution should be taken to avoid a premature delivery in such a setting. Furthermore, the standard of care requires him to supervise his subordinates and ensure that they are carrying out his orders and adhering to the standards of care themselves.

By his own notes, he observed on December 27 that Ms. Rodriguez was pregnant with twins and was experiencing contractions. He also noted her expected delivery date was not until March, so if labor was imminent the babies would be very premature. Part of his plan was that Rodriguez continued to be monitored. Although he did note Ms. Rodriguez's pre-existing appointment with Dr. Spears on the 28th, and left a corresponding order that she see an Obstetrician as soon as possible, he breached the standard of care by failing to follow up to see if she actually went to that appointment or what the results were. Had he done so, he would have realized that Ms. Rodriguez never did get to see Spears or any other Obstetrician. Shaw also breached the standard of care by never following up with Ms. Rodriguez himself to see if she continued to have contractions or if her condition changed in any way.

Finally, the facility itself is subject to a standard of care. Primarily, because it is inevitable that some of its inmates will be pregnant women, and because those inmates are not free to seek their own medical care, it must ensure that its providers at the jail are aware of the standards outlined above and adhere to them. SHP failed to do that here.

9

Injuries Sustained and Causal Link Between Breach of Standards of Care and Injuries

There is a reasonable degree of medical probability that had Irene Rodriguez delivered in a medical facility with appropriate equipment and personnel trained to deliver and manage premature infants, the severe neurodevelopmental disability the two infants now experience would have been avoided.  Stabilization of VLBW infants is a highly specialized skill practiced by people certified by the American Heart Association's Neonatal Resuscitation Program.  It also requires a dedicated environment and specialized equipment sized for very low birth weight infants.  This equipment includes radiant warmers, thermal mattresses and polyethylene wraps used to maintain a normal body temperature in these very small newborns.  Also needed are face-masks sized for these infants which are much smaller than those needed for term-born infants and adults.  It is highly unlikely that the Navarro County Jail or even the EMS units responding to the scene possessed face-masks and oxygen delivery equipment suitable for effective positive pressure ventilation in VLBW infants.  Without this equipment and training, maintaining normal body temperature and effectively supporting respirations of very preterm infants are not possible.

By delivery in an out-of-hospital environment, the infants were exposed to hypothermia, hypoxia and hemodynamic instability that more likely than not caused severe IVH, cystic PVL and the resultant neurologic disability.  The rapid nature of the delivery and transport by EMS left Navarro Regional Hospital little time to prepare for these critical infants.  As a Level 2 Neonatal Intensive Care Unit (NICU) they are capable of stabilization of VLBW infants prior to transport to a Level 3 Center but do not offer comprehensive care to this kind of patient.  Had Irene Rodriguez been transported to Navarro Regional Hospital in a timely manner (at a minimum, in the several days prior to delivery), Navarro Regional Hospital would have either (a) ensured that staff skilled in neonatal resuscitation could have been assembled and present at the delivery with appropriate equipment, or (b) transported her to a center with a Level 3 NICU that specializes in the care of infants born weighing less than 1500g and with a gestational age of <32 weeks.  Based on my experience at a level 3 Center, level 2 Centers routinely make these transfers.  In either scenario the infants' temperature, breathing and perfusion would more likely than not have been properly controlled preventing the subsequent, severe brain injury.

Specific medical causation for each child is as follows:

Analeyah Rodriguez was noted to be breathing spontaneously immediately following delivery but stopped breathing soon thereafter. An attempt to stabilize her condition was made by

10

corrections officers and EMS but records from Navarro Regional Hospital show that she was severely hypothermic and in need of assistance breathing upon arrival.  The Apgar scores of 1 at one minute and 5 at five minutes describe an infant in distress and in need of ongoing resuscitation.  Medical records from Navarro Regional Hospital show that her condition soon worsened and report an approximately 15 minute period during which she required CPR due to low blood oxygen saturations and low heart rate (bradycardia).  Her heart rate, breathing and oxygen saturations did not stabilize until an endotracheal tube was placed at approximately 2.5 hours of life.  During this period, the flow of oxygenated blood to her brain and body was compromised.  This resulted in hemodynamic instability and hypoxic/ischemic stress. Hemodynamic instability in a newborn VLBW infant is well known to cause intraventricular hemorrhage while hypoxic/ischemic stress has been clearly linked to the development of periventricular leukomalacia. (2,3) The finding of severe IVH at 3 days of life is consistent with an injury suffered at the time of delivery and the resulting post-hemorrhagic hydrocephalus is consistent with progression of severe IVH.  The later diagnosis of cystic PVL is also consistent with injury at the time of birth and is directly linked to the diagnosis of cerebral palsy with left sided hemiplegia. The damage to her brain is permanent and her impairment will be life-long. In short, her injuries were caused by hemodynamic instability and hypoxic/ischemic stress resulting from being born in a jail cell without any appropriately trained personnel or supportive equipment present.  Antenatal therapies such as steroid treatment or magnesium sulfate would also have mitigated Analeyah's catastrophic injuries.  All of these disabilities, more likely than not, would have been avoided if Dr. Shaw, Nurse Hullett, and SHP had not breached the standard of care as described above.

Benjamin Rodriguez's Apgar scores as assigned by EMS were 7 at one minute and 4 at 5 minutes.  Decreasing Apgar scores from 1 to 5 minutes show an infant who was vigorous at birth but whose condition worsened over the first 5 minutes of life.  This is consistent with the narrative provided by EMS and is very likely due to inadequate positive pressure ventilation and thermoregulation.  Skills required to adequately stabilize a VLBW infant are beyond those normally expected of EMS.  Records from Navarro Regional Hospital note that he required ongoing positive pressure ventilation on admission due to respiratory distress and that he remained unstable until the arrival of the BUMC transport team approximately 2 hours later. The prolonged period of hemodynamic instability almost certainly led to the finding of encephalopathy at 3 days of life along with the findings of severe IVH and cystic PVL which are directly linked to the later diagnosis of global developmental delay and spastic quadriparesis. The damage to his brain is permanent and severe and he will require life-long medical care.  As

11

with Analeyah, had Benjamin received antenatal therapy and the presence of appropriately trained personnel and supportive equipment at his delivery, the prolonged period of hemodynamic instability and hypoxic stress—as well as the resulting injuries—would more likely than not have been avoided. All of Benjamin's disabilities, more likely than not, would have been avoided if Dr. Shaw, Nurse Hullett, and SHP had not breached the standard of care as described above.

The optimal result for these infants would have been realized had Irene Rodriguez been transferred to a hospital as soon as the risk of preterm delivery became evident. Had transfer taken place on January 2, 2018 when she presented with contractions for the third time, she very likely would have received antenatal steroids which have not only been proven to improve outcomes in VLBW infants but specifically have been shown to decrease the rate of severe intraventricular hemorrhage. If, while hospitalized, preterm labor became imminent she would have likely received magnesium sulfate to help prevent cerebral palsy in the infants. As stated above, Navarro Regional Hospital would almost certainly have transferred Ms. Rodriguez to a Level 3 NICU such as BUMC. Delivery at a center with a Level 3 NICU would have more likely than not prevented the severe brain injury suffered by these infants because they would have benefited from therapies proven to decrease IVH and PVL and delivery in the hands of experienced and properly trained personnel would very likely have prevented the severe hypothemia, hypoxia and hemodynamic instability needed to cause severe IVH and cystic PVL.

In sum, breaches of the standard of care by Linda Hullett, Dr. Shaw, and SHP caused Irene Rodriguez to give birth to premature infants in a jail cell, a wholly unsafe environment for such a delivery. The breaches also prevented Rodriguez from receiving any antenatal therapies. Being delivered under such circumstances caused hypoxic/ischemic stress, hypothemia and prolonged hemodynamic instability in both twins, which in turn caused serious brain injuries. It is more likely than not that all of this would have been avoided had Defendants transported Ms. Rodriguez to a hospital in a timely manner.

Sincerely,

Donald F. Meyn Jr., MD
Neonatologist
Diplomate, American Board of Pediatrics
Fellow, American Academy of Pediatrics

PLS.' APPX. 091

**Curriculum Vitae**

**Personal Information:**
Donald F. Meyn Jr.
Citizen of the United States of America
1415 Campden Dr
Baton Rouge, LA 70810
dmeynjr@gmail.com
225-993-1274

**Rank**:
Neonatologist
Infamedics
Baton Rouge, LA

**Education:**

| | | |
|---|---|---|
| 1988 – 1993 | Jesuit High School | New Orleans, LA |
| 1993 – 1995 | University of Texas at Austin | Austin, TX |
| 1995 – 1997 | Louisiana State University BS – Zoology | Baton Rouge, LA |
| 1997 – 1999 | Our Lady of the Lake College AS – Emergency Health Science | Baton Rouge, LA |
| 1999 – 2003 | Louisiana State University School of Medicine Doctor of Medicine | New Orleans, LA |

**Licensure:**

| | |
|---|---|
| 2004 – 2009 | Alabama Medical Licensure Commission |
| 2009 - present | Louisiana Medical Licensure Commission |

**Postdoctoral Training:**

| | |
|---|---|
| 2003 – 2004 | Pediatric Internship: University of Alabama at Birmingham |
| 2004 – 2006 | Pediatric Residency: University of Alabama at Birmingham |
| 2006 – 2009 | Neonatology Fellowship: University of Alabama at Birmingham |

**American Board of Pediatrics Certifications**

| | |
|---|---|
| 2007 - present | General Pediatrics |
| 2010 - present | Neonatal-Perinatal Medicine |

**Awards/Honors:**

| | |
|---|---|
| 2007 | Young Researcher Award Winner for Basic Science at Southern Society of Pediatric Research |
| 2007 | UAB Department of Pediatrics Dixon Fellowship Recipient |

**Professional Societies:**
     2003 – present     Fellow - American Academy of Pediatrics


**Abstracts:**

**Meyn DF**, Harvey CR, Ness JN, Washington J Regulation. of p53 in Neonatal Hypoxia and Ischemia, Southern Society of Pediatric Research, Atlanta, GA, March 2006

**Meyn DF**, Harvey CR, Ness JN. p53 Dependent Regulation of AIF in Neonatal Hypoxia-Ischemia, Southern Society of Pediatric Research, New Orleans, LA February 9, 2007

**Meyn DF**, Harvey CR, Ness JN. Neonatal Hypoxia-Ischemia Causes Bax-dependent AIF Increase, Pediatric Academic Society, Honolulu, HI

**Meyn DF**, Ness JN, Ambalavanan N, Carlo W. Prophylactic Phenobarbital and Whole-Body Cooling for Neonatal Hypoxia-Ishcemia

**Meyn DF,** Voelker C, Schorr M, Morris, A. Reducing Morbidities in Mircopremature Infants. NICQ Next 2 – Care of the Micropremature Infant. Woman's Hospital, Baton Rouge, LA. 2016

**Meyn DF**, Voelker C, Schorr M, Morris, A. Improving Survival Without Morbidity in Micropremature Infants NICQ Next 2 – Care of the Micropremature Infant. Woman's Hospital, Baton Rouge, LA. 2017

**Meyn DF**, Voelker C, Schorr M, Morris, A. Improving Survival Without Morbidity in Micropremature Infants NICQ 2018-2019 – Care of the Micropremature Infant. Woman's Hospital, Baton Rouge, LA. 2018

**Meyn DF**, Voelker C, Schorr M, Morris, A. Improving Survival Without Morbidity in Micropremature Infants: Thermoregulation – Care of the Micropremature Infant. Woman's Hospital, Baton Rouge, LA. 2019


**Oral Presentations:**
     2006     Cell Death Mechanisms in Neonatal Hypoxia and Ischemia, Southern Society of Pediatrics
     2007     Role of Apoptosis Inducing Factor in Neonatal Hypoxia and Ischemia, 31st Southeastern Conference on Perinatal Research
     2007     p53 Dependent Regulation of Apoptosis Inducing Factor

**Curriculum Vitae**

(AIF) in Neonatal Hypoxia and Ischemia

**Publications:**

Meyn DF, Ness JN, Ambalabanan N, Carlo C. Prophylactic Phenobarbital and Whole Body Cooling for Neonatal Hypoxic-Ischemic Encaphalopathy J Pediatr 2010; 157:334-6

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION
 3   IRENE RODRIGUEZ, individually   )
     and as parent and legal         )
 4   guardian of A.R., and Maria     )
     Antonia Santos as representative)
 5   of the estate of B.R.,          )
          Plaintiffs,                )
 6                                   )   CIVIL ACTION NO.
     V.                              )   3:20-cv-00045D
 7                                   )
     SOUTHERN HEALTH PARTNERS, INC., )
 8   LINDA HULLETT, and              )
     DR. GRADY SHAW,                 )
 9        Defendants.                )
10
11    * * * * * * * * * * * * * * * * * * * * * * * * * *
12     ORAL AND VIDEOTAPED DEPOSITION OF DONALD F. MEYN, JR., M.D.
                      REPORTED REMOTELY
13
       * * * * * * * * * * * * * * * * * * * * * * * * * *
14
15
16
17      ORAL AND VIDEOTAPED DEPOSITION OF DONALD F. MEYN, JR.,
18   M.D., being produced as a witness at the instance of the
19   Defendants, taken in the above-styled and numbered cause on the
20   14th day of June, 2022, from 10:02 a.m. to 3:29 p.m., before
21   Rhonda Jacks Certified Shorthand Reporter in and for the State
22   of Texas, reported remotely by machine shorthand.  The witness
23   is located in Baton Rouge, Louisiana.  This deposition is being
24   taken remotely and in accordance with the Federal Rules of
25   Civil Procedure and the agreements hereinafter set forth:
```

Page 1

1    expert that since this is your only case you don't have a

2    designation of the amount of time you spend as an expert.

3    Right?

4         A    That's correct.

5         Q    Are you the supervisor for the nurses at any of the

6    three hospitals where you work?

7         A    Define what you mean by supervisor.

8         Q    Sure.  Are you employed at those hospitals to

9    supervise certain nurses that are in any particular role that

10   are working under you, meaning you're responsible for

11   overseeing what they do, they would report to you and you would

12   be considered their boss?

13        A    In my role as a neonatologist I definitely supervise

14   nurses.  However, I am not paid specifically or have a specific

15   title that goes beyond that.  So just as my role seeing

16   patients everyday working with nurses everyday, I supervise in

17   that way.

18        Q    So it sounds like what you're explaining is you --

19   you work alongside the nurses in the hospital.  And I assume

20   you have an open door policy that they would be able to come to

21   you with questions, but you are not designated in title as

22   their supervising practitioner.  Is that fair to say?

23        A    Yes.

24        Q    Okay.  Do you know the difference between the scopes

25   of practice for an LPN and an RN?

Page 52

```
 1                  MR. TITTLE:  Objection; form.

 2       A    I think the standard of care requires proper

 3  documentation of a medical encounter.

 4       Q    So you are saying that when -- when an inmate is seen

 5  by a medical provider in a correctional setting, that that

 6  needs to be documented?

 7       A    Yes.

 8       Q    Does the standard of care call for any particular

 9  type of forms or documentation used within a correctional

10  facility setting?

11                  MR. TITTLE:  Objection; form.

12       A    I am not aware that there is a specific type of

13  documentation other than one that would contain information

14  regarding the patient's history, current vital signs and

15  pertinent aspects of physical exam, any problems that may be

16  ongoing or medications that may be taken or allergies that the

17  person may have and any specific plan that's required by that

18  person.

19       Q    What is the standard of care for correctional

20  healthcare providers to make referrals to providers outside the

21  jail or prison?

22                  MR. TITTLE:  Objection; form.

23       A    I think that standard is the same as it would be the

24  same for anyone else regardless of whether you're inside a

25  correctional facility or not.
```

PLS.' APPX. 097

```
1        Q     And so if you believe that the standard of care for
2   making referrals is the same in a correctional facility, then
3   what is that standard of care in your opinion?
4        A     I think if the patient requires more specific or
5   specialized care than the admitting or in-take or provider that
6   we're talking about is able to do, then that consult to a
7   specialist needs to be done in a timely manner.
8        Q     What's the standard of care for a correctional
9   healthcare provider in arranging transportation to appointments
10  that the inmates might have with outside providers?
11       A     I think that standard would be the same as somebody
12  in any type of institution or had any transportation difficulty
13  that if the patient required specialized care, then an effort
14  to expedite transport of that patient from wherever they are to
15  wherever they need to go needs to be done in an efficient
16  manner.
17       Q     Do you have any knowledge or experience in what role
18  the medical providers inside a jail or prison play in arranging
19  transportation for an inmate who needs to see an outside
20  provider?
21       A     So you're asking me specifically how that is done?
22       Q     Yes.
23       A     I do not know the specifics of how that
24  transportation within an institution or facility like this is
25  accomplished.
```

Page 82

PLS.' APPX. 098

1   who performed the mouth-to-mouth suction or resuscitation in

2   the absence of having a suction device immediately available?

3       A    No.  No.  I think that guard did as much as possible

4   for that baby.

5       Q    On the page 12, the last paragraph, you say in sum,

6   breaches of the standard of care by Linda Hullett, Dr. Shaw and

7   SHP caused Irene Rodriguez to give birth to premature infants

8   in a jail cell.  When you say breaches in the standard of care,

9   what are you referring to there?

10      A    Well, as I have stated previously on page -- let's

11  see -- on page nine from Nurse Hullett, failed to follow Dr.

12  Shaw's order from December 27th that Irene Rodriguez needed to

13  see an obstetrician as soon as possible.  Failed to ensure that

14  Ms. Rodriguez attended a pre-scheduled appointment with Dr.

15  Spears on December 28th.  Failed to ensure that Ms. Rodriguez

16  was examined by an obstetrician or transferred to a hospital

17  despite numerous signs of impending labor.  Failed to urgently

18  call EMS when learning of regular contractions at three

19  minutes.  Let's see.  And then as for Dr. Shaw, he breached --

20  this is on page nine, last paragraph -- breached the standard

21  of care by failing to follow-up to see if she actually went to

22  the appointment or what the results were had she gone.  And

23  then to the facility, because its -- it employed providers

24  that were -- Ensure that its providers at the jail are aware of

25  the standards outlined and that they adhere to them.

Page 127

1     Q    Have you spoken to any other types of colleagues or

2    healthcare providers or professors even about the facts of this

3    case and your opinions?

4    A    No.

5    Q    Are there any additional medical records you're

6    waiting on to review?

7    A    No.

8    Q    If you do end up reviewing any additional materials,

9    would you please let Mr. Tittle know right away so that we can

10    get an update on that?

11    A    Yes.

12           MS. DRAKE:  I will pass the witness.

13           MR. TITTLE:  Thank you.  I just have a couple of

14    quick follow-ups.

15                     EXAMINATION

16    BY MR. TITTLE:

17    Q    All right, Dr. Meyn.  Have you intended to suggest in

18    any way during today's deposition testimony that there is a

19    difference in the standard of care for either Linda Hullett or

20    Dr. Grady Shaw due to their working in a correctional setting

21    versus a non-correctional setting?

22    A    No.

23    Q    With respect to recognizing a medical condition or

24    diagnosing a medical condition including decisions to refer to

25    specialists or decisions to hospitalize, is there a difference

1  in the standard of care expected of medical providers between a

2  correctional setting and a non-correctional setting?

3           MS. DRAKE:  Form and foundation.

4      A    No.

5      Q    And let's see.  Just to clarify, you were asked a

6  couple of questions by Ms. Drake about whether you had reviewed

7  any records prior to Ms. Rodriguez's incarceration, and I think

8  maybe earlier in the deposition you said that you didn't recall

9  any, and then I think you answered that you recalled looking at

10  Dr. Spears' records at some point.  So I just want to ask you

11  to clarify that.  Do you know if at the time you wrote your

12  report in this case you had reviewed Dr. Spears' records of

13  Irene pre-incarceration?

14      A    Yes.  At the time I wrote my report I didn't -- I had

15  reviewed those records.  However, I did not review those

16  records in preparation for this deposition.  Thank you.

17      Q    Okay.  In the last few days you haven't reviewed

18  them, but it's your belief that you reviewed them, and they

19  were considered as -- when you were giving your -- your

20  opinions in your report dated September 16, 2021?

21      A    Yes.

22      Q    And with respect to the questions Ms. Drake asked you

23  about Dr. Cooke, she was asking you to give some opinions about

24  his advice.  Do you have -- Do you have any -- You don't have

25  firsthand knowledge or any kind of a recording of what she

1    That pursuant to the information made available to me at

2    the time said deposition was taken, the following includes all

3    parties of record:

4    MR. DON TITTLE, Attorney for the Plaintiffs

5    MS. JO BETH DRAKE, Attorney for the Defendants

6    That before the conclusion of the deposition, the witness,

7    DONALD F. MEYN, JR., M.D., did request a review of this

8    transcript pursuant to Rule 30(e)(1).

9    I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties or attorneys in

11   the action in which this proceeding was taken, and further that

12   I am not financially or otherwise interested in the outcome of

13   the action.

14

15   Certified to by me, this 27th day of June, 2022.

16

17

18

19

20

21   RHONDA JACKS, CSR #3665

     Expiration Date:  10-31-2023

22   VERITEXT LEGAL SOLUTIONS

     Firm Registration No. 571

23   300 Throckmorton Street

     Suite 1600

24   Fort Worth, TX 76102

     817-336-3042

25

Page 144

Page 1

                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
                        DALLAS DIVISION

IRENE RODRIGUEZ,              )
individually and as          )
parent and legal guardian    )
of A.R., and Maria           )
Antonia Santos as            )
representative of the        )
estate of B.R.,              )
                             )  CIVIL ACTION NO.
              Plaintiffs,    )
                             )  3:20-CV-00045-D
VS.                          )
                             )
SOUTHERN HEALTH PARTNERS,    )
INC., LINDA HULLETT, and     )
DR. GRADY SHAW,              )
                             )
              Defendants.    )
        -----------------------------------
           ORAL AND VIDEOTAPED DEPOSITION OF
                    IRENE RODRIGUEZ
                   OCTOBER 28, 2021
        -----------------------------------

     ORAL AND VIDEOTAPED DEPOSITION OF IRENE RODRIGUEZ,
produced as a witness at the instance of the Defendants,
and duly sworn, was taken in the above-styled and
numbered cause on October 28, 2021, from 9:36 a.m. to
4:12 p.m., before Mindy E. Bressert, CSR in and for the
State of Texas, reported by machine shorthand, at the
Law Offices of Don Tittle, PLLC, 8350 N. Central
Expressway, Suite M1085, Dallas, Texas, pursuant to the
Federal Rules of Civil Procedure and the provisions

Page 143

1                    MR. TITTLE:  Let's take a short break.

2                    MS. DRAKE:  Sure.

3                    THE VIDEOGRAPHER:  Off the record.  The

4     time is 1:28.

5                    (Lunch recess from 1:28 p.m. to 2:15.)

6                    THE VIDEOGRAPHER:  Back on the record.  The

7     time is 2:15.

8          Q.  (BY MS. DRAKE)  Okay.  You told me before the

9     break that the twins first went to the Navarro Regional

10    Hospital --

11         A.  Uh-huh.

12         Q.  -- where you were, and then went from there to

13    Baylor Hospital in Dallas, is that right?

14         A.  Yes.

15         Q.  Okay.  And then how long did they both stay at

16    Baylor?

17         A.  Like a week.

18         Q.  Did they leave at the same time?

19         A.  No.

20         Q.  Okay.  Let's start with Analeyah then.  When

21    did she leave?

22         A.  Analeyah did not leave sooner.  Benjamin left

23    that one week, or two weeks, around there.

24         Q.  And where did Benjamin go from there?

25         A.  Children's Hospital.

Page 144

1        Q.   To where?

2        A.   Children's Hospital.

3        Q.   And that's the one in Dallas, too?

4        A.   Yes.

5        Q.   And then Analeyah went to Children's, too,

6    right?

7        A.   I -- I went and ordered them to send her over

8    there.

9        Q.   And why did you do that?

10       A.   I feel like Baylor did not do a great job.

11       Q.   What were you unhappy with about Baylor

12   treating Analeyah?

13       A.   Not Analeyah, Benjamin.  They were more

14   concerned on his brain than his stomach.

15       Q.   So you were unhappy that Baylor was focused

16   more on Benjamin's brain than dealing with his stomach

17   problems?

18       A.   Yeah.

19       Q.   And why is it that you picked Children's

20   Health?

21       A.   Because they had sent Benjamin from there to

22   Children's.  And as soon as we arrived there, the

23   doctors there told me that the more important is his

24   stomach, not his brain.  At this moment, the fluid, they

25   could take it out, but his stomach, he was already

Page 230

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION
 3  IRENE RODRIGUEZ,              )
    individually and as parent   )
 4  and legal guardian of        )
    A.R., and Maria Antonia      )
 5  Santos as representative     )
    of the estate of B.R.,       )
 6                               )
                    Plaintiffs,  )
 7                               ) CIVIL ACTION
    VS.                          )
 8                               ) NO.: 3:20-CV-00045-D
                                 )
 9  SOUTHERN HEALTH PARTNERS,    )
    INC., LINDA HULLETT, and     )
10  DR. GRADY SHAW,              )
                                 )
11                  Defendants.  )
12
13               REPORTER'S CERTIFICATION
14             DEPOSITION OF IRENE RODRIGUEZ
15                   OCTOBER 28, 2021
16
17          I, Mindy E. Bressert, Certified Shorthand
18  Reporter in and for the State of Texas, hereby certify
19  to the following:
20          That the witness, IRENE RODRIGUEZ, was duly
21  sworn by the officer and that the transcript of the oral
22  deposition is a true record of the testimony given by
23  the witness;
24          I further certify that pursuant to FRCP Rule
25  30 (f) (1) that the signature of the deponent:
```

Page 231

1            ___xx___ was requested by the deponent or a

2    party before the completion of the deposition and is to

3    be returned within 30 days from date of receipt of the

4    transcript.  If returned, the attached Changes and

5    Signature page contain any changes and the reasons

6    therefor;

7            _____ was not requested by the deponent or

8    a party before the completion of the deposition.

9            I further certify that I am neither counsel

10   for, related to, nor employed by any of the parties or

11   attorneys in the action in which this proceeding was

12   taken, and further that I am not financially or

13   otherwise interested in the outcome of the action.

14           Subscribed and sworn to by me this 4th day of

15   November, 2021.

16

17

18   _____
                                         *Mindy E. Bressert*

                     Mindy E. Bressert

19                   Texas CSR No. #11780

                     Expiration Date:  April 30, 2023

20                   Elite Deposition Technologies, Inc.

                     Firm Registration No. 10110

21                   400 N. St. Paul Street

                     Suite 1340

22                   Dallas, Texas 75201

                     214.698.5199

23                   www.EliteDeps.com

24

25

DR. MICHELLE SPEARS  -  May 10, 2023

```
                 IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
                         DALLAS DIVISION


                                    )
IRENE RODRIGUEZ, individually       )
and as parent and legal             )
guardian of A.R., and Maria         )
Antonia Santos as                   )
representative of the estate        )
of B.R.,                            )
                                    )
               Plaintiffs,          )  CIVIL ACTION
                                    )
v.                                  )  NO.: 3:20-cv-00045-D
                                    )
SOUTHERN HEALTH PARTNERS,           )
INC., LINDA HULLETT, and            )
DR. GRADY SHAW,                     )
                                    )
               Defendants.          )
                                    )
```

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

DR. MICHELLE SPEARS

MAY 10, 2023

VOLUME 1

-----------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF DR. MICHELLE SPEARS,

produced as a witness at the instance of the PLAINTIFFS, and

duly sworn, was taken in the above-styled and numbered cause on

May 10, 2023, from 1:25 p.m. to 3:29 p.m., before Amber Garcia,

Notary Public in and for the State of Texas, reported by

machine shorthand, at the offices of Dr. Michelle Spears,

400 Hospital Drive, Suite 210, Corsicana, Texas, pursuant to

the Federal Rules of Civil Procedure and the provisions stated

on the record or attached hereto.

DR. MICHELLE SPEARS  -  May 10, 2023

1        A.   Well, I would not be caring for that patient who

2   would be incarcerated during that period of incarceration,

3   other than prenatal visits or the hospital.

4        Q.   (BY MS. MCMILLON)  Okay.  You didn't, typically, go

5   out to the jail?

6        A.   I've never gone out to the jail.

7        Q.   Okay.  So your experience with patients who are in

8   the jail is just to communicate back and forth with whoever is

9   calling you about that patient, correct?

10       A.   So I rarely communicate.  There are rarely questions

11  that are -- are asked of us.  I would say appointments would be

12  generally done by the front desk.  Communications that I have

13  with the jail would generally be in direct care of the patient,

14  if they bring the patient in for prenatal visits, ultrasounds,

15  labs or to labor and delivery for acute care.

16       Q.   Okay.  The standard of care would be different in a

17  medical setting versus in the jail setting, though, correct?

18            MR. TITTLE:  Objection, form.

19       A.   The standard of care?  The standard of care, in my

20  opinion, would be the standard of care.

21       Q.   (BY MS. MCMILLON)  Okay.

22       A.   I would not see that being different in jail versus

23  to a person who's not incarcerated.

24       Q.   Okay.  This patient wouldn't have been able to pick

25  up a cell phone and call you anytime she wanted, though, true?

DR. MICHELLE SPEARS  -  May 10, 2023

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION


 3                                    )
    IRENE RODRIGUEZ, individually     )
 4  and as parent and legal           )
    guardian of A.R., and Maria       )
 5  Antonia Santos as                 )
    representative of the estate      )
 6  of B.R.,                          )
                                      )
 7                   Plaintiffs,      )  CIVIL ACTION
                                      )
 8  v.                                )  NO.: 3:20-cv-00045-D
                                      )
 9                                    )
    SOUTHERN HEALTH PARTNERS,         )
10  INC., LINDA HULLETT, and          )
    DR. GRADY SHAW,                   )
11                                    )
                     Defendants.      )
12

13                  REPORTER'S CERTIFICATION

14            DEPOSITION OF DR. MICHELLE SPEARS

15                      MAY 10, 2023

16

17     I, Amber Garcia, Notary Public in and for the State of

18  Texas, hereby certify to the following:

19     That the witness, DR. MICHELLE SPEARS, was duly sworn by

20  the officer and that the transcript of the oral deposition is a

21  true record of the testimony given by the witness;

22     That the deposition transcript was submitted on

23  May 22, 2023 to the witness or to the attorney for the

24  witness for examination, signature and return to me by

25  June 21, 2023;
```

ON-THE-RECORD REPORTING
(214) 956-9950

DR. MICHELLE SPEARS  -  May 10, 2023

```
 1        That the amount of time used by each party at the

 2   deposition is as follows:

 3        MR. DON TITTLE.....00 HOUR(S):59 MINUTE(S)
          MS. WENDY A. MCMILLON.....00 HOUR(S):54 MINUTE(S)
 4        MR. TY BAILEY.....00 HOUR(S):00 MINUTE(S)

 5        That pursuant to information given to the deposition

 6   officer at the time said testimony was taken, the following

 7   includes counsel for all parties of record:

 8        MR. DON TITTLE, Attorney for Plaintiffs

 9        MS. WENDY A. MCMILLON, Attorney for Defendants

10        MR. TY BAILEY,  Attorney for Witness

11        That $_____ is the deposition officer's charges to

12   the Plaintiffs for preparing the original deposition transcript

13   and any copies of exhibits;

14        I further certify that I am neither counsel for, related

15   to, nor employed by any of the parties or attorneys in the

16   action in which this proceeding was taken, and further that I

17   am not financially or otherwise interested in the outcome of

18   the action.

19        Certified to by me this 22nd day of May, 2023.

20

21                        _____

                          Amber Garcia
22                        Notary ID No. 13426953-9
                          Cert. Expires:  3-24-2027
23                        On-The-Record Reporting
                          Firm Registration No. 406
24                        4131 N. Central Expressway
                          Suite 977
25                        Dallas, Texas 75204
                          (214) 956-9950
```

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION

 3

 4   IRENE RODRIGUEZ,            *
     Individually and as parent *
 5   and legal guardian of A.R., *
     and Maria Antonia Santos as *
 6   representative of the       *
     estate of B.R.              *
 7                               *
     VS.                         * CIVIL ACTION CA NO.
 8                               * 3:20-cv-00045-D
     SOUTHERN HEALTH PARTNERS,   *
 9   INC., LINDA HULLETT, AND    *
     DR. GRADY SHAW              *
10

11

12          ****************************************
             REMOTE ORAL DEPOSITION OF CLAIRE TESKE
13                    DECEMBER 12, 2022
             ****************************************
14

15

16

17

18           ANSWERS AND DEPOSITION OF CLAIRE TESKE,

19   produced as a witness at the instance of the Plaintiff,

20   taken in the above-styled and -numbered cause on the

21   12th day of December, 2022, at 8:58 a.m., before Susan

22   M. Foreman, a Certified Shorthand Reporter in and for

23   the State of Texas, via Zoom teleconference, in the City

24   of Dallas, County of Dallas, and State of Texas, in

25   accordance with the Federal Rules of Civil Procedure.
```

```
 1        Q.   Are the national standards for nurses set forth

 2   in any particular document?

 3              MS. DRAKE:   Objection, form.

 4        A.   I'm not sure what -- what you're asking.

 5        Q.   You -- you were saying that --

 6        A.   A document, umm.

 7        Q.   Okay.

 8              The reason I said document is I couldn't

 9   think of the -- the right word.  But are they set forth

10   in any particular body of work?  In other words, like

11   you have the NCCHC that you referenced; that's, you

12   know, a body of work.  Is there anything like that that

13   pertains to nursing standards --

14        A.   Yeah, I think --

15        Q.   -- on a national level?

16        A.   There's Board -- Board of Registered Nursing;

17   and then there's Board -- the Board of Licensed

18   Vocational Nursing, and they have standards that are --

19   that are available or posted.

20        Q.   Do you -- do you consider those to be the

21   standard of care, as setting forth the standard of care?

22        A.   Yes, certainly one -- one entity that does that

23   sort of thing.  But there's lots of, you know, different

24   organizations and things that also produce suggestions

25   for standard of care and suggestions for certain types
```

1    of treatment or whatever.  So there's a whole lot of

2    information out there.

3         Q.   Well, if you can --

4         A.   The basic would be the Board -- the Board of

5    Nursing would be basic standard, yes.

6         Q.   The Board of Nursing would be the basic

7    standard of care?

8         A.   Yes.

9         Q.   And that's a national organization?

10        A.   No, I think that those are individual states.

11   They have Board of Registered Nursing in each state...

12   And there's -- I believe there's a -- a national

13   organization, the American Nursing Association, and that

14   probably has a set of their standards.

15        Q.   Those standards that you just mentioned, those

16   are not further broken down by correctional setting

17   versus noncorrectional setting, are they?

18        A.   Well, yes, because the nat- -- the -- what I --

19   the organization we talked about earlier, the NCCHC, is

20   a national, and it's corrections.  So it's -- it's --

21   it's a separate just for corrections.

22        Q.   I -- I understand that.

23             But the national or the Board of --

24             Strike that.

25             The -- you said the Board of Nursing, is

 1  that what you said, that would be on a statewide

 2  level --

 3      A.   Yeah.

 4      Q.   -- each state would have that?  Did you --  is

 5  that what the --

 6      A.   Yeah.

 7      Q.   -- the phrase you used?

 8      A.   Yes.

 9      Q.   Okay.

10      A.   Yes.  And they have their -- their standards

11  for the requirements, the testing requirements, that

12  sort of thing.

13      Q.   They also have requirements on scope of

14  authority, correct?

15      A.   Yes, I believe so.

16      Q.   And those -- that scope of authority in those

17  standards is not broken down by correctional setting

18  versus noncorrectional setting, right?

19      A.   No, I don't believe they are.

20           MS. DRAKE:  Objection, form.

21      Q.   And you mentioned the American Board of

22  Nursing, I believe.  Did they say they also have

23  suggestions and standards?

24      A.   The American Association of Nursing; and

25  there's a -- there's several different organizations for

1  parties to the action in which this deposition is taken,

2  and further that I am not a relative or employee or any

3  attorney or counsel employed by the parties hereto, or

4  financially interested in the action.

5          Certified to me this 30th day of December,

6  2022.

7

8          _____

           Susan M. Foreman
9          Texas CSR Number 5240
           On-The-Record Reporting
10         25 Highland Park Village
           Suite 100-333
11         Dallas, Texas 75205
           Certification Expires: 12-31-24
12         susan@otr-reporting.com

13

14  Taxable Cost of original charged to Plaintiff
    $ _____
15  Attorney: Mr. Don Tittle

16

17

18

19

20

21

22

23

24

25

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IRENE RODRIGUEZ,            )
Individually and as        )
parent and legal           )
guardian of A.R. and       )
Maria Antonia Santos as    )
representative of the      )
estate of B.R.,            )
                           ) CIVIL ACTION
        Plaintiffs,        )
                           ) NO.: 3:20-CV-00045-D
VS.                        )
                           )
SOUTHERN HEALTH            )
PARTNERS, INC., LINDA      )
HULLETT, and DR. GRADY     )
SHAW,                      )
                           )
        Defendants.        )


------------------------------------

VIDEOCONFERENCE ORAL DEPOSITION OF

MARK B. LANDON, M.D.

JANUARY 5, 2023

------------------------------------


    VIDEOCONFERENCE ORAL DEPOSITION OF MARK B.

LANDON, M.D., produced as a witness at the

instance of the Plaintiff, and duly sworn, was

taken in the above-styled and numbered cause on

January 5, 2023, from 11:04 a.m. to 3:32 p.m., via

Zoom Videoconference, before Melody A. Monk, CSR

Electronically signed by MELODY MONK (401-154-423-4513)                    2730ceef-a5fb-4513-b275-fabcb4d25d0c

Page 16

1    recall which side I was looking at the case for

2    involving an incarcerated pregnant woman.

3        Q.  Dr. Landon, you indicated in your report

4    that -- and I'm going to paraphrase, that you are

5    familiar with the care -- well, I'm not going to

6    paraphrase.  I can just read it:  I am also

7    familiar with the care of pregnant incarcerated

8    women as this population is served by Ohio State

9    University Medical Center.

10           That's your familiarity with medical

11    care provided to -- in a correctional setting; is

12    that true?

13        A.  True.

14        Q.  Have you yourself ever provided medical

15    care in a correctional setting?

16        A.  No.

17        Q.  You've never been employed by any --

18    anyone that either runs, runs a jail or a prison,

19    any type of correctional facility, to provide

20    medical care?

21        A.  Not directly.

22        Q.  Other than simply the fact that some

23    incarcerated women are served by Ohio State

24    University Medical Center, you don't have any, any

25    additional knowledge of the provision of medical

Electronically signed by MELODY MONK (401-154-423-4513)                2730ceef-a5fb-4513-b275-fabcb4d25d0c

Page 178

1    STATE OF TEXAS        )

2    COUNTY OF DALLAS      )

3

4            I, Melody A. Monk, Certified Shorthand

5    Reporter, duly qualified in and for the State of

6    Texas, certify that the foregoing pages

7    constitutes a full, true and correct transcript of

8    the proceedings had before me.

9

10            I further certify that I am neither

11   counsel for, nor related to, any parties in this

12   cause and am not financially interested in the

13   outcome.

14

15            GIVEN UNDER MY HAND OF OFFICE on this the

16   _____ day of _____, 2023.

17

18

19   _____

20                      Melody A. Monk, RPR
                        Texas CSR No. 3613
21                      Expires 10.31.2024

22   ON-THE-RECORD REPORTING
     Firm Registration No. 406
23   25 Highland Park Village
     Suite 100-333
24   Dallas, Texas 75205
     214.956.9950
25   214.956.7161 (fax)

Electronically signed by MELODY MONK (401-154-423-4513)                    2730ceef-a5fb-4513-b275-fabcb4d25d0c